**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

----------------------------------------------------------------------X

ASHU SHUKLA, **Index No.:**

Plaintiff,

-against- **SUMMONS**

GOOGLE LLP,
DELOITTE CONSULTING LLP
Defendant.

----------------------------------------------------------------------X

***YOU ARE HEREBY SUMMONED*** to answer the complaint in this action and to serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice of appearance, on the Plaintiff's attorneys within twenty (20) days after the service of this Summons, exclusive of the date of service (or within 30 days after the service is complete if this summons is not personally delivered to you within the State of New York); and in the case of your failure to appear or answer, judgment will be taken against by default for the relief demanded in this complaint.

Dated: March 13th 2024,
New York, New York

**Yours,**
Ashu Shukla
_s_ashu shukla
Plaintiff
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143

TO:

GOOGLE LLP,
1600 Amphitheatre Pkwy,
Mountain View, CA 94043

DELOITTE CONSULTING LLP,
30 Rockefeller Plaza
New York, NY 10112

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------------------------------------------X

ASHU SHUKLA, **Index No.:**

Plaintiff,

-against-

**VERIFIED COMPLAINT**

GOOGLE LLP,
DELOITTE CONSULTING LLP,

Defendant.

-----------------------------------------------------------------------X

Plaintiff, ASHU SHUKLA (hereinafter "Plaintiff"), as and for his Complaint against defendant GOOGLE LLP ("Defendant Google"), DELOITTE CONSULTING LLP ("Defendant Deloitte"), alleges as follows:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction of the claims that arise under US Federal laws and New York laws.

2. Venue is proper because at least one of the parties resides in New York County.

3. Plaintiff ASHU SHUKLA is a resident of New Jersey and a former employee of the Deloitte Consulting LLP.

4. Plaintiff ASHU SHUKLA's profile was selected by Defendant Google. The plaintiff interview at Defendant Google, however, Defendant Google refused to hire the plaintiff.

5. Upon information and belief, Defendant DELOITTE CONSULTING LLP ("Deloitte") ("Defendant Deloitte"), is a Delaware partnership with a principal place of business at 30 Rockefeller Plaza, New York, New York

6. Upon information and belief, Defendant Google LLP (also known as "Google") ("Defendant Google"), is a foreign corporation with its principal place of business located 1600 Amphitheatre Pkwy, Mountain View, CA 94043

7. This is a civil action seeking monetary relief, compensatory damages, disbursements, costs and fees for violations of Plaintiff's rights resulting from Google Inc.'s failure to hire the plaintiff in violation of U.S. Federal laws, New York State employment laws, and retaliation.

8. Specifically, Plaintiff alleges that Defendants Google Inc. negligently, intentionally, and knowingly sought and did wrongfully deprive him of his employment, position, title, and pay through discrimination and retaliation and by failing to hire him.

9. Plaintiff also alleges that defendants intentionally, recklessly, and knowingly sought to maintain an illegal control of his federal and state civil and constitution rights, his personal liberty, his life, health, personal wellbeing, employment opportunities and willfully discriminated against him.

10. Plaintiff alleges that defendants purposefully and intentionally, violated plaintiff's civil and constitutional rights, and defendant Deloitte continued to commit other wrongful acts after termination of plaintiff's employment.

11. The alleged acts against Plaintiff were done knowingly, purposely, and with all intentions of depriving him of his right to be free of discrimination and retaliation for purposes of employment with the defendant Google Inc.

12. The Federal and State Court of New York, New York have subject matter jurisdiction, supplemental jurisdiction as well as remedial authority over this case pursuant to the various federal civil right laws, federal statutes, state law violations and common law torts.

13. This is a civil action seeking monetary relief, compensatory damages, injunctive relief, disbursements, costs and fees for violations of Plaintiff's rights resulting from plaintiff not being hired for a fulltime job opportunity by defendant, Google LLP, in violation of U.S. Federal laws, New York and/or California State laws, including employment laws.

14. The Federal and State Court of New York, New York have jurisdiction over this matter since (a) the Defendants 'Deloitte' and 'Google' maintain a place of business New York County where the Plaintiff was employed, (b) Plaintiff received a Notice of Notice of Right to Sue from the EEOC on 12/15/2023, and (c) plaintiff's claims are valid in both Federal and State courts.

15. Deloitte has continued to retaliate against the plaintiff, and such continuing violations is the basis of this complaint.

## PARTIES AND RELEVANT INDIVIDUALS

16. Plaintiff, ASHU SHUKLA, is a former employee of Defendant DELOITTE CONSULTING LLP, ("Defendant Deloitte" or "Deloitte").

17. Plaintiff, ASHU SHUKLA, applied to a fulltime employment opportunity at Defendant GOOGLE LLP ("Defendant Google" or "Google") in July 2018, and was subsequently interviewed by defendant Google

18. Defendant, DELOITTE CONSULTING LLP, is a professional services firm that provides consulting services to a wide range of clients.

19. The parent company of Deloitte Consulting LLP is Deloitte LLP. Deloitte LLP employs over 300,000 employees globally. Upon information & belief, in year 2022, Deloitte LLP had total revenues in excess of $50,000,000,000 (Fifty Billion USD)

20. Defendant, Google LLP (also known as "Google", Previously known as "Google Inc."), is a multinational technology company headquartered in Mountain View, California, that designs,

develops and owns internet search engines, internet applications, technology platforms, consumer electronics, etc. and relies on advertising for a vast majority of its revenue. Upon knowledge and belief, Google LLP employs over 120,000 employees globally.

21. The parent company of Google LLP is Alphabet Inc. Alphabet Inc employs over 150,000 employees globally. Upon information & belief, in year 2022, Alphabet Inc had total revenues of over $250,000,000,000 (Two-Hundred Fifty Billion USD).

22. On December 15th 2023, the plaintiff requested Notice of Right to Sue (NTRS) from the Equal Employment Opportunity Commission (EEOC) San Jose, CA office against defendant Google.

23. Defendants are subject to Federal laws and State laws of the State of New York.

## STATE ACTORS

24. Upon knowledge and belief, Deloitte has engaged or worked with one or more State Actors to work against the interests of the plaintiff

25. Upon knowledge and belief, Deloitte employed Mr. Austin Perez, a State Actor or an individual who engaged in conduct that otherwise may be considered as State Action, as a Deloitte talent relation professional. Mr. Perez, an attorney, worked to support the discriminatory interests of Deloitte, and conducted biased investigations. The person maintained a discriminatory animus against the plaintiff as identified later on this complaint. Upon knowledge and belief, Mr. Austin Perez worked with DOJ, law enforcement or intelligence services to support the interests of Deloitte.

26. Similarly, Upon knowledge and belief, Deloitte employed Ms. Joanna Rohde, who has continually engaged in conduct that otherwise may be considered as State Action. As a supervisor, Joanna had directed subordinates like Austin Perez to take action against the plaintiff, had actual knowledge of subordinate's violation of plaintiff's rights and acquiesced in such violations, and had acted with deliberate indifference to the consequences or had established or

maintained a policy, practice or custom which directly caused a violation (e.g. incomplete ethics violation investigation).

27. Upon knowledge and belief, Joanna's UK based friend is a Deloitte HR, engages in conduct that otherwise may be considered as State Action. Upon knowledge and belief, she has been trained by the state. In 2020, she called the plaintiff on Facetime.

28. Similarly, upon knowledge and belief, Joanna worked or collaborated with Deloitte employed State Actors in India over a long period of time. Upon knowledge and belief, such State Actors were a part of Indian intelligence service or law enforcement. The plaintiff believes that Deloitte continues to employ or work with such state actors on special projects or on contractual basis.

29. Upon knowledge and belief, a female previously working for Deloitte and Joanna Rohde, got selected into Indian Civil Services within the last 2-3 years. She was then re-hired to work for Deloitte on a special project. She has been supporting the interests of Deloitte as an Indian government person or intelligence service agent for the last 2-3 years.

30. The plaintiff has previously identified that as a Deloitte talent relations professional, Joanna Rohde, has maintained continuous surveillance over the plaintiff in order to mitigate the risks around her malicious acts. In February 2023, upon knowledge and belief, she influenced or forced several female professionals (including intelligence services or law enforcement professionals) supporting Deloitte to follow and track the plaintiff at a night club in National Capital Region, India (NCR Delhi). The event took place at the night club named "Paso" at Noida on the evening of February 18th 2023, a location with CCTV cameras installed.

31. The fact that such female professionals are State actors can be further validated from the fact that on or around February 19th 2023, the plaintiff saw the above identified intelligence services professional riding a government vehicle and following the plaintiff.

32. One can infer that multiple instances of such offenses are unlikely to be coincidental.

33. Upon knowledge and belief, as part of discovery, depositions or interrogatories, this female Indian professional has a duty to disclose the identities or government affiliations of Joanna

Rohde, her UK Colleague and the females supporting Deloitte who followed the plaintiff into the night club.

34. Joanna has worked to support the discriminatory interests of Deloitte, and as a Deloitte talent relation professional, Joanna has conducted biased investigations. Joanna has maintained a discriminatory animus against the plaintiff as identified later on this complaint.

35. Joanna intentionally and deliberately interviewed Christina more than one month after the event dated December 14th 2017 such that the CCTV images from the event could not be accessed. It can be inferred that in order to protect the interests of Financial Services Partners and herself, Joanna had a motive to ensure that Christina was interviewed only after the CCTV images from the event were automatically erased (as normal course of business).

## FACTS

36. Plaintiff ASHU SHUKLA is a 39-year-old male of Indian national heritage who suffers from serious allergies which cause anaphylactic reactions and disability when triggered.

37. Plaintiff was awarded a Bachelor's degree in Electronics and Telecommunication Engineering in 2006 from India, and a Master's degree in Information Systems in 2010 from New York University – Courant School of Mathematics and Stern School of Business. Using this education, Plaintiff has amassed over 10 years of experience in the Technology Consulting Industry.

38. Approximately 9 years into his consulting career, in October, 2016, Plaintiff was offered a position as Senior Consultant in the Defendant's New York office. After accepting the offer and clearing various background checks, the Plaintiff commenced working in December, 2016.

39. As employee for Deloitte Consulting LLP, Plaintiff enjoyed success in managing and delivering several projects where he helped the Deloitte and its clients develop and implement solutions and improvements to their businesses. He was praised for his work both by Defendant's leadership and by Defendant's clients. In 2017, the Plaintiff was also honored with the Deloitte US Consulting Business Solution Award after winning a cross Deloitte Consumer & Industrial

Products (C&IP) practice solution competition Honors award on Consumer Product ideation challenge.

40. Before the plaintiff was diagnosed of his medical condition / disability in April 2017, Plaintiff got good performance reviews, and was liked by defendant Deloitte leaders and clients. In April 2017, plaintiff received good performance review for his client work at Citibank, and was appreciated by both Deloitte Leader, Sr. Manager Jintae Lee, and Citibank Leader Sr. Director Thomas Reynolds.

41. Similarly, Plaintiff's performance was liked by Deloitte leaders, clients and colleagues. (a) In June - July 2017, plaintiff was appreciated for his client work at Pfizer by both Deloitte leader, Aditya Kudumala, Partner Deloitte Consulting LLP and Patrick McBrearty, Sr. Manager Deloitte Consulting LLP, and Pfizer leader Sr. Director Jerry Whaley. (b) As a matter of fact, plaintiff used his Pfizer project experience to create several firm eminence materials, and got a good performance review for all those firm eminence materials by Deloitte Leader Sr. Manager Sriram Ramamurthy. (c) In addition, in Aug – Sept. 2017, plaintiff was appreciated and recommended by his Deloitte Leader, Ryan Hoffmeister, Director Deloitte Consulting LLP, based on plaintiff's knowledge in the field and his work at client Celgene. (d) Plaintiff's good performance was also verified by Deloitte Leader, Robert Kennedy, Sr. Manager Deloitte Consulting LLP.

42. On February 23rd 2018, the above project performances and referrals were also verified by two Deloitte female managers, Aditi Shankar and Rushika Patel, both Managers, Deloitte Consulting LLP, who confirmed plaintiff for another project at Citibank, and who at the time, were not negatively influenced by Deloitte Human Resource professionals. However, plaintiff was given a poor performance rating for the 2017-18 performance cycle in spite of his good performance.

43. In addition, Plaintiff was liked and appreciated by his male colleagues. For performance year 2017-18, plaintiff got great appreciation on his internal firm contribution projects. (a) Shynish Maru, Manager, said "*plaintiff contributed significantly on the client RFP*" (b) Wout Vandegaer, Sr. Manager, said *plaintiff was a driver and contributor* (c) Jamil Siddiqui, Specialist Leader, said "*plaintiff worked well, collaborated with team effectively*" and "*helped create critical time sensitive RFP response*" (d) Kartik Nagaraja, Sr. Manager, in Feb. 2018 said "*plaintiff had made significant impact on couple of client proposal responses they had been working on", "Kartik is*

*actively trying to staff the plaintiff on a project*" and *"Plaintiff was a great add to the team, he was able to single handedly manage RFP drafts, own his pieces and deliver upon them"* (e) Kathick Kannan, Specialist Master, said plaintiff was "*very quick in understanding the needs, even though the proposal that we were working is not his expertise*" (f) Sriram Ramamuthy said plaintiff had *"Good understanding of subject matter and ability to follow-through",* and *plaintiff "did a good job of collating use cases and quals from various clients for analytics and cognitive workshops at multiple LS clients".*

44. However, plaintiff was given a poor performance rating for the 2017-18 performance cycle by female members of defendant human resource department, Joanna Rohde and Brenda Arenda, in spite of his good performance. Defendant Deloitte knowingly and wantonly issued the plaintiff a false negative performance rating, a false non-discriminatory reason for adverse action, after the plaintiff was diagnosed of his medical condition / disability in April 2017. Plaintiff was treated differently than similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, who were not discriminated based on their medical condition / disability and were given a good performance rating for their work.

45. Plaintiff was also liked and appreciated by his Junior and Senior female colleagues (a) Danica Devito, Campus Placement Officer, *invited the plaintiff to present an information session* on Deloitte's behalf at *Duke University Management school*, (b) Morgan Carlon, Manager, and Megan Gorges, Business Analyst, *praised plaintiff's work ethics*, (c) Lydia Schffield, Business Analyst, said "*she really enjoyed working with the plaintiff*", (d) Shelly Rescober, Sr. Manager, said "*it was nice working with the plaintiff*", (e) Aditi Shankar and Rushika Patel, Managers, who thoroughly *checked all of plaintiff past project performances and references* on February 23rd 2018 said '*it was great to have the plaintiff onboard and they look forward to working with plaintiff*', (f) Karma Porter, Fanzi Mao Pitzer, Tanya Srivastava said *they really liked working with the plaintiff*, (g) plaintiff was appreciated by Shruti Nayyar, Manager, *for work at Client Takeda commercial data governance pursuit.* However, in Nov. 2018, plaintiff was terminated by the defendant in spite of his good recommendations and appreciations by female colleagues.

46. Similarly, after the defendant learned about plaintiff's medical condition / disability, and the malicious sexual harassment allegations against him in early 2018, Plaintiff's performance was

liked by defendant leaders, clients and colleagues. (a) In July and Aug. 2018, plaintiff was praised for his work at Client Bausch Health by Deloitte Leader Peter Harbin, Director Deloitte Consulting and Anand Sairam Sr. Manager Deloitte Consulting, and client Leader Chandra Miranda, Sr. Manager Bausch Health. (b) In Aug. 2018, plaintiff was appreciated by Ball Corporation Client Leader, Kristian Guerrero, Manager. However, in Nov. 2018, plaintiff was given a bad performance rating, and terminated by the defendant for performance reasons in spite of his good recommendations and appreciations by Deloitte and Client Leadership.

47. The Plaintiff has alleged that his claims for retaliation, and discrimination based on his disability, gender, national origin and race are intertwined. In year 2017 of his employment with Deloitte, the Plaintiff received good performance rating until the defendant became aware of his disability / medical condition.

48. The facts stated below clearly identify facts that after learning about plaintiff's disability / medical condition in 2017, after learning about the a sexual harassment complaint by a 62-year old female employee (almost double the plaintiff's age) in early 2018, after learning about the assignment of disproportionately heavy work assignment with racial bias in early 2018, the firm Deloitte Consulting assigned the plaintiff projects that were outside of plaintiff's core industry experience and expertise, removed him from multiple projects and changed his project responsibilities that were so significant as to constitute a setback in plaintiff's career.

## I. Discrimination based on Medical Condition / Disability

## Discrimination by Deloitte based on Plaintiff's Medical Condition / Disability

49. On December 14, 2017, Plaintiff attended a Deloitte year-end event where alcohol was served to all attendees. After drinking one-and-half of the alcoholic drinks served to him, the Plaintiff suffered a serious anaphylactic reaction, where he remembers feeling a choking sensation caused by his throat swelling shut and began to lose consciousness. The Plaintiff does not remember the events after that. That night, he vaguely remembered, two Deloitte partners had carried him to a hotel.

50. The following morning, the Plaintiff reported the events of the prior evening and his condition to one of the Deloitte Partners, Michael Fernandez, who had carried him to a hotel, by both email and phone. Michael first contacted the Plaintiff over email. In the morning, Plaintiff continued to suffer breathing difficulty, experienced itchy throat and observed rashes and hives on his body.

51. Eight months before the event, in New York, the Plaintiff was tested and diagnosed with potentially life-threatening allergies that could result in anaphylaxis, a condition for which the Plaintiff was prescribed an EpiPen. Upon information and belief, the drinks and food served and consumed contained allergens which triggered an allergic reaction in the Plaintiff, rendering him temporarily disabled.

52. On around December 18, 2017, three days after Plaintiff's anaphylactic reaction, Plaintiff was advised that he would no longer be sent to work on the JP Morgan project in the UK. Although the Plaintiff had already purchased a plane ticket and obtained his visa to travel, the project leader told him that she was getting "pressure from above" not to put him on the project. The project leader also accused the plaintiff of buying an airplane ticket without her approval, when in-fact the air-ticket was a requirement placed by the UK consulate to obtain a visa and the same was discussed with the project leader.

53. Soon thereafter, it became apparent that the Defendant did not want to assign the Plaintiff to any projects and intentionally sent the Plaintiff to client interviews for which he was destined not to be hired due to lack of relevant experience. For instance, approximately a week after learning that he would not work on the JP Morgan project, the Plaintiff was asked to interview at a client on leading Data Governance training project for 40,000+ employees globally. Since the Plaintiff had no experience in this domain, he was not assigned to the project. Similarly, the Defendant asked the Plaintiff for project that required deep knowledge of health care industry which the Plaintiff did not have. Upon information and belief, Plaintiff was singled out due to his medical condition and treated differently from other employees in this regard. In fact, Plaintiff was treated differently than he had been treated before the Defendant became aware of his medical condition and disability. Never before had he been sent to interview for projects he was not qualified for.

54. Due to his serious allergic reaction and temporary disability caused when the allergy is triggered, Plaintiff was singled out and treated differently from similarly situated employees who did not suffer from life-threatening allergies or disabilities. Upon information and belief, similarly situated employees who did not suffer from life- threatening allergies or disabilities did receive bonuses for their work and were not harassed on an ongoing basis by their supervisors.

55. In around February, 2018, the Plaintiff took part in firm-wide ethics, integrity and compliance training. Based on the training he received, he reported an observed misbehavior from his previous project leadership to Human Resources (HR). Specifically, on his written complaint, the Plaintiff reported that, he was assigned the workload of two fulltime employees. On this particular project, the plaintiff was threatened against raising such issues with supervisors in higher positions and learned it would 'obviously result in a bad rating', he faced unprofessional treatment by his supervisor and finally was removed from the project by his immediate supervisors.

56. When Plaintiff appeared for a meeting regarding his report to Deloitte Partner Deborshi Dutt and Brenda Arends of HR on February 16th 2018, HR showed no interest in the matter reported but instead wrongly accused the Plaintiff of being inebriated on two (2) different occasions and asked the Plaintiff to sign a Letter of Reprimand admitting he was inebriated on two (2) separate events on two (2) different dates otherwise his employment would be terminated.

57. Brenda Arends further advised that if the Plaintiff did not sign the Letter within two (2) days, his employment would be terminated. On the same phone call, the Deloitte Partner Deborshi Dutt told the Plaintiff "we are watching you" and "there will be consequences to such actions". Plaintiff did not sign the letter and, instead, produced multiple witnesses to confirm that he was sober at the other event and of his underlying medical condition.

58. During the course of next several months, various Deloitte supervisors began harassing the Plaintiff regarding his anaphylactic reaction by mocking him. For example, on August 27th 2018, on the evening of the day when Deloitte declared Bonus payouts to employees, a Deloitte Consulting Sr. Manager, Sriram Ramamurthy, called the Plaintiff, mocked him for not getting any bonus, inquired multiple times about Plaintiff's lack of bonus, and harassed the Plaintiff by

suggesting that he would be released from the client project the Plaintiff had been working on. Four (4) days later the Plaintiff was, in fact, released from the project.

59. On or about August 30th, 2018, Brian Zhong, Sr. Manager, Deloitte Consulting, in spite of the Plaintiff's fantastic project work which secured great appreciation from the client, acted with hostility towards Plaintiff, falsely claiming that he observed 'gaps and empty spaces' on the Plaintiff's near perfect work and that the Plaintiff's performance deteriorated when he heard he was not getting any bonus for his last year's work. Five weeks after joining the Ball Corporation project, Brian Zhong released the Plaintiff from the project, admitting to the Plaintiff that he was getting pressure from the Partner and HR to release the Plaintiff from the project.

60. Defendant Deloitte continued to single out, discriminate against and harass the Plaintiff throughout 2018. Upon information and belief, the Defendant carried out an ongoing scheme to intimidate, harass and force the Plaintiff out of the company because Defendant knew it would be illegal to terminate the Plaintiff based upon his medical condition and temporary disability which occurred when his allergies were triggered. Upon information and belief, Defendant did not want to continue to employ Plaintiff due to his life-threatening allergies but, instead, sought to retaliate against the plaintiff for defending himself with proof of his medical condition.

61. In September and October 2018, the Plaintiff's submitted his profile for various client projects on the internal job portal, but his Resource Manager (RM) kept closing his project role submissions requests citing - 'Position Closed, Not selected'. Upon information and belief, Plaintiff was singled out and treated differently than similarly situated employees who did not suffer from life threatening allergies. Upon information and belief, the project role submission requests submitted by other similarly situated employees who did not suffer from allergies were not immediately closed.

62. Thus, plaintiff's project opportunities were limited by the defendant, and he was pushed to choose projects that were outside of his skill-set and expertise like the Kaiser Permanente project. Plaintiff came to understand that these assignments with no formal training, and outside of expertise, were specifically meant to target the plaintiff making his assignments, ability to achieve and prove good results more difficult. Upon information and belief, similarly situated

employees who did not suffer from allergies were not assigned projects for which they did not have industry experience or formal training, or were outside of their skillsets.

63. Defendant Deloitte ultimately terminated the Plaintiff's employment over email on November 5th 2018 while the Plaintiff was on a sick leave with his three-week paid time leave starting the next day.

64. After termination, Defendants continued to harass the Plaintiff by intentionally revoking his access to Deloitte's transition website where the Plaintiff could apply for jobs at other firms. Upon information and belief, he was treated differently than similarly situated former employees who did not suffer from life threatening allergies and whose transition website access was not removed by the defendant.

### 1.1 Deloitte had access to Plaintiff iPhone

65. After joining Deloitte, as part of Deloitte's corporate phone policy, plaintiff enrolled his personal smart phone (iPhone) number (ending in *6143) into his employer Deloitte Consulting LLPs corporate phone network.

66. After the plaintiff transferred his Phone into Deloitte supported phone network, Deloitte Consulting LLP required the plaintiff to install various applications. The installation of such applications required plaintiff's iPhone password.

67. The plaintiff complied with Deloitte corporate policy and allowed Deloitte to install applications which required iPhone administrator password or root access. The plaintiff provided his iPhone passcode for such installation.

68. Since plaintiff's iPhone was tied to an enterprise environment, Deloitte was be able to set up accounts and other items on plaintiff's iPhone by installing a configuration profile. Configuration profiles let Deloitte administrator set up plaintiff's iPhone to use the information systems at Deloitte. For example, per information provided by iPhone manufacturer Apple on their website,

a configuration profile might set up an iPhone to access the Microsoft Exchange servers at work, so iPhone can access your Exchange email, calendars, and contacts.

69. In addition, a configuration profile can configure many different settings on an iPhone. For example, a configuration profile can set up an Microsoft Exchange account, VPN account, and certificates for secure access to your company's network and information. A configuration profile can also turn on Passcode Lock, which requires the device owner to create and enter a passcode in order to use iPhone.

70. Upon knowledge and belief, Deloitte administrator distributed configuration profiles by email, or by installing them directly on the plaintiff's iPhone through applications which required administrator access.

71. Upon knowledge and belief, Deloitte network administrator or actors supporting Deloitte installed profiles on plaintiff's iPhone device that that tied plaintiff's iPhone to a Deloitte's mobile device management server. This allowed Deloitte to administrator or configure plaintiff's phone settings remotely, and allowed the actors to access plaintiff's personal email, call and message data.

72. Upon knowledge and belief, after Deloitte learnt about plaintiff's disability / medical condition, Deloitte maintained a continuous surveillance over plaintiff's phone communications.

73. Upon knowledge and belief, Deloitte accessed or acquired plaintiff's personal emails, messages, calendar, phone logs, call records etc. through such applications, access or covert means.

74. Upon knowledge and belief, supported by testimonies provided on the Federal court docket, Deloitte had the ability to image or clone a Phone, or have realtime access to Phone communication and data through such applications or access.

75. Such abuse of technology allowed Deloitte access plaintiff's personal data, including his personal phone calls, mails and messages to his relatives or relationships, plaintiff's real-time

location and travel within the United States, and his personal communications or interviews with other corporations.

76. Deloitte specifically gained access to plaintiff's regular and frequent phone communications and messages with his then girlfriend, Dr. Niti Aggarwal, a Cardiology graduate from Mayo Clinic, MN, working as a Cardiologist at University of Wisconsin, Madison. This information was specifically valuable to Deloitte because Deloitte knew that the plaintiff suffered from a disability / medical condition, and Dr. Niti Aggarwal could stand against the interests of Deloitte as a Physician and a witness to plaintiff's condition.

### 1.2 Discrimination against Dr. Niti Aggarwal in coordination with Deloitte

77. The Plaintiff has known Dr. Niti Aggarwal from year 2016. Prior to meeting the plaintiff, Dr. Niti Aggarwal graduated from top Medical School in the US, and attended the highest ranked hospital in the United States for her Residency in Medicine and Fellowship in Cardiology.

78. Prior to joining University of Wisconsin, Madison, as a Cardiologist, Dr. Niti Aggarwal demonstrated consistent academic and professional excellence.

79. Upon knowledge and belief, Dr. Niti first completed her undergraduate degree in Minnesota with flying colors, and was then selected by a top Medical School, University of Minnesota, for Medicine (M.D.).

80. Dr. Niti Aggarwal was then selected by Mayo Clinic for her Residency in Internal Medicine. Upon knowledge and belief, Mayo Clinic is the top most ranked (rank #1) hospital in the United States for Residency in Internal Medicine. *Note*: Specialized training in the form of "Residency" is required for Physicians who wish to practice in the US. To receive US Medical Board accredited status in a specialty of Medicine known as Internal Medicine, a Physician needs to complete three years of specialized training known as "Residency".

81. Dr. Niti Aggarwal then competed with thousands of US Medical Board accredited and certified Physicians in the United States, and was selected by Mayo Clinic for her Fellowship in

Cardiology. Upon knowledge and belief, Mayo Clinic is ranked #1 in the United States for Fellowship in Cardiology. Dr. Niti Aggarwal's special interests include Cardiac and vascular computed tomography, Cardiac and vascular magnetic resonance, Echocardiography and Nuclear Cardiology.

82. Dr. Niti Aggarwal was not only qualified for her job and skilled at all times, Dr. Niti Aggarwal demonstrated professional excellence in her work. Dr. Niti Aggarwal was professionally trained by the best institutions and by the best professionals in the United States.

83. University of Wisconsin is a Deloitte client or customer. Upon knowledge and belief, during years 2017 through 2023, defendant Deloitte regularly pitched their business to University of Wisconsin, and provided continued professional services to University of Wisconsin at Madison. Moreover, Deloitte had significant affiliation with University of Wisconsin, with several Deloitte Partners who had graduated from the University.

84. Specifically, after the plaintiff filed his ethics and integrity complaint at Deloitte, Dr. Niti Aggarwal, Cardiologist at University of Wisconsin, Madison, was falsely accused of same, similar or repetitive discriminatory themes on or around same or similar time by her employer, the Hospital of University of Wisconsin, Madison. Around the same time the plaintiff also provided witnesses as evidence against Deloitte's Letter of Reprimand, and the plaintiff briefed Deloitte Leaders from plaintiff's Business Unit that he had suffered a medical issue on December 14th 2017 event.

85. The timing and sequence of events, combined with the details of the allegations made against the plaintiff and Dr. Niti Aggarwal, suggest that the events are unlikely to be coincidental. It may be inferred that in order to maintain an illegal control over the plaintiff and his rights, Deloitte targeted plaintiff's girlfriend, Dr. Niti Aggarwal, by extending their discriminative and retaliatory influence to her employer.

86. The fact that information on plaintiff's confidentially filed ethics and integrity complaint was leaked to accused employees, Ms. Ashley Scorsatto and Mr. Binu Janardhanan can be further substantiated by three facts as identified below, namely (a) timing and sequence of

discriminatory events, (b) similarity of vindictive allegations, and (c) targeted attacks to malign the image of plaintiff and Dr. Niti Aggarwal.

87. First, in early February 2018, the plaintiff filed his ethics complaint. Immediately one hour after the plaintiff submitted his ethics complaint on the Deloitte Talent Relations website, Sr. Manager and Supervisor Sriram Ramamurthy pinged the plaintiff on skype enquiring the names of plaintiff's project supervisors who the plaintiff raised issue against. The plaintiff provided him with names of Ashley Scorsatto and Binu Janardhanan.

88. Subsequently thereafter, Dr. Niti Aggarwal was discriminated and falsely accused by her employer as identified below, and Deloitte Sr. Partner and HR Professional issued a malicious letter of reprimand threating the plaintiff with termination.

89. After the plaintiff provided witnesses as evidence against Deloitte's Letter of Reprimand, and after the plaintiff briefed Deloitte Leaders from plaintiff's Business Unit about his medical condition, the malicious, baseless and unreasonable allegations which appeared on Deloitte's incomplete or inconsistent investigation with Ms. Ashley Scorsatto, reappeared through the employer of plaintiff's girl-friend, Dr. Niti Aggarwal.

90. Specifically, after the plaintiff provided witnesses as evidence against Deloitte's Letter of Reprimand, and after the plaintiff briefed Deloitte Leaders from plaintiff's Business Unit about his medical condition, Dr. Niti Aggarwal, Cardiologist at University of Wisconsin, Madison, was falsely accused of same, similar or repetitive discriminatory themes on or around same or similar time by her employer.

91. The timing and sequence of events suggests, combined with the details of the allegations, suggest that the events are unlikely to be coincidental. It may be inferred that in order to maintain an illegal control over the plaintiff and his rights, Deloitte targeted plaintiff's girlfriend, Dr. Niti Aggarwal, by extending their discriminative and retaliatory influence to her employer.

92. Second, specifically, the accused employees on plaintiff's ethics complaint, in coordination with Deloitte Human Resource Professionals, falsely accused the plaintiff of "not being liked by the

Client or his teammates", when in-fact, Sr. Client Leaders continued to attend every meeting led by the plaintiff, continued to praise plaintiff's work and efforts on those meetings, continued to pay Deloitte thousands of Dollars for Plaintiff's Work. Similarly, plaintiff's teammates organized a release party on plaintiff's project release at a prestigious venue in Atlanta, and accused supervisors repeatedly enquired whether the plaintiff would be able to attend the event. The plaintiff was not able to attend the event due to his allergies and next project assignment discussion calls.

93. Similarly, Dr. Niti Aggarwal's supervisors and human resource professionals at University of Wisconsin, Madison, falsely accused Dr. Niti Aggarwal on same or similar discriminatory themes, on or around same or similar time. Specifically, Dr. Niti Aggarwal was falsely accused on not being liked by her junior fellows or residents, when in-fact, her junior fellows or residents repeatedly showed their eagerness to work with her, praised her professional abilities and inter-personal skills, and would inform her if they knew about any concern

94. Similarly, six-months later, close to plaintiff's termination in November 2018, Deloitte in their internal notes falsely accused that the plaintiff '*wasn't able to get along with his team*'. However, before falsely accusing the plaintiff, the Deloitte supervisors failed to consider the fact that the plaintiff did not even get a chance to meet his team, as he was released from the project while on-boarding and before he could actually start working at the client location. In order to baselessly accuse the plaintiff and build immunity against their discriminatory acts against Dr. Niti Aggarwal, Deloitte females overlooked the fact that the plaintiff in-fact received more than ten positive recommendations or praises from female colleagues in different projects. These team members liked working with the plaintiff, and the plaintiff was able to get along with them and his team.

95. The sequence and timing of the events is important because during the same or similar time, Deloitte targeted the plaintiff and discriminated against him on the basis of his disability / medical condition, gender, race and national origin as identified on this complaint. The temporal proximity of the discriminatory events, combined with the Pattern of discrimination indicate that both Deloitte and University of Wisconsin were motivated to limit the civil and constitutional rights of the plaintiff and Dr. Niti Aggarwal, and were motivated to create baseless or false

acquisitions which would help them both cite defense and limit liability in case of a potential claim or lawsuit.

96. Deloitte was specifically motivated to target the plaintiff and Dr. Niti Aggarwal, because of the nature and extent of plaintiff's discrimination and Whistle Blower allegations. Upon knowledge and belief, given the numerous stakeholders involved, it may be inferred that Deloitte must have done a cost benefit analysis, and must have estimated that if plaintiff were to expose the malicious, improper and discriminatory behavior of Deloitte, including its Leaders, Partners and HR Professionals, the costs of such damage (in terms of loss of reputation, lawsuits, liability, etc) would easily surpass any positive benefits earned by keeping the plaintiff or Dr. Niti Aggarwal employed without any defense.

97. Dr. Niti's White Supervisor, was a Physician Cardiologist and a decision maker in adverse employment actions against her. Since his discriminatory acts against Dr. Niti were repetitive and targeted, and since similarly situated White employees did not face such discrimination or retaliation by Dr. Niti's White Supervisor, one can infer that Dr. Niti's supervisor harbored prejudice and held racial animus against her.

98. Upon knowledge and belief, Witness Dr. Niti Aggarwal, MD was similarly situated to Dr. Zach Goldberger, MD at University of Wisconsin, Madison. For the years 2014-2018, Dr. Niti Aggarwal and a similarly situated employee, Dr. Zach Goldberger, a White Male Cardiologist at University of Wisconsin, Madison, performed similar work consisting of the same or similar duties including, but not limited to Patient Consultation and Examination, requesting and interpreting diagnostic testing to access heart functions, including Electrocardiogram, Echocardiogram, Stress Tests, etc, requesting and interpreting cardiac medical imaging including MRIs, X-Rays, CT scans, patient diagnostic and treatment planning, collaborating with other medical providers or medical staff, teaching and mentorship to fellows or residents about cardiovascular medicine, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment and in the same geographic location. Dr. Niti Aggarwal was subject to the same standards of governing performance evaluation and discipline as Dr. Zach Goldberger.

99. Upon knowledge and belief, Dr. Zach Goldberger was not in a relationship with a person ("his Partner") who was a foreign national and worked for Deloitte Consulting LLP on H1B visa just like the plaintiff, and Dr. Zach Goldberger or his relation did not suffer from life-threatening allergies or disabilities similar to the plaintiff.

100. Upon knowledge and belief, just like the plaintiff, Dr. Niti Aggarwal was singled out and treated differently from similarly situated white employees who were not falsely accused on similar themes, like not being liked by her clients or colleagues.

101. Upon knowledge and belief, Dr. Niti's White colleagues or their girl-friends, spouses, or Partners did not file an ethics and integrity violation report with their employers and were not assigned disproportionately heavy workload by their employer, just like the plaintiff.

102. Upon knowledge and belief, Dr. Niti's White colleagues were neither tracked through the cell phone of their Partners, nor retaliated or discriminated by their employers. In addition, they were neither released from multiple projects, nor retaliated or discriminated by their employer on the basis of their national origin-based visa limitations.

103. Third, furthermore, Dr. Niti Aggarwal's employer further created a hostile work environment against Dr. Niti based on her race, and continued to further target her in the months August through October 2018. The discriminatory acts of Dr. Niti Aggarwal's employer, including repetitive verbal and written false allegations by her White Supervisor, were so oblique, vicious, venomous or vindictive that Dr. Niti Aggarwal resigned from her job on or around the end of October 2018.

104. The sequence and timing of the events is important because during the same or similar time, Deloitte targeted the plaintiff and terminated his employment as alleged on his employment complaint. The temporal proximity of the discriminatory events, combined with the Pattern of discrimination indicate that both Deloitte and University of Wisconsin were motivated to limit the civil and constitutional rights of the plaintiff and Dr. Niti Aggarwal, and were motivated to create baseless or false acquisitions which would help both cite defense and limit liability in case of a potential claim or lawsuit.

105. In order to create defense on their discriminatory and retaliatory acts against Dr. Niti Aggarwal, and negate the possibility that Deloitte coordinated and conferred with Human Resource Professionals at University of Wisconsin, Madison, Deloitte went one step further to establish that they were motivated to use nefarious means to create defense around plaintiff's Ethics and Integrity violations.

106. Specifically, upon knowledge and belief, Deloitte maliciously attacked Dr. Niti Aggarwal by assigning her negative and biased online reviews. Such discriminatory reviews and negative patient testimonies appeared after Dr. Niti Aggarwal resigned from her work.

107. Upon knowledge and belief, Deloitte employs state actors with significant ability or skill to manipulate online reviews, and used one such employee named Mr. Austin Perez to target Dr. Niti Aggarwal. Mr. Austin Perez's motivation is evident because he incorrectly paraphrased the plaintiff and misrepresented plaintiff's statements on his ethics and integrity complaint investigation.

108. Deloitte sabotaged Dr. Niti's online reviews to fraudulently cite a defense that Dr. Niti was not liked by her patients, which is contrary to the fact that she has treated and is liked by thousands of Heart Patients in the United States, and is a top Cardiology Fellow and Graduate from the number one (#1) ranked Medical Center in the United States, Mayo Clinic.

109. A falsely concocted theme may state that Dr. Niti Aggarwal was not liked by her resident colleagues, whereas, in reality, Dr. Niti was adored by her resident colleagues. Thus, a false allegation concocted under a false pretext or under the influence of a biased or discriminatory supervisor cannot or should not negate the strong positive opinion or response of the many. The fact that Dr. Niti's employer created a hostile work environment against her to the point she resigned from her job, and the temporal proximity of her resignation followed by plaintiff's termination within one week, strongly suggest that Dr. Niti was wrongly targeted by her employer under the guidance of Deloitte Leaders and HR Professionals.

110. Deloitte was specifically motivated to target the plaintiff and Dr. Niti Aggarwal, because of the

nature and extent of plaintiff's discrimination and Whistle Blower allegations. Upon knowledge and belief, given the numerous stakeholders involved, it may be inferred that Deloitte must have done a cost benefit analysis, and must have estimated that if plaintiff were to expose the malicious, improper and discriminatory behavior of Deloitte, including its Leaders, Partners and HR Professionals, the costs of such damage (in terms of loss of reputation, lawsuits, liability, etc) would easily surpass any positive benefits earned by keeping the plaintiff or Dr. Niti Aggarwal employed without any defense.

111. After the plaintiff started his employment at Deloitte in 2016, the plaintiff moved his personal cell phone ending with *6143 into Deloitte's network. The plaintiff was required to install Deloitte applications on his cell phone per Deloitte's firm policy. During his employment at Deloitte, the plaintiff maintained just one cell phone, and made all communications through his cell phone ending with *6143.

112. Specifically, Deloitte required the plaintiff to grant root or administrative access to his cell phone, such that the firm may install Deloitte Applications on plaintiff's smartphone. Upon knowledge and belief, Deloitte tracked or maintained surveillance over plaintiff's phone communications through such installed Deloitte applications, through Deloitte's phone network provider, or by imaging plaintiff's phone as identified below.

113. Previously, the firm and its employees have acknowledged on the Federal court docket that the firm has the ability to constantly or continually monitor phone communications including text messages from the devices enrolled on their network, and also have the ability to "image or clone such devices".

114. In 2017 and 2018, after the firm learned about plaintiff's disability and whistle blower allegations, the firm readily tracked plaintiff's frequent messages and communications with Dr. Niti Aggarwal made through his cell phone ending in *6143, and targeted Dr. Niti Aggarwal first to maintain an illegal control over the plaintiff or to negatively influence the plaintiff, and later to threaten the plaintiff not to expose the malicious and fraudulent practices of Deloitte Leaders and supervisors.

115. After plaintiff's termination, Deloitte continued to track plaintiff's communications. In year 2020, the plaintiff identified a 150-page iPhone code, specially inserted into plaintiff's computer and iPhone. Upon knowledge and belief, the code was inserted by Deloitte HR Joanna Rohde to modify, intercept or track plaintiff's communications. The 150-page iPhone code has been provided as public record on the district court docket (id) (see 1:19-cv-10578-AJN).

116. Deloitte, Joanna Rohde and her female colleagues have readily used tools to track, intercept or continually monitor plaintiff's online and phone communications, specially to gain a foresight on plaintiff's court filings, and specially to gain a foresight on the sexual services allegations or claims raised by the plaintiff.

117. At all times the Deloitte CEO, Executive Chair and Board of Directors were aware that Deloitte Leaders and Deloitte Human Resource Professionals can coordinate with other employers, and influence such employers to target or discriminate against a spouse, partner or girl-friend of a Deloitte employee. Since Deloitte earns an annual revenue in excess of $50 Billion, Plaintiff's allegations suggest or provide an inference that at all times Deloitte Leaders and Human Resource Professionals had the political and/or financial means to maliciously influence such employers, and target innocent individuals like Dr. Niti Aggarwal.

118. The sequence and timing of the events is important because during the same or similar time, Deloitte targeted the plaintiff and discriminated against him on the basis of his disability / medical condition, gender, race and national origin as identified on this complaint. The temporal proximity of the discriminatory events, combined with the Pattern of discrimination indicate that both Deloitte and University of Wisconsin were motivated to limit the civil and constitutional rights of the plaintiff and Dr. Niti Aggarwal, and were motivated to create baseless or false acquisitions which would help them both cite defense and limit liability in case of a potential claim or lawsuit.

119. Deloitte was specifically motivated to target the plaintiff and Dr. Niti Aggarwal, because of the nature and extent of plaintiff's discrimination and Whistle Blower allegations. Upon knowledge and belief, given the numerous stakeholders involved, it may be inferred that Deloitte likely performed a cost benefit analysis, and must have estimated that if plaintiff were to expose the

malicious, improper and discriminatory behavior of Deloitte, including its Leaders, Partners and HR Professionals, the costs of such damage (in terms of loss of reputation, lawsuits, liability, etc) would easily surpass any positive benefits earned by keeping the plaintiff or Dr. Niti Aggarwal employed without any defense.

120. In 2018, on her quick visit to the bathroom, Dr. Niti kept her patient notes and cellphone in the Women's bathroom counter. However, to her dismay, during her call, her patient notes and cell phone were stolen and misplaced by another malicious female actor working at University of Wisconsin. It took more than 45-mins to locate her stolen device and patient notes. Such discriminatory or retaliatory acts by University of Wisconsin, Madison, jeopardized patient safety during critical hours when a physician is on call.

121. Specifically, after the plaintiff filed his ethics and integrity complaint, Dr. Niti Aggarwal, Cardiologist at University of Wisconsin, Madison, was falsely accused of same, similar or repetitive discriminatory themes on or around same or similar time by her employer. Around the same time the plaintiff also provided witnesses as evidence against Deloitte's Letter of Reprimand, and the plaintiff briefed Deloitte Leaders from plaintiff's Business Unit that he had suffered a medical issue on December 14th 2017 event.

122. The timing and sequence of events, combined with the details of the allegations made against the plaintiff and Dr. Niti Aggarwal, suggest that the events are unlikely to be coincidental. It may be inferred that in order to maintain an illegal control over the plaintiff and his rights, Deloitte targeted plaintiff's girlfriend, Dr. Niti Aggarwal, by extending their discriminative and retaliatory influence to her employer.

123. Since plaintiff was a fulltime employee of Deloitte and Dr. Niti Aggarwal was plaintiff's girlfriend working for another institution, a similar comparison can be drawn between Deloitte fulltime employees, including Supervisors and Leaders, and their female girlfriends, domestic partners or spouses.

124. Since both the plaintiff and Dr. Niti Aggarwal were targeted by Deloitte, it can be inferred, in part, that Dr. Niti Aggarwal was targeted because of underlying protected characteristics or

factors of one or more Deloitte employees like Pregnancy, or underlying protected characteristics or factors of their female girlfriends, domestic partners or spouses.

125. Deloitte and Joanna knew that the circumstances substantially favored the plaintiff on the sexual harassment issue identified by Christina Young. However, the very fact that the plaintiff suffered a disability based on a medical condition, the fact that plaintiff's girlfriend was a physician and could potentially help the plaintiff, the fact that plaintiff's girlfriend was related to an Indian Legend, and the fact that the plaintiff's was helped by multiple Deloitte Partners for his disability event, persuaded White Caucasian female HR and Deloitte Talent Relation Manager Joanna Rohde, who continually engaged in conduct that otherwise may be considered as State Action, to involve or engage state actors to maintain a surveillance over the plaintiff.

126. Specifically, after the plaintiff identified his disability / medical condition, Deloitte employees and State actors supporting Deloitte maintained a surveillance over the plaintiff's and his employment at Deloitte. Upon knowledge and belief, in order to ensure that the interest of Deloitte financial services partners remained preserved, they identified all the possibilities under which a litigation would be possible with the firm.

127. Such possibilities included litigation based on underlying protected characteristics or factors of one or more Deloitte employees, or underlying protected characteristics or factors of their female girlfriends, domestic partners or spouses, and include pregnancy as an important factor.

128. Specifically, Deloitte knew that the plaintiff worked or was employed in market conditions with pregnant individuals, be it pregnant Deloitte supervisor or colleagues, or pregnant spouses, domestic partners or girlfriend of such supervisors or colleagues. Based on the work, involvement or actions of such individuals on plaintiff's projects or employment at Deloitte, Deloitte knew that the plaintiff and Dr. Niti Aggarwal were competing in a market environment that would allow or provide them with a direct factual basis to make or file a claim against Deloitte.

129. Deloitte has till date failed to identify with particular specificity the pregnant individuals, be it pregnant Deloitte supervisor or colleagues, or pregnant spouses, domestic partners or girlfriend of such supervisors or colleagues.

130. Specifically, the pregnant spouses, domestic partners or girlfriend of such Deloitte supervisors or colleagues is important because as per Deloitte policy, such Deloitte Supervisors or Colleagues get preferential treatment from Deloitte Supervisors in the form of preferred project assignments, preferred work locations, preferred timings or accommodations upon requests, additional benefits such as leave, etc.

131. Upon knowledge and belief, given Deloitte's liberal maternal or pregnancy related policies, based on the facts and inferences identified on this complaint, Deloitte female HR professionals have shown an inclination to abuse such policies to cover their own malicious acts under the pretext of supporting the interests of the firm and the pregnant individual. That is, one may infer that in order to support the interests of one such female, or indirectly support their own interests, Deloitte HR professionals may coordinate with another female to bring about a preferred action.

132. In addition, based on intertwined factors such as plaintiff's disability, ethics and integrity complaint, plaintiff's Deloitte knew plaintiff and Dr. Niti Aggarwal were competing in a market environment which would allow or provide the plaintiff with multiple factual basis, reasons or inferences to make or file a claim against Deloitte. It can be inferred that Deloitte ascertained for itself that continuing to employ the plaintiff and/or Dr. Niti Aggarwal (at her employer) without any legal basis (either lawful reason based on misconduct, or a non-discriminatory reason) for adverse action, would be less favorable or economically less viable than providing continued employment to them.

133. Thus, Deloitte first decided to target both the plaintiff and Dr. Niti Aggarwal with false discriminatory reasons for adverse actions, such that they cite them as valid lawful reasons for an adverse action (also known as adverse action or termination for cause). Deloitte first falsely accused the plaintiff of being inebriated at multiple occasions, which is an act against Deloitte's policies and procedures.

134. Similarly, upon knowledge and belief, Deloitte reached out to Dr. Niti's employer and presented the plaintiff's employment circumstances to reach an understanding or agreement that Dr. Niti be accused of a false discriminatory reason which may ultimately lead to defense against a lawsuit or defense against an adverse action. Dr. Niti's employer first falsely accused her of not

being liked by her junior or colleagues because of her behavior. Regardless of the fact that Dr. Niti was accused without proper details, reasoning or rationale, the accusations were still against her employment conditions at University of Wisconsin.

135. The plaintiff proved his innocence against fake and discriminatory reason by Deloitte that would lead to an adverse employer action by instantly identifying his disability / medical condition over the phone to the Deloitte Partner and HR, and by providing a series of witnesses who would testify that the plaintiff was in-fact not drunk or inebriated on two occasions.

136. Similarly, Dr. Niti requested for proper details, reasoning or rationale about the accusations, including the name and details of the accusers. However, since the accusations itself were fake, such details were never provided by her employer. Dr. Niti knew that her junior fellows or residents repeatedly showed their eagerness to work with her, praised her professional abilities and inter-personal skills, and would inform her if they knew about any concern. However, no concerns were ever directly raised by her fellows or residents.

137. Both employers Deloitte and Hospital of University of Wisconsin, Madison provide professional services to US Citizens and individuals. Both employers provide employment opportunities to US Citizens and individuals, and are governed by the same set of Federal Rules or Laws within the United States. However, Deloitte knew that the plaintiff and Dr. Niti Aggarwal were competing in a market environment which was designated or destined to favor one set of employees based on their protected characteristics.

138. Such concerted or cooperative action between two firms which is directly effectuated by a contract, combination or conspiracy in the form of an understanding or agreement between two firms, Deloitte and Hospital of University of Wisconsin, Madison, and which is purposefully enacted to cause harm to the targeted individuals, the plaintiff and Dr. Niti Aggarwal, in the form of wage suppression or adverse employment action including termination, is anti-competitive by its inherent nature. Such acts undermine fair competition with existing employees, and lead to limited choices available for the targeted individuals.

139. After the malicious attempts by Deloitte and University of Wisconsin to properly accuse the plaintiff and Dr. Niti Aggarwal with lawful reason to effectuate adverse actions failed, Deloitte

and University of Wisconsin decided to concoct a false non-discriminatory performance-based reason that may lead to their termination.

140. The false non-discriminatory performance-based reasons against the plaintiff are further discussed in detail on this complaint. Upon knowledge and belief, Dr. Niti Aggarwal was falsely accused of not completing her patient notes by her employer University of Wisconsin, and deteriorated performance around the same time or similar timeframes when Deloitte had targeted the plaintiff on the basis of his performance. The pattern and timing of events suggest that both Deloitte and University of Wisconsin collaborated with each other on the matter, as the plaintiff was accused of the very same offenses. The false, derogatory and demeaning allegations against Dr. Niti Aggarwal were against the professional ethics and standards she maintains as a Physician.

141. The plaintiff has already submitted evidence to Deloitte that he compiled more then 100-pages of client notes on the project. Importantly, defendant Deloitte has not shared information and emails from the Anthem client email used by the plaintiff. Upon knowledge and belief, Deloitte supervisor falsely accusing the plaintiff failed check plaintiff's emails on her Anthem email box, which the client mandated to use.

142. Since Dr. Niti Aggarwal was retaliated by her employer after Deloitte discovered plaintiff's medical condition / disability, after the plaintiff was wrongly accused of sexual misconduct by a woman double his age, and after the plaintiff filed his ethics complaint, it can be inferred that plaintiff's employment with Deloitte was the contributing factors to Dr. Niti Aggarwal's employer discriminating or retaliating against her, especially when Deloitte had targeted the plaintiff based on his disability / medical condition, gender or race.

143. Knowing that Deloitte faced direct competition from the plaintiff and Dr. Niti Aggarwal based on factors like plaintiff's disability / medical condition, gender or race, including pregnant women, in order to **minimize competition** from the plaintiff and Dr. Niti Aggarwal, Deloitte instituted **restraints** against the plaintiff in the form of releasing him projects, sending him on project interviews where he was destined not to be selected, issuing a letter of reprimand with threat of termination, intentional assignment of a false non-discriminatory reason for adverse action in the form of a negative performance rating, etc.

144. Knowing that Deloitte faced direct competition from the plaintiff and Dr. Niti Aggarwal based on factors like plaintiff's disability / medical condition, gender or race, including pregnant women, in order to **minimize competition** from the plaintiff and Dr. Niti Aggarwal, Deloitte coordinated with Dr. Niti Aggarwal's employer to institute **restraints** against Dr. Niti in the form of falsely accusing her of not being liked by her junior or subordinates, when in-fact, her junior fellows or residents adored or praised her professional abilities and inter-personal skills, creation of an working environment filled with false accusation, intimidation, and ridicule by her White US Supervisor, etc.

145. Because of the very nature of such restrains and its effects, through unreasonable agreements, understandings or business practices, Deloitte and Dr. Niti's employer, University of Wisconsin, Madison, stalled the competitive growth, and limited the professional and personal development options available to the plaintiff and Dr. Niti Aggarwal.

146. For instance, upon knowledge and belief, the employers restricted the plaintiff and Dr. Niti Aggarwal from competing in certain areas like Financial Services, and Cardiac and vascular magnetic resonance respectively, thereby, further limiting the enhancement of their skills and abilities in such areas. Such deliberate employer actions curbed their competitive abilities to demonstrate excellence in areas where they had previously thrived.

147. Such deliberate discriminatory actions not only curbed the professional development options available to the plaintiff and Dr. Niti Aggarwal at Deloitte or University of Wisconsin, such actions restrained their abilities to differentiate themselves in the market place, such as ability make their profile attractive to prospective future employers, ability to attract and retain high quality professional connections (networking), ability to excel in the professional arenas, etc.

148. Thus, deliberate discriminatory employer actions created artificial barriers of entry for the plaintiff and Dr. Niti Aggarwal prohibiting or preventing them from exceling in certain areas, prohibiting them from acquiring new skills, clients or customers in certain areas, and preventing them from entering into or exploring new market spaces with new or renewed competition.

## Discrimination by Google based on Plaintiff's Medical Condition / Disability

149. In January 2017, the plaintiff attended a two-week Google Cloud Platform training at their New York offices located at Google's Port Authority Building, 111 8th Ave, New York, NY 10011, along with 7 – 8 other Deloitte employees. The plaintiff required an internal recommendation and approval to be a part of this client training, and Deloitte Partner Deborshi Dutt from plaintiff's business unit gave or provided the necessary approval.

150. In July and August 2017, the plaintiff worked with White Deloitte Partner Scott Holcomb on various internal firm initiatives. Based on plaintiff's efforts, Deloitte won the client contract for 'MDM Strategy and Roadmap' engagement at client PVH (also known as Philip Van Hausen, a retail sector client). Plaintiff received praise from the team members, especially Deloitte Supervisors and Senior Managers Kartik Nagaraja and Wout Vandegaer, and congratulations from the Deloitte Partner Scott Holcomb over the phone.

151. Deloitte Supervisor Kartik Nagaraja congratulated the plaintiff and declared his eagerness to staff the plaintiff on the PVH project, while Deloitte Partner Scott selected plaintiff's profile for another internal firm initiative for client Arrow and copied the entire team on plaintiff's inclusion.

152. While working at Deloitte, the plaintiff identified his disability / medical condition in December 2017, and the plaintiff filed his written ethics and integrity complaint in February 2018. By filing his ethics and integrity complaint within Deloitte, the plaintiff engaged in a protected activity.

153. On March 21st 2018 at 11:38 AM EST, the plaintiff received an internal message from plaintiff's Resource Amy Hanes over Skype. The message said your profile has been placed on hold for an opportunity at client Google.

154. Subsequently, Deloitte Partner Scott Holcomb interviewed the plaintiff, and selected plaintiff's profile for the opportunity. The plaintiff reminded Deloitte Partner Scott Holcomb of plaintiff's work at client PVH and Arrow, and Deloitte Partner Scott Holcomb acknowledged and praised plaintiff's efforts.

155. However, soon after getting selected for a client project at Google, the plaintiff learned that the Google project opportunity itself has been put on hold.

156. Upon knowledge and belief, in order to build or claim immunity on Deloitte Partner Deborshi Dutt's recommendation and approval for plaintiff's training at Google, and in order to claim immunity on White Deloitte Partner Scott Holcomb's engagement with the plaintiff, including plaintiff's work effort and contributions for clients PVH and Arrow, Deloitte collaborated with Google and concocted a malicious scheme to wantonly deny the plaintiff an opportunity to work at client Google.

157. Instead, unbeknownst to the plaintiff, Deloitte's real discriminatory motive to build immunity on the involvement of multiple Deloitte Partners with the plaintiff, including Financial Services Partners Brian Jonston, Michael Fernanez, and Business Unit Partners Deborshi Dutt and Scott Holcomb, becomes evident. Because after the Google position was put on hold, Deloitte directed the plaintiff's profile to a different client, TJX industries in the state of Massachusetts, under the leadership of Supervisor Kartik Nagaraja.

158. Denial of a project opportunity at Google is similar denying the plaintiff an opportunity to transition to a new employer and secure an alternate visa sponsored employment, after plaintiff's termination in November 2018. In December 2018, plaintiff interviewed at firm Teva. Teva interviewing supervisor confirmed to the plaintiff that the plaintiff did well in his interview and will move to in-person interview, and the Teva recruiter scheduled the in-person interview with the plaintiff.

159. However, during her coaching sessions with the plaintiff, a member of the Deloitte transition team, Aileen Baxter, secured confidential information from the plaintiff that the plaintiff was interviewing at client Teva. Deloitte then coordinated with and conferred with the Human Resource (HR) department of Teva to ensure that the plaintiff would not be selected. Specifically, after the plaintiff disclosed such confidential information to Deloitte transition manager Aileen Baxter, plaintiff's interview process for the Teva position was abruptly put on hold, and then cancelled despite being confirmed by the interviewing supervisor, and despite being confirmed and scheduled by the recruiter for the final round in-person campus interview.

160. In March and early April 2018, instead of letting the plaintiff work for client Google under a new and unknown project Supervisor, Deloitte directed the plaintiff's profile to client TJX industries, such that the plaintiff may work under the leadership of a known project supervisor and Sr. Manager Kartik Nagaraja.

161. Since Deloitte Leaders and HR Professionals reached an agreement or understanding that the plaintiff be denied project assignment at Google, but provided an opportunity at TJX industries, it can be inferred that such agreement to allocate specific project to the plaintiff from or within a pool of multiple projects or clients was meant to exert exclusive control or dominance over the plaintiff, thus, limiting competition from the plaintiff, reduced efficiency in the marker space, reduced competition amongst similarly situated employees, and potentially harming Deloitte customers or clients.

162. Upon knowledge and belief, in order to protect the interests of Deloitte Partners, and show his allegiance or loyalty to the firm under the premise that if he were to become a Deloitte Partner, Senior Manager Kartik Nagaraja must not only protect his own interests and but also protect the interests of the firm and other Deloitte Partners, Deloitte tasked Senior Manager Kartik Nagaraja to build a legal immunity against the plaintiff based on either a legitimate lawful reason based on cause that could be used to effectuate an adverse action or claim immunity, or a non-discriminatory reason.

163. The fact that Deloitte knew that consumption of alcohol and allergic food substances exacerbated plaintiff's underlying allergies has been identified previously. The fact that Senior Manager invited the plaintiff into events with alcohol, and pushed the plaintiff to consume alcohol has also been identified. Deloitte knew or should have known that the very act of influencing or forcing the plaintiff to consume alcohol in order to build or claim immunity for Deloitte Partners is discriminatory, but if it succeeded, they would be able to produce a legitimate reason to terminate the plaintiff for cause.

164. Defendant knew it would be illegal to terminate the Plaintiff based upon his medical condition and temporary disability which occurred when his allergies were triggered. But if the plaintiff would knowingly, willingly and repeatedly indulge in an act that would cause his allergies to be

triggered, based on similar actions which triggered his allergies previously at the December 2017 Deloitte event, then Deloitte and involved Deloitte Partners, including Partners from Plaintiff's Business Unit and Financial Services Partners, would have a valid defense against their involvement and targeted acts against the plaintiff, and Deloitte would have a legal reason to terminate the plaintiff.

165. However, since the plaintiff refused to partake in multiple such events, and since the firm was unable to generate a lawful reason for cause to effectuate an adverse employment action against the plaintiff, Deloitte was left with no choice but to assign the plaintiff a negative performance rating. Negative performance rating, and separation or termination based on performance, remains a non-discriminatory reason for employment action.

166. Furthermore, in addition to providing or build immunity on the actions or involvement of Deloitte Partners, denying the plaintiff an opportunity to work at client Google served two additional purposes.

167. First, since Deloitte Supervisor and Sr. Manager Wout Vandegear was involved with the recruitment of the plaintiff, where provided good recommendation on plaintiff's profile to the hiring committee over email, and since Mr. Vandegear worked close with the plaintiff on PVH and Arrow opportunities with Deloitte Partner Scott Holcomb, and provided positive review or feedback to the plaintiff, denying the plaintiff an opportunity to further interact with the same Partner or work under the leadership of the same Partner (who regularly worked with Mr. Vandegaer) would help Deloitte secure immunity both against the Partner and the Sr. Manager, especially when their involvement was related to 2017 Performance cycle.

168. Second, since Deloitte Supervisor and Sr. Manager Kartik Nagaraja was designated to find a lawful reason for cause (based on misconduct, etc.) or non-discriminatory reason to assign the plaintiff a negative performance rating for the 2018 Performance Cycle, Deloitte ensured that working with a known supervisor at a client other than Google would prevent the plaintiff from raising any retaliatory concerns during the assignment of a negative rating for Performance cycle 2017 (as the performance was set or scheduled to be identified only towards the end of TJX assignment), and would also help the firm assign the plaintiff a subsequent negative performance rating for the 2018 Performance cycle.

169. On July 13th 2018, the plaintiff received an email from Google recruiter Jose Martinez Avalos, who reached out to the plaintiff on behalf of Google Product Management Recruiting team to enquire whether the plaintiff was interested in working at Google as a full-time employee.

170. Specifically, Google wanted the plaintiff to explore opportunities within the Product Management space, and was seeking a Product Manager for their Mountain View, California, office. The Product Manager role required the individual to bring to fruition new products and features that genuinely benefit Google, act as managers of Google products by providing leadership across functional teams to conceptualize, build and deliver Google's next great product.

171. The Google recruiter identified that Google had Product Manager opening across all of their products in areas such as Consumer, Mobile, Apps, Enterprise and Infrastructure to name a few, and confirmed the same over email. The Google recruiter liked plaintiff's profile and scheduled phone interviews with members of the Google Product Management team

172. On July 25th 2018, the first interviewer, a distinguished Leader and Supervisor of the Google Product Management team and a Product Manager, interviewed the plaintiff. The Google supervisor who interviewed the plaintiff liked his background and profile, and informed the plaintiff that he had similar academic or professional experiences, and spent considerable time in Germany at the same institution where the plaintiff was selected to represent his University as exchange student in year 2006. Overall, the interviewer was impressed with plaintiff's profile, gave a positive-feedback to the plaintiff. When the plaintiff asked him about the interview process at Google, the interviewer explained the process, and mentioned the words "hope to see you on campus".

173. However, during this time, plaintiff's employer Deloitte Consulting LLP was aware of his disability / medical condition, his ethics and integrity complaint, and gender discrimination issues. Plaintiff's phone number ending in *6143 was also enrolled in Deloitte's corporate network.

174. As identified previously, Deloitte required the plaintiff to install corporate applications like Mobile data management application on his smart phone, which required root or administrator

access to plaintiff's phone. Just like multifactor authentication or virtual private network (VPN), such tools or applications enhanced the security of Deloitte corporate data, and ensured employees do not accidentally compromise corporate information on or from their devices.

175. For instance, Mobile data management solutions allow enterprises to manage access to devices through identity and authentication protocols, by installing solution agents and/or configuration profiles onto a device and monitoring access requests.

176. It is known that once corporate applications like Outlook email and Exchange server are setup and tied to a corporate network, a user need not re-enter his password. That is, anyone with access to an employee's unlocked portable device can access his corporate information. That is, since one can access both corporate data and personal data on a device by entering a four (4) or a six (6) digit passcode, it can be inferred that Deloitte was responsible in ensuring that all data stored within a portable device is protected

177. Since plaintiff's iPhone was tied to Deloitte's corporate environment, through corporate servers, applications and/or covert means, upon knowledge and belief, Deloitte compromised plaintiff's privacy by accessing plaintiff's personal data on his iPhone. That is, upon knowledge and belief, Deloitte had access to plaintiff's personal emails, phone communications, records etc., and learned that the plaintiff was interviewing at Google.

178. In fact, Deloitte HR professionals and state actors supporting Deloitte maintained a surveillance over plaintiff's communications, with an agenda to later influence and force the plaintiff to accept a non-discriminatory reason for termination and waive his right to sue or bring a lawsuit against Deloitte.

179. After intercepting plaintiff's interview call and learning that the plaintiff did well on his Product Manager interview, Deloitte HR Professionals and state actors concocted a dual agenda. Delay plaintiff's progress at Google to influence or force the plaintiff to accept a non-discriminatory reason for adverse employment action, and protect the interests of both Deloitte and Google from a potential discrimination and/or retaliation claim.

180. Ten days later, on August 6th 2018, the Google recruiter replied to the plaintiff stating that he would like to schedule a second interview with focus on product creativity and strategic insight.

The recruiter's email was directly contradictory to the tone, demeanor and feedback provided by the first interviewer who indicated that the plaintiff was ready for onsite interviews.

181. With benefit of hindsight, once can infer that Deloitte HR Professionals coordinated with or conferred with the Google Product Management Recruitment team, presented plaintiff's circumstances to the Google Product Management Recruitment team, and reached an understanding or agreement with the Google Recruiting team that plaintiff's interview progress at Google must be delayed such that both Deloitte and Google are able to claim immunity against a potential discrimination and retaliation claim.

182. On August 24th 2018, the plaintiff held his next round of phone interview with another Product Manager within the Google Product Management space. Next Monday, on August 27th 2018 at 11 AM, the plaintiff sent a quick thank you note to the recruiter, thanking the interviewer for his time. This is the exact same date when Deloitte was set to address or release Bonus payout data for the last performance year (2017).

183. At 12:27 PM local time, the plaintiff received two sets of emails at the exact same time. On plaintiff's personal email, the Google recruiter thanked the plaintiff and reiterated his willingness to thank the interviewer and providing feedback on the interviews shortly. On his corporate email, Deloitte Manager, Manoj Kumar, who worked closely with Supervisor Kartik Nagaraja asked the plaintiff to complete his snapshot or performance review for the TJX project.

184. The timing of the emails dated August 27th 2018 remain extremely important, not only because the plaintiff received an email from Google and an email from Deloitte Manager at the exact same time, but also because such synchronization requires two different parties to coordinate scheduling emails at an instant. Since it can be assumed or inferred that the Google recruiter did not directly interact or coordinate with the Deloitte Manager, such a feat can only be accomplished by having two distinct parties schedule send an email at a specific time, or by Deloitte HR through advanced knowledge of Deloitte internal tools and systems. The reason why one can eliminate the first option, that Manoj Kumar schedule sent the email is because in such a scenario, Deloitte would become liable for Deloitte Manager's employment as such information can be sought as part of discovery. That is, Deloitte did not directly ask or require Mr. Manoj Kumar to send an email at 12:27 PM.

185. Instead, the reason why the plaintiff can claim with high degree of certainty that Deloitte HR through advanced knowledge of Deloitte internal tools and systems coordinated matching the timing of two emails is because on August 27th 2018, between 12 PM and 2:30 PM, the plaintiff received several notifications of manipulation on his Deloitte Email Outlook. The notifications required the Deloitte server to access email server settings on plaintiff's Deloitte computer. The plaintiff has saved pictures of screenshots of such manipulation. Such manipulation can only be done internally by a Deloitte system administrator, with advanced knowledge of Deloitte internal tools and systems, or by a third-party external hacker with access to Deloitte server. However, since no external hacks were reported on the date, and since the plaintiff was harmed by the non-payment of bonus on the same date, one can safely assume that the beneficiary, Deloitte Consulting LLP, maliciously concocted such actions.

186. The events at Deloitte just before the date help establish the facts that intertwined factors based on plaintiff's Whistle Blower Complaint, combined with Deloitte's discrimination against the plaintiff based on his disability, gender, and race as identified on this complaint, provided the necessary impetus for Deloitte to coordinate with and confer with the Human Resource and recruiting department of Google.

187. With benefit of hindsight, and facing the same set of defendants and supporting actors over a period of time, it can be inferred that Deloitte synchronized the timing of the emails from Deloitte Supervisor and Google Recruiter, in order to influence the plaintiff into believing that plaintiff's recruitment at Google can only proceed if the plaintiff accepts a negative performance rating on the TJX project for the next performance year (2018), and do not challenge the fact that he would not be given any bonus for the prior performance year (2017) for lack of performance.

188. The sequence and timing of the events suggest that Deloitte actively coordinates with and confers with the Human Resource and recruiting department of other firms to influence or target the recruitment of a Deloitte employee, and internally assigns a false non-discriminatory reason to the employee to build defense from potential liabilities

189. The plaintiff refused to accept the discriminatory performance standards by Deloitte. The fact that on the evening of August 27th 2018, Sriram Ramamurthy, called the Plaintiff, and suggested

that the plaintiff would be released from the Ball corporation client project, and that four (4) days later the Plaintiff was, in fact, released from the project by supervisor Brian Zhong.

190. The fact that during the bonus payout period in August 2018, three Deloitte supervisors Kartik Nagaraja, Brian Zhong and Wout Vandegaer agreed with one another to concoct a non-discriminatory performance-based reason to limit plaintiff's options, and restrict any competition that may emerge from the plaintiff from non-payment of bonuses

191. Specifically, the three supervisors, Kartik Nagaraja, Brian Zhong and Wout Vandegaer, acted under the premise that if they were to become Deloitte Partners, they must not only protect their own interests and but also protect the interests of the firm and other Deloitte Partners, and wanted to showcase their own talent in terms of strategic insights and product creativity. So they decided to combine a trifecta of factors – hiring, performance and compensation - to provide immunity to themselves, the involved Deloitte Partners, and the firm Deloitte.

192. On his email notes to the Deloitte hiring team dated 08/05/2016, Sr. Manager Wout Vandegaer identified that he was impressed with plaintiff's profile and would either recommend to recruit the plaintiff as a Manager, or recommend to include the ability to fast track to a Manager.

193. The very fact that the rating on plaintiff's recruitment evaluation sheet was changed from one (1) most favorable on a scale of five (5) to four (4) (i.e. one less than least favorable five) for interviewer Wout Vandegaer shows that Deloitte Leaders and female Human Resource Professionals provided the necessary impetus to the above identified Sr. Managers to act against the Federally protected rights of the plaintiff.

194. Upon knowledge and belief, rating on recruitment evaluation sheet could only be tampered by a Deloitte Leader or by a Deloitte HR Professional with knowledge and access to the hiring tool and evaluation platform.

195. Upon knowledge and belief, after the firm learned about plaintiff's disability/ medical condition, and his ethics complaint, and after the plaintiff was assigned a false letter of reprimand with threats of termination, Deloitte Leaders and HR Professionals carried the necessary motivation to tamper or change plaintiff's performance rating on his recruitment evaluation sheet to ensure

that a poor rating would match the non-discriminatory reason for an adverse action, including termination

196. By agreeing in advance to manipulate the performance evaluation of the plaintiff, each Sr. Manager, namely Kartik Nagaraja, Brian Zhong, Sai Hampankatta and Wout Vandegaer, acted against the Federally protected rights of the plaintiff and indulged in artificially limiting or deflating plaintiff's wages, thus, limiting the options available to the plaintiff and stifling competition, in-exchange for high-markup or salary increases for themselves, and added bonuses for themselves.

197. It can be inferred that had they decided to follow moral principles, and/or ethical standards identified by Deloitte on their corporate policies, and had not assigned the plaintiff with a non-discriminatory reason for adverse employment action, they would not have received such high bonus or salary increases.

198. Based on their collaboration, it can be inferred that Sr. Managers, namely Kartik Nagaraja, Brian Zhong, Sai Hampankatta and Wout Vandegaer, and similarly, Sai Hampankatta and Ashley Scorsatto on another instance, reached an understanding or agreement to allocate projects, work assignments, or maintain biased performance standards (assign a negative performance rating based on intertwined factors), to limit competition from the plaintiff and distort the normal operation of plaintiff's professional growth.

199. With each supervisor wanting the other to validate their discriminatory bias, as identified on the communication between Kartik Nagaraja, Brian Zhong, Sai Hampankatta and Wout Vandegaer, one can infer that the supervisors were eager to impose market allocation agreements such as limited or shortened client assignments, wage fixing against the plaintiff, or Supervisors helping each other to prevent the plaintiff from competing against them on the basis of their biased project performance evaluation.

200. By assigning the plaintiff a false negative performance rating, Deloitte Supervisors fixed plaintiff's wages, restricted competition from the plaintiff, reduced efficiency among similarly situated employees, and agreed amongst themselves to set prices for services at a certain level

rather than allow the market to determine the prices. During this time, clients agreed and continued to pay hundreds of thousands of dollars in consulting fees for plaintiff's work.

201. Similarly situated employees such as Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies and who did not have a malicious sexual harassment allegation against them, were neither restricted by market allocation agreements such as limited or shortened client assignments, wage fixing against the plaintiff, or Supervisors helping each other to prevent the plaintiff from competing against them on the basis of their biased project performance evaluation.

202. Later, on his meeting notes with performance Management team, Supervisor Brian Zhong failed to identify that he himself was strategically placed or positioned by Deloitte to falsely assign the plaintiff a lawful reason for cause (based on misconduct, etc.) or a non-discriminatory legal reason for adverse employment action, and indirectly tried to blame the fact on his colleagues like Kartik Nagaraja or Wout Vandergear.

203. Furthermore, on his meeting notes with performance Management team, Supervisor Brian Zhong failed to identify that he himself maintained discriminatory and retaliatory bias against the plaintiff, tried to ping the plaintiff outside of working hours late in the evening, changed the course or direction of the project as and when he pleased without any knowledge or agreement with the client, and immediately required the plaintiff to provide finished project presentation for work or issues that did not even commence or start, and blamed the plaintiff for having empty spaces on an internal work in progress meeting deck for work that did not even commence or start.

204. The sequence and timing of Deloitte Supervisor Brian Zhong's actions on or around the bonus payout date suggest that Supervisors Kartik Nagaraja and Wout Vandagaer had already reached an understanding to assign the plaintiff a negative performance rating; and a fourth Supervisor, Sriram Ramamurthy working 2000 miles away in New York knew beforehand that (a) the plaintiff will be released from his project in Denver, Colorado in four (4) days, and (b) the plaintiff did not receive any bonus for the prior performance year.

205. The above highlighted events are important and provide an inference that Deloitte Leaders and HR Professionals leaked plaintiff's confidential compensation information to Deloitte Supervisors.

206. The sequence and timing of above highlighted events are important and also provide an inference that Deloitte Leaders and HR Professionals worked in collaboration with multiple such supervisors. Had Deloitte not leaked plaintiff's compensation information, had Deloitte HR not agreed in April 2018 to assign the plaintiff a negative performance rating, and had Deloitte not informed plaintiff's Counselor that his performance rating will not change regardless of his work and positive opinion of other Supervisors, and had the above identified Supervisors not collaborated with each other to mitigate the risks of another ethics and integrity complaint by the plaintiff based on their own discriminatory and biased actions against the plaintiff, one could have inferred that Deloitte Leaders and HR professionals did not collaborate with Supervisors.

207. However, in order to get promoted to Deloitte Partners, Deloitte Sr. Managers must show that they are capable of protecting their own interests, and protecting the interests of the firm and other Deloitte Partners, because if such newly promoted Partners are <u>unable to protect</u> their own interests, they would attract added liability for both themselves and for other Deloitte Partners, which would result in added liability for the firm.

208. Since Deloitte Partners employ female HR Professionals, and since Deloitte Sr. Manager Supervisors get promoted to become Deloitte Partners, one can infer that the trifecta of individuals – Deloitte Partners, Deloitte HR Professionals and Deloitte Sr. Managers - did infact harbor common interests against the plaintiff, and were motivated to discriminate against the plaintiff and Dr. Niti Aggarwal.

209. The sequence and timing identified on this complaint suggest that suggest that the trifecta of individuals – Deloitte Partners, Deloitte HR Professionals and Deloitte Sr. Managers – did in fact collaborate with each other but first failed to assign the plaintiff with a <u>lawful reason for cause (based on misconduct, etc.)</u> for adverse employment action based on one or more false and malicious reasons, and subsequently concocted a malicious scheme to assign the plaintiff a <u>non-discriminatory legal reason</u> for adverse employment action in the form of an negative performance rating for two different performance cycles (year 2017 and 2018).

210. Upon knowledge and belief, Deloitte Partners approve and employ Deloitte female HR Professionals. The primary objective of Deloitte female HR professionals is to protect the interests of the firm.

211. Upon knowledge and belief, Deloitte continued to promote the interests of Supervisors Kartik Nagaraja and Brian Zhong, continued to provide them with pay salary increases and additive bonuses for Performance year 2017, 2018 or beyond, because these supervisors agreed to protect or serve the interests of Deloitte Partners and the firm, and their colleagues who worked at the same level of the market structure and who coordinated with female HR Professionals, over and above the interests of the plaintiff.

212. In order to mitigate their risks associated with such anti-competitive practices, Deloitte conducted an incomplete and inconsistent investigation on plaintiff's ethics complaint, and upon knowledge and belief, coordinated with Google Recruiting team to ensure that the plaintiff would not be recruited by Google.

213. On August 29th 2018, the plaintiff received an email that Google would not be moving forward with plaintiff's interview. In the subsequent three weeks, the plaintiff received five (5) to seven (7) separate emails from Google Recruiter Rebecca requesting the plaintiff to complete the Google Candidate Experience Survey. The Google recruiter had already informed the plaintiff that Google would not disclose facts on the interview, making the emails from Google Candidate Experience team redundant.

214. Specifically, Deloitte coordinated with Google or entered into an understanding or arrangement with Google to proceed with plaintiff's recruitment only if the plaintiff accepted Deloitte's false non-discriminatory reason for adverse action in the form of a negative performance rating (despite plaintiff's good performance). Since the plaintiff did not accept Deloitte's bias and discriminatory interests, and would never have accepted a false non-discriminatory reason for termination, plaintiff's recruitment prospects with Google were terminated.

215. After defendant Deloitte learned about plaintiff's medical condition and disability caused when allergies were triggered, and after the plaintiff filed his Whistle Blower Complaint internally,

Deloitte wanted to limit their liability on related matters. Upon knowledge and belief, Deloitte coordinated with and conferred with the Human Resource and recruiting department of Google to prevent the plaintiff from securing alternate visa-sponsored employment and to shelter themselves from liabilities on one or more related matters.

216. First, in order to limit their liability, Deloitte targeted Dr. Niti Aggarwal. Deloitte coordinated and conferred with Dr. Niti's employer to allege false allegations to ensure that her position as a strong witness on plaintiff's case was negatively impacted.

217. Defendant Deloitte had a significant presence in India, and maintained a place of Business in India. Deloitte talent relations team, led and supervised by Joanna Rohde, worked with one or more government professionals or officials in India.

218. Second, Deloitte engaged or worked with one or more State Actors to maintain a surveillance over the plaintiff, and ensure that the plaintiff would not be able to entangle Deloitte into extended statutes and periods of litigation based on their own prior involvement with the plaintiff, or based on plaintiff's relatives with government affiliations.

219. Upon knowledge and belief, Deloitte learned that one immediate female relatives of the plaintiff worked for Deloitte in India, and such females had government affiliations. Specifically, Deloitte as a firm learned that her father currently or previously worked for the Indian Government. Upon knowledge and belief, Deloitte employee Joanna Rohde already had prior knowledge of such relations and wanted to conceal her involvement.

220. Similarly, Defendant Deloitte knew retaliating against female relatives of the plaintiff may generate extended litigation opportunities due to involvement or association with one or more state actors. Thus, Deloitte was motivated to build defenses around plaintiff's female relatives with government affiliation, motivated to misuse state actors to maintain a surveillance over the plaintiff.

221. Specifically, in order to conceal their discriminatory acts against the plaintiff based on intertwined factors such as plaintiff's disability/ medical condition, gender, race and/or national origin, Deloitte incorrectly engaged and misused state actors to maintain a surveillance over the

plaintiff. Deloitte had no right to unduly infringe upon plaintiff's privacy just because the plaintiff had relatives with government affiliations, or was related to democratically elected ex-government dignitaries, or Dr. Niti Aggarwal was related to a late Indian Legend, or because Deloitte HR professionals previously worked in areas concerning the above identified individuals and had a motive to shield themselves from legal liabilities.

222. Since the plaintiff had already defended himself by providing proof of his disability and medical condition, Defendant Deloitte knew it would be illegal to terminate the Plaintiff based upon his medical condition and temporary disability which occurred when his allergies were triggered. So instead, for defending himself with proof of medical condition, defendant Deloitte sought to retaliate against the plaintiff by coordinating with and conferring with human resource and recruiting team at Google to prevent the plaintiff from securing alternate visa-sponsored employment.

223. Similarly, since the accuser Christina Young herself had provided one or more inconsistent statements on her sexual harassment allegation against the plaintiff, Defendant Deloitte knew that such inconsistent statements may provide an inference of discrimination or retaliation to the plaintiff. So instead, defendant Deloitte sought to retaliate against the plaintiff by interfering with plaintiff's recruitment to ensure that the plaintiff would accept a valid non-discriminatory reason for termination.

224. Christina Young falsely accused the plaintiff on other matters as well. For example, Christina accused the plaintiff of having the meeting with the client without her present, when in fact, the plaintiff had no such meetings as the client project, which was due to start in London, did not even start.

225. Deloitte Business Unit leaders provided a fraudulent letter of reprimand to the plaintiff and threatened the plaintiff with termination, and then Deloitte Business Unit leaders decided to assign the plaintiff with a negative or poor performance rating regardless of plaintiff's performance. Such discussions or decisions were taken in collaboration or coordination with members of Deloitte talent relations team, including Supervisor Joanna Rohde and Austin Perez.

226. Based on the discriminatory acts of Deloitte leaders, such as retaliation against the plaintiff after the December 14th 2017 event by Deloitte Financial Services Leaders in form of project releases, etc. as identified, or retaliation against the plaintiff by providing a frivolous letter of reprimand which falsely accused the plaintiff of being inebriated on two occasions by Leaders from his Business Unit, and based on the evidence plaintiff had to support his claims in February and March 2018, Deloitte knew that plaintiff had a valid retaliation claim against Deloitte. Deloitte knew that their retaliation against the plaintiff was in-part based on plaintiff's disability / medical condition.

227. Thus, in order to mitigate their risks, Deloitte first retaliated against Dr. Niti to negatively impact her position as a witness, and then coordinated with and influenced Google to ensure that the plaintiff can only secure alternate full time employment if he accepts a non-discriminatory reason for adverse action.

228. On April 5th 2018, without informing the plaintiff, Deloitte policy makers agreed that the plaintiff should not be put on a low performer list, given the **risks** associated with putting the plaintiff on a low performer list. Specifically, Deloitte policy makers identified and discussed that the plaintiff may claim retaliation by tying the two issues (a) issuing a fraudulent or false letter of reprimand (LOR) and threats of termination for not signing the LOR, and (b) placing the plaintiff on low performer list.

229. However, in early 2018, the plaintiff continued to receive positive feedback on his internal project work at Deloitte. Deloitte policy makers not only failed to inform the plaintiff about any performance related issues, they intentionally concealed such information such that the plaintiff may not claim retaliation as identified. In addition, the plaintiff was never informed and was never aware that there existed a low-performer list and the plaintiff could have been a part of this exclusive list.

230. On April 5th 2018, in order to build immunity or defense on their biased actions against the plaintiff, Deloitte policy makers, including talent relation professional Austin Perez, sought to retaliate against the plaintiff by further agreeing to assign the plaintiff a negative performance rating yet disclosing it only later during the year-end review. Such rating was intentionally provided despite plaintiff's good performance.

231. On April 6th 2018, Deloitte talent relation professional Austin Perez held a call with the plaintiff. On this call, Deloitte talent relation professional Austin Perez failed to explain the scatter-plot that was just provided to the plaintiff. The scatter plot contained a dot on a page, and failed to provide any information or underlying details on how the dot was derived or calculated. Instead of addressing the concerns raised by the plaintiff on his ethics and integrity complaint, Mr. Austin Perez kept on saying that he does not see any problems with plaintiff's scatter-plot.

232. On April 6th 2018, Mr. Austin Perez specifically mentioned that did not see or identify any performance issues. However, on her call on or around June 8th 2018, Plaintiff's female counselor, Sai Hampankatta, mentioned to the plaintiff that the plaintiff is being assigned a low performance rating because of performance issues. When the plaintiff challenged her to provide examples and performance issues, Supervisor Sai Hampankatta said plaintiff's poor performance rating was assigned by the HR, and as per an email she received from the HR.

233. Interestingly, June 8th 2018 call for the year 2017 performance cycle was near or close to the end of plaintiff's TJX project, a project whose performance would be recorded for the next year performance cycle (2018). Thus, Deloitte Human Resource department maintained double standards against the plaintiff, provided inconsistent information, and ensured that Deloitte would not only assign the plaintiff a negative performance rating for the 2017 performance cycle, but also would coordinate internally to later assign the plaintiff a negative performance rating for the 2018 performance cycle.

234. One year earlier, in early 2017, plaintiff's female counselor, Sai Hampankatta, had failed to explain the relevance of scatter-plot to the plaintiff. She had failed to explain how the scatter-plot was derived or calculated. In early 2017, she told the plaintiff that the plaintiff would receive a new hire rating despite plaintiff's performance, and after that the plaintiff had no discussion on scatter-plot with her.

235. On April 6th 2018, the behavior and statements made by Mr. Austin Perez over the phone were directly opposite to the statements recorded by him on his internal notes or memos. In fact, his notes are in-line with his recent discussions with Deloitte Policy making Supervisors, and not with the plaintiff.

236. At this point, Deloitte knew that had Mr. Austin Perez identified any performance issues at this point in time, or mentioned that the plaintiff would definitely be assigned a negative performance rating despite his good performance, the plaintiff could have claimed retaliation. Hence, Deloitte deliberately, intentionally and wantonly choose not to disclose or mention any such details to the plaintiff in April 2018.

237. On April 6th 2018, on his call with the Plaintiff, Deloitte talent relations professional Mr. Austin Perez mentioned that he could not substantiate plaintiff's concerns on the basis of scatter plot containing one dot just received by the plaintiff. However, Mr. Austin Perez (a) failed to provide his investigation process or methodology to the plaintiff, (b) failed to provide his reasoning or rationale as to how or why he failed to consider the series of facts provided by the plaintiff on his written complaint, or (c) failed to discuss why he did not interview the witnesses identified by the plaintiff on his ethics and integrity complaint.

238. On April 6th 2018, on his call with the Plaintiff, Deloitte talent relations professional further maintained a dismissive tone. Based on his own incomplete or inconsistent investigation of plaintiff ethics complaint, and based on lack of details provided on scatter plot, Mr. Perez tried to convey or advance his theory that he no longer felt plaintiff's ethics and integrity complaint was necessary. The plaintiff directly questioned Mr. Austin Perez over the phone "whether Mr. Perez was suggesting the plaintiff to withdraw his complaint"?

239. On April 6th 2018, on his call with the Plaintiff, alarmed by plaintiff's questions and perseverance, Mr. Austin Perez immediately said that he was not suggesting the plaintiff anything, and the plaintiff should let him know. The plaintiff never asked Perez to rescind his complaint, as the plaintiff had clear and convincing evidence to support his claims. However, Mr. Austin Perez falsified or deliberately wrongly paraphrased the plaintiff on his internal notes, that the plaintiff would like to rescind his complaint because he no longer felt it was necessary.

240. Importantly, since the plaintiff had clear and convincing evidence or valid inferences on the issues raised by him on his ethics complaint, it would not be in the best interest of the plaintiff to rescind his complaint. Even more so because Deloitte continued to discriminate or retaliate

against the plaintiff such as forcing the plaintiff to sign a fraudulent letter of reprimand or face termination.

241. Upon knowledge and belief, Deloitte recorded calls with talent relation professionals. Thus, plaintiff's call dated with April 6th 2018 Mr. Austin Perez was recorded or should have been recorded by Deloitte. At no point in time the plaintiff said or mentioned that he would like to rescind his complaint because details on his ethics complaint were not discussed or provided.

242. This is further substantiated by (a) the inconsistent statements made by Mr. Austin Perez on his internal memo, (b) the fact that Deloitte had already decided to assign the plaintiff a negative performance rating despite his performance, and (c) Deloitte never informed or notified the plaintiff about his ethics and integrity complaint, or that his ethics complaint was or will be closed.

243. Deloitte talent relation professional Austin Perez falsified the outcome on plaintiff's ethics and integrity investigation on April 6th 2018, in order to build immunity or defenses around Deloitte's discrimination against Dr. Niti Aggarwal, build defenses around Deloitte's not informing the plaintiff about the sexual harassment complaint by Christina Young, build defenses around incomplete and inconsistent investigations by the Deloitte Talent Relations team on the matters, and dissuade the plaintiff or other witnesses from identifying the involvement of the Deloitte Talent Relations investigator Joanna Rohde on matters.

244. Deloitte talent relations executive Joanna Rohde was the supervisor of Austin Perez. Joanna had directed her subordinate Mr. Austin Perez to conduct an investigation on plaintiff's ethics and integrity complaint, and oversaw the investigation. Joanna was aware and had knowledge of the discriminatory acts by Mr. Austin Perez against the plaintiff and acquiesced in such violations.

245. At all times was Joanna Rohde aware of the direct facts and supporting evidence or witnesses cited on plaintiff's ethics and integrity complaint, yet, in order to provide defense to defendant Deloitte, Joanna acted with deliberate indifference to the issues identified by the plaintiff. At all times was Joanna aware of the risks associated with overlooking facts and evidence, omitting or

ignoring witness testimonies, etc., yet displayed substantial departure from accepted professional judgment, practice, or standards on the issues raised by the plaintiff.

246. Joanna's departure from accepted professional judgment, practice, or standards demonstrated that she did not base her decisions on the facts, evidence, witness testimonies or arguments presented by the plaintiff on his ethics and integrity complaint. But instead, Joanna recklessly discriminated against the plaintiff and violated plaintiff's rights by basing her decisions on the business needs and perceived business liabilities of Deloitte.

247. Similarly, Joanna was aware of the inconsistent or incomplete investigation by Mr. Austin Perez, yet remained indifferent to the risks or consequences of such discriminatory acts. At all times was Joanna aware of the risks associated with misrepresentation or misconduct by her subordinate, yet continued to overlook facts and intentionally misguide Mr. Perez.

248. Additionally, one may also infer that given the gender discrimination matter against the plaintiff, Joanna deliberately used a male subordinate to conceal her own coordination with female supervisors and professionals within Deloitte.

249. Based on the pattern of behavior and internal notes or memos by Deloitte, especially those compiled by Mr. Austin Perez, one can further infer that Joanna and female supervisors within Deloitte used male Supervisors like Binu Janardhanan, and male investigators like Austin Perez, to falsify evidence or falsely accuse the plaintiff on discriminatory acts, while female supervisors like Ashley Scorsatto were only set to provide superficial justifications for discriminatory acts. Upon knowledge and belief, male employees like Binu Janardhanan were later incentivized by Deloitte, including Promotion and tuition-sponsorship for MBA.

250. By intentionally assigning a negative performance rating on his client work at Deloitte, despite positive feedback and recommendations from clients, defendant **Deloitte engineered a false non-discriminatory reason for plaintiff's termination**. Thus, one may infer that the discriminatory practices of Deloitte senior policy making officials, like Joanna Rohde and/or Brenda Arends, were so persistent or widespread as to constitute a custom or usage under law.

251. Since senior policy making officials, like plaintiff's human resource supervisor Brenda Arends, either had an input on or directly influenced plaintiff's termination, their acts or edicts may fairly be said to represent the official policy of defendant, Deloitte Consulting LLP.

252. At all times defendant Deloitte was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff

253. Based on the above arguments, it can be inferred that by preventing the plaintiff from securing alternate visa-sponsored employment at Google, both Deloitte and Google acted with a "**community of purpose**" on three or more reasons.

254. First, had Deloitte let Google hire or employ the plaintiff, without letting Deloitte secure any defenses or immunities such as a non-discriminatory performance based reason for termination, given the involvement of State actors, Deloitte could have been liable for discrimination or retaliation based claims and damages for an extended period of time, and Google would have to protect its own interests while the plaintiff worked as a fulltime employee and an active litigant on an ongoing lawsuit.

255. Second, Google was Deloitte's client or customer. Deloitte Provided professional services to Google. Deloitte and Google shared same or similar interests in multiple areas of growth and development. Deloitte HR coordinated with Google HR or recruiting team to reach an understanding or agreement that if Google were to hire the plaintiff without providing Deloitte any immunity, the liabilities that may incur from potential Whistle blower claims against Deloitte may provide a perception of on-going conflict or unresolved issues at Deloitte, and may impact the existing business relations, common interests, work projects and resource deployment between the two firms.

256. Third, since the plaintiff was discriminated by Deloitte female supervisors who raised gender discrimination issues against the plaintiff or by Deloitte female/s with a protected characteristic or factors such as pregnancy, if Google were to hire the plaintiff without letting Deloitte claim any immunity or defenses, a pending litigation against Deloitte or Google in the same area may create tension or conflicts of interests between male and female workers at Google, affecting

team dynamics and employee morale. Similarly, the workplace morale, productivity and reputation of Google could have been impacted.

257. It can also be inferred that such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

258. For example, Joanna Rohde worked with Deloitte Financial Services Partners as identified, and previously targeted the plaintiff using a similar pattern of recruitment tactics at J.P. Morgan Chase to shield the interests of Deloitte Financial Services Partners Jonston and Fernandez, and shield her personal collaboration with such Partners. Similarly, Deloitte Partner Scott Holcomb, who previously provided the plaintiff with good performance review, wanted to shield the interests of multiple other Deloitte Partners and his ongoing work projects at Google. Plaintiff's profile for a project at Google was selected, however, the project was put on hold.

259. Finally, based on the above arguments, it can be inferred that Deloitte HR or state actors and the Google recruiters had a 'meeting of the minds', and thus reached an understanding that plaintiff should be refused or denied recruitment opportunities at Google. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the involvement of State actors who maintained a surveillance over the plaintiff.

260. For the years 2018-2024, Plaintiff was similarly situated to Google White female employees, Carol Skordas Walport. Both plaintiff and Carol Skordas Walport had almost the same or comparable number of years of work experience. Carol Skordas Walport worked on similar positions that required similar skill, effort, and job responsibilities at Google, which is comparable to plaintiff's Client Consulting work at Deloitte. Carol Skordas Walport was subject to the same standards of fulltime employment discrimination laws at Google, as the plaintiff at Deloitte. She held a Master's Degree and had similar educational background as the plaintiff. Plaintiff held Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

261. For the years 2018-2024, Carol Skordas Walport was hired by Google for similar positions that the plaintiff applied to, however, the plaintiff was not hired. Upon knowledge and belief, Carol Skordas Walport did not suffer from a life-threatening allergies or disability. Carol Skordas Walport also lacked plaintiff's diverse work experience dealing with several multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

262. Upon knowledge and belief, unlike the plaintiff, similar situated applicants like Carol Skordas Walport did not file an ethics and integrity complaint with their previous employer, did not have a relative with government affiliation working for Google (similar to plaintiff's relative working at Deloitte), and her circumstances did not threaten Google with extended litigation possibilities.

263. Similarly, Plaintiff was more qualified than similarly situated White employees Christopher Schlaepfer, Eric Savage, etc. These applicants were hired for similar position/s after Google started their recruitment process with the plaintiff. Upon knowledge and belief, such similarly situated applicants did not suffer from life-threatening allergies or disabilities were hired by Google. Plaintiff had more experience in terms of diverse Client Consulting Experience in different industries over 8+ years that gave him an added advantage as an applicant. Such actions show that Google was unwilling to provide non-discriminatory employment opportunity as a fulltime employee to the plaintiff.

## II. <u>Discrimination Based on Gender</u>

### <u>Discrimination by Deloitte based on Plaintiff's Gender</u>

264. On Friday, December 15th 2017, the morning after his disability incident, plaintiff contacted Deloitte Financial Services Partner, Michael Fernandez, over phone. On the conversation, partner enquired whether plaintiff was okay, mentioned that plaintiff threw up in the hotel room several times and refused help. In reply, plaintiff apologized, mentioned about his medical condition, said that he was deeply embarrassed and did not remember the events clearly. This conversation is consistent with plaintiff's email sent to the partner immediately after the call. On

Friday, December 15th 2017, the Deloitte partner, Michael Fernandez, reported the incident internally to Deloitte Human Resource Managers.

265. On Monday, December 18th 2017, plaintiff received communications from a recruiting firm, Scotland Group, for a role at J.P. Morgan Chase U.S Financial Services Treasury team. Since plaintiff recently completed a project at Citibank for their Treasury and Capital markets team, and since he was scheduled for a J.P Morgan chase project in the U.K., plaintiff saw this call as chance to learn more about the business & opportunities at J.P Morgan. Around 1:15 PM, plaintiff held 18-minute call with a Scotland Group recruiter. The plaintiff was released from his J.P Morgan Chase client project within the next hour of this call as mentioned in the following paragraph. Upon information, belief and pattern of behavior, this call was coordinated by Deloitte Human Resource team, likely by Talent Relations Manager, Joanna Rohde.

266. On Monday, December 18th 2017, at 2:07 PM plaintiff received a call from Christina Young about the J.P. Morgan Chase project which lasted for 38 minutes. On this call, Christina Young mentioned she had to release the plaintiff from the project as she was "*getting pressure from above*" (as mentioned on paragraph 21 of the complaint). Since plaintiff made arrangements for the U.K project and was doing so well, plaintiff pushed back and enquired further about his project release.

267. Christina Young said it "was very political", and she was told by plaintiff's resource manager that "if she did not release the plaintiff, she would get in trouble". Upon information & belief, at this point, Deloitte Human Resource Management team coordinated internally to have plaintiff's resource manager instruct Christina Young to get the plaintiff released from the project. Thus, the plaintiff was singled out and released from project, as opposed to similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, who did not suffer from life-threatening allergies and who were not released from projects based on their disability / medical condition.

268. On Tuesday, December 19th 2017, plaintiff held an in-person meeting with Christina Young and another female team member to transition his work so far on the J.P Morgan project. The fourth team member joined over the phone. Christina Young acted very professionally and amicably at this meeting.

269. Similarly, on January 10th 2018, plaintiff again briefly bumped into Christina Young at a holiday event. In this event, Christina Young said that her J.P Morgan project U.K trip was again delayed because the project sponsor "Mr. Richard" broke his bone on a skiing incident. Until this point, Christina Young behaved very professionally and amicably with the plaintiff, and there was no mention or sign of any malicious or indecent behavior from her side. This further suggests that the sexual harassment allegations filed by Christina Young after these events are false and malicious.

270. On January 11th 2018, late afternoon, Christina filed a malicious sexual harassment complaint against the plaintiff of inadvertently touching her behind at the January 10th 2018 holiday party. The allegations were filed as confidential and non-retaliatory, so the identity of the accuser was concealed, and no one could know allegations in their entirety, except the accuser Christina Young, and her interviewer Joanna Rohde. The plaintiff was neither informed nor interviewed about these allegations during his employment with the defendant.

271. On January 11th 2019, the event identified by Christina on her report was the January 10th 2018 holiday party, and not the December 14th 2017 holiday party. In fact, there were no reasons for Christina to make allegations on January 11th 2018 about the December 14th 2017 holiday event - which occurred almost a month before. Plaintiff was already released from the J.P Morgan Chase project on December 18th 2017 by Christina, per her own statements that she was getting "*getting pressure from above*", plaintiff met with Christina several times after that and Christina behaved amicably.

272. The plaintiff was singled out by Deloitte as against similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies and who did not have a malicious sexual harassment allegation against them.

273. Deloitte's internal coordination and internal involvement in this matter is further evident from the fact that in early 2019, the defendant moved Christina Young, an employee with 25+ years of experience with stock market data in financial services industry, from Deloitte, and placed her as Chief of Staff to a Litigating firm. Upon information and belief, big corporates like Deloitte who actively scan court dockets, upon discovering plaintiff's complaint submitted to

the court, scrambled to move Christina to another employer. She was moved to another firm around the same time plaintiff's complaint was submitted to the New York Supreme Court (end of January 2019).

274. In addition, Deloitte's coordination and internal involvement in this matter is further evident from the conversations between plaintiff's previous attorney and the defendant attorneys. Plaintiff has several recorded conversations with his previous attorney, Mr. Vandamme, where Mr. Vandamme clearly reiterates his conversations with defendant attorneys, who claim that Christina Young was still working at the defendant during the summer of 2019. However, after Mr. Vandamme's dismissal, defense attorneys wrongly stated in their communications to the plaintiff, and to the court, that Christina Young left Deloitte well before plaintiff's filed his lawsuit in the state court on February 1st 2019.

### 1.1 Firmwide Ethics & Integrity Training

275. In around February, 2018, the Plaintiff took part in firm-wide ethics, integrity and compliance training. Specifically, Plaintiff reported that, though it was his duty to point out instances where projects were mismanaged and to suggest improvements, when he did so during a Fall 2017 project based in Los Angeles, he was threatened against raising such issues with supervisors in higher positions and learned it would '*obviously result in a bad rating*', he faced *unprofessional treatment* by his supervisor and *finally removed from the project* by his immediate supervisors.

276. Specifically, the goal of plaintiff's ethics violation report was to report the disproportionately heavy workload assigned to the plaintiff on the project, discriminatory workplace conduct and request correct performance evaluation on plaintiff's project work. Based on the firm-wide ethics training, as duly reported to HR in early February 2018, the plaintiff was given the responsibility of taking on two-full time roles on the project by his supervisors, in an industry where plaintiff had no experience at all. After receiving plaintiff's ethics violation report, the firm immediately took steps mentioned below to reduce their legal liability on the issue.

277. After receiving plaintiff's ethics report, unbeknownst to the plaintiff, as explained below, first, the firm tried a discriminatory reason to illegally control the plaintiff by issuing a malicious letter of reprimand based on his medical condition and disability, and threatened him with termination,

when that did not work, the firm Deloitte Consulting llp falsely engineered a non-discriminatory reason to illegally control the plaintiff by giving him permanently poor performance rating. Plaintiff was singled out, and treated differently than similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies, and who did not have a malicious sexual harassment allegation against them.

### 1.2 Malicious Sexual Harassment Complaint

278. On January 11th 2018, more than three weeks after plaintiff's anaphylaxis event *(which occurred on December 14th 2017)*, a 61-year old woman employee of the defendant, Christina Young, filed confidential allegations against the plaintiff with Defendant Human Resource professionals for getting drunk and inadvertently touching her backside at a holiday party. This allegation was never mentioned to the plaintiff during his employment, and Plaintiff learned about this allegation in its entirety in mid-2019 after receiving defendant's discovery response.

279. In early January 2018, plaintiff got staffed and started on an internal firm development Mergers and Acquisitions (M&A) growth accelerator project at Deloitte. Plaintiff's female team members, Karma Porter, Fanzi Mao Pitzer, Tanya Srivastava were very pleased with plaintiff's background and skillset. However, on January 12th 2018, one day after Christina Young filed her falsified allegations, plaintiff's female resource manager, Amye Hanes, directed the M&A team to immediately release the plaintiff from the project. Not knowing the background, both Plaintiff and his female colleagues on the project were stunned and greatly moved by Deloitte management's interference and decision. Defendant as such singled out the plaintiff, discriminated against him on the basis of his gender on the basis of a malicious sexual harassment allegation, harassed him, and forestalled his professional and career growth.

280. On January 18th 2018, a Defendant's female Human Resource Professional, Katie Tiller Wittenbraker, had a discussion about Christina Young, and the plaintiff, as documented in her notes. Katie Tiller Wittenbraker quoted "*They would have meetings setup, and Tina would try to find him in office and would find him with the client, and having the meeting with the client without her present*". In reality, the plaintiff had no such meetings as the client project, which was due to start in London, did not even start. This is consistent with allegations mentioned on paragraph 21 of the complaint, which state that the plaintiff was released from the JP Morgan

Chase project on December 18th 2017 before it even started. Defendant as such singled out the plaintiff, filed falsified allegations against him, discriminated against and victimized the plaintiff on the basis of his gender, harassed him, forestalled his professional and career growth.

281. In January and February 2018, on her follow-up interrogatory calls with Deloitte Human Resource Professionals, elderly woman employee Christina Young, first stated that touching her backside incident happened on January 10th 2018. Then on a call on February 27th 2018, she changed her statements, and stated that the incident happened at the December 14th 2017 event, and she got the dates confused. In contrast, however, on December 14th 2017, the plaintiff suffered a serious life-threatening anaphylactic reaction at the event and became unconscious. Secondly, on January 10th 2018, plaintiff attended the event for just 40-50 minutes. Plaintiff has call records to prove his location, and has produced supporting witnesses to prove that he was sober. Christina Young's change of date statements were made a month after the plaintiff produced his supporting witnesses for the January 10th event.

282. Similarly, on her interrogatory calls with Deloitte Human Resource Professionals, Christina Young mentioned that the incident happened on January 10th 2018 and Deloitte leader Brian Johnston attended the same event. However, Brian Johnston, Deloitte Strategy & Operations (S&O) service line leader, was neither invited to the January 10th 2018 event, which was sponsored by Deloitte Analytics and Information management (AIM) team, nor did he attend. Similarly, Christina also mentioned that Deloitte Financial Services Sr. Manager KP Parekh attended the same event. However, KP Parekh was neither invited to the December 14th 2017 event, nor did he attend. As a matter of fact, the plaintiff clearly remembers Christina Young introducing him to KP Parekh for the first time at the January 10th 2018 event. This further suggests that the sexual harassment allegations by Christina Young were malicious.

283. During the internal investigation with Joanna Rohde, Christina claimed that "*plaintiff's hand would brush against her butt*", that she had a "*large butt*" and the "*incident was not intentional in any way*". Here, Christina did not accuse plaintiff of just any misconduct; she accused him of sexual misconduct. That choice is significant, and it suggests that plaintiff's sex played a part in her allegations. A rational finder of fact could therefore infer that such an accusation was based, at least in part, on plaintiff's sex as these allegations would not have been made if another female

inadvertently touched Christina. Thus, Plaintiff's sex was a motivating factor in the discrimination, that is, plaintiff's adverse employment action was based, in part, on gender discrimination.

284. Christina Young, as such, used and abused the very law that is meant to protect her as a female, as a weapon against the plaintiff. Defendant as such singled out the plaintiff, discriminated against him on the basis of his medical condition and gender, filed internal falsified allegations against the plaintiff but never informed or interviewed the plaintiff, and later threatened him with termination, and supported a female Deloitte professional in her false claims against the plaintiff.

## 1.3 Malicious Letter of Reprimand and Gender discrimination

285. In Feb. 2018, after receiving plaintiff's ethics and integrity violation report, defendant Human Resource professionals panicked. At this point the firm knew that, (a) Plaintiff had a medical condition and was unconscious, (b) Senior Partner from the firm were involved in plaintiff's matter, (c) Joanna Rohde, Manager, Talent Relations, had retaliated against the plaintiff by releasing him from the J.P Morgan project, (d) defendant financial services leadership had retaliated against him by sending him to interview for a project where he was destined not to be hired, (e) plaintiff had a malicious sexual harassment complaint against him, (f) plaintiff filed an ethics and integrity violation report with defendant Talent Relations on disproportionately heavy workload.

286. In order to maintain an illegal control of the plaintiff and avoid punitive damages in the case, the defendant hatched a scheme to issue a malicious letter of reprimand to the plaintiff. On February 16th 2018, Deloitte Partner Deborshi Dutt and HR Professional Brenda Arends wrongly accused the plaintiff for being inebriated at two different events, threatened him to immediately sign a letter of reprimand within 2-days or face termination. However, Plaintiff talked about his underlying medical condition for the first event, and produced several witnesses against defendant's claims stating that he was sober for the second event. The witnesses were interviewed by the defendant HR.

287. The defendant knew that it has provided a false and malicious letter of reprimand to the plaintiff, and since the plaintiff had produced witnesses to support his innocence, the firm has further exposed another partner, Deborshi Dutt, and the firm on the issue. Upon knowledge and belief, the defendant, in urgent need to save itself from any legal liability, (a) hatched another malicious scheme by adding false references on Senior Manager K.P Parekh's presence at the Dec. 14th event, as he was not present at the Dec. 14th event; and (b) later coordinated internally to support Christina Young's testimony by helping her change the dates on her testimony by stating she got the dates confused Dec. 14th 2017 vs. Jan. 10th 2018. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to such discriminatory behavior and retaliation.

**1.4 Discrimination and Retaliation based on Protected Characteristics of Women**

288. Deloitte employees Joanna Rohde, Katie Tiller WittenBraker, Brenda Arends, Amye Hanes, Shanah Setzen, Ashley Scorsatto and Sai Hampankatta were plaintiff's human resource professionals or supervisors, and their supervisory oversight suggests that they had input in the final decision of plaintiff's termination.

289. Upon knowledge & belief, defendant Deloitte Consulting LLP knowingly discriminated and retaliated against the plaintiff on the basis of a protected characteristic or factor of a female employee. The defendant knew of the protected characteristic or factor of a female supervisor employee, that the employee is pregnant, and knowingly instituted malicious allegations against the plaintiff and knowingly assigned the plaintiff a negative performance rating.

290. The defendant Deloitte Consulting LLP and plaintiff's Human Resource supervisors like Joanna Rohde and Brenda Arends knew about the protected characteristic or factor of a female employee, and based on it knowingly instituted a discriminatory bias against the plaintiff based on his race. The plaintiff was released from multiple projects, and was replaced on more than one project with a white employee.

291. Until the time of filing this complaint, Defendant Deloitte Consult LLP has indulged in fraudulent concealment of material facts, and has not disclosed facts on the matters to the plaintiff. These fraudulent concealment of material facts are sufficient to toll the running of the statute of limitations against Deloitte and provide the plaintiff a right to file an amended complaint in future. Deloitte has disregarded plaintiff's discovery requests under the Federal Rules of Civil procedure and has not disclosed such information.

292. Upon knowledge and belief, Deloitte has moved several employees named on plaintiff's employment lawsuit to other firms. Beginning February 2021, after moving several employees to other firms, upon knowledge and belief, Deloitte female HR professionals targeted the plaintiff with messages about this protected characteristic or factor, (a) in part to boast about their own internal concealment of facts, (b) in part to mock the plaintiff on the malicious sexual harassment allegation on which a female employee twice as old as the plaintiff claims to have a "*large butt*", and (c) in part to boast their own corroboration with female supervisors and human resource professionals who targeted the plaintiff not only by terminating his employment through wrongful means, but also by instituting recruitment fraud against him.

293. Deloitte white Human Resource professionals, Brenda Arends, Joanna Rohde, Shanah Setzen and/or Amye Hanes maintained their discriminatory intent as they favored White employees like Christina Young, Ashley Scorsatto, Emerson Marenyi, Morgan Carlson, Tim Van Ee more than the plaintiff. Their supervisory oversight over the malicious sexual harassment allegation and protected characteristic or factor of women such as pregnancy suggests that they had input in the final decision of plaintiff's termination

294. Plaintiff was assigned disproportionately heavier workload than similarly situated employees. Upon information and belief, similarly situated US based white employees with similar responsibilities like Adrienne Moorefield, Morgann Carlon and Irma Arellano, were not as heavy workload as the plaintiff, were not released from multiple projects, and were not given a bad performance rating due to his gender, race or national origin.

295. Defendant Human Resource Professional Joanna Rohde drafted a malicious letter of reprimand that falsely accused the plaintiff and threatened him with termination, however, the plaintiff

produced witnesses against this retaliatory act. After the plaintiff produced witnesses, the defendant employee Joanna Rohde knew that on January 11th 2018, Christina Young had made false allegations against the plaintiff for the January 10th 2018 event.

296. The sequence and timing of the events suggest that Joanna Rohde showed her discriminatory bias against the plaintiff based on his gender as she (a) coordinated with HR Amye Hanes to release the plaintiff from the JP Morgan Chase project, (b) architected a malicious letter of reprimand against the plaintiff, (c) did not follow the defendant's own processes and protocols of informing or interviewing the plaintiff on the malicious sexual harassment allegation, (d) concealed the identity of the accuser, Christina Young, and information about her retaliation history at JP Morgan Chase, (e) treated Christina Young's more favorably by not investigating her malicious allegations, (f) requested plaintiff's release from 21st Century Fox and Bausch Health projects, (g) upon information & belief, helped place Christina Young as Chief of Staff to a litigating firm. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to this discriminatory behavior which was mainly based on plaintiff's gender.

297. In early January and February 2018, the Defendant female Human resource professions Joanna Rohde, Katie Tiller WittenBraker knew that there existed a sexual harassment allegation against the plaintiff, and the plaintiff needs to be knowing assigned false negative performance rating, a legitime non-discriminatory reason, to limit the liability of the firm. On February 8th 2018, the plaintiff completed his firmwide Ethics training. Deloitte knew about the sexual harassment issue, knew plaintiff was required to take an ethics training and knew about the protected characteristic of another female supervisor. In order to conceal facts and limit the firm liability, the female supervisors and human resource professionals coordinated internally.

298. The firm waited until February 9th 2018, to have plaintiff's supervisor Ashley Scorsatto assign the negative project performance rating to the plaintiff, such that the rating may not be challenged on the basis of the malicious sexual harassment allegation which purportedly was alleged to have occurred on January 10th 2018. Previously, Ashley assigned the plaintiff disproportionately heavy workload outside of his skillset or expertise, and her actions such as

waiting until February 9th 2018 to assign the plaintiff a negative performance rating in coordination with Ms. Katie Wittenbraker provide an inference for gender-based discrimination.

299. Defendant Deloitte's internal coordination on the issue is evident. Joanna Rohde, Katie Tiller WittenBraker and Ashley Scorsatto were plaintiff's supervisors, and their supervisory oversight suggests that she had input in the final decision of plaintiff's termination. Ashley had previously maintained a racial animus against the plaintiff and assigned him with disproportionately heavy workload. These HR employees and supervisors aided and abetted each other due to the malicious sexual harassment issue and the existence of other female protected characteristics such as pregnancy.

300. On February 27th 2018, Christina Young and Human Resource professional Joanna Rohde exchanged email communications with several inconsistencies which further show defendant's involvement and coordination with Christina Young. The first email was sent by Joanna Rohde to confirm the date, location and details of the incident with Christina Young. This email request was sent by Joanna at 2:20 PM, however, it was replied by Christina Young six minutes earlier at 2:14 PM - which is factually not possible.

301. On February 27th 2018, Christina Young and Joanna Rohde exchanged email communications with several inconsistencies which further show defendant's involvement and coordination with Christina Young. The second email was sent by Joanna Rohde to confirm whether the incident happened on January 10th 2020 per Christina's earlier testimony, or whether it happened on December 14th 2020. The email was sent by Joanna Rohde at 5:39 PM and replied by Christina Young within two minutes at 5:40:39. Christina Young, a 62 year old female employee, who requires glasses to read information on the computer, could not have replied and typed her email message reply within 2-minutes unless she was aware of the upcoming email request and the contents. Plaintiff has personally worked with Christina, who is not an extremely proficient computer user, and requires time to open and reply to emails.

302. On January 11th 2019, the event identified by Christina on her report was the January 10th 2018 holiday party, and not the December 14th 2017 holiday party. In fact, there were no reasons for Christina to make allegations on January 11th 2018 about the December 14th 2017 holiday event - which occurred almost a month before. Plaintiff was already released from the J.P Morgan

Chase project on December 18th 2017 by Christina, per her own statements that she was getting "*getting pressure from above*", plaintiff met Christina several times after that and Christina behaved amicably. Upon knowledge and belief, Deloitte Financial Service team, Partner Michael Fernandez and Joanna Rohde collaborated internally with plaintiff's Resource Manager Amye Hanes to instruct Christina to release the plaintiff from the JP Morgan project on December 18th 2018.

303. On February 16th 2018 as well as on March 6th 2018, the plaintiff clearly stated his allergy-based disability / medical condition to Joanna Rohde over a phone call. On February 16th 2018, the Plaintiff also provided Joanna with several witnesses for the January 10th 2018 event. After the plaintiff produced witnesses on February 16th 2018, Joanna knew that Christina had made a false allegation. In order to save herself, Joanna Rohde, the firm Deloitte Consulting LLP and the financial services partners from liability, Joanna likely corroborated with Christina Young and to help her provide inconsistent statements on the sexual harassment issue.

304. In order to conceal her false letter of reprimand that falsely identified the plaintiff of being inebriated on two occasions, it is reasonable to believe that Deloitte had no choice but to collaborate with Christina on the issue. Orchestrating inconsistent statements directly helped the firm Deloitte, Partner Michael Fernandez, HR professionals Joanna Rohde and Amye Hanes, and employee Christina Young limit their direct involvement and liability on plaintiff's disability / medical condition and sexual harassment issues.

305. Thus, Christina Young was getting help from other defendant employees – likely from HR professional Joanna Rohde; and the date change for the incidents was likely made to protect the interests of Christina Young, Joanna Rohde, the Financial Service Team and the firm in the case. Joanna further acted under the color of law to conceal all such information on the malicious sexual harassment allegation from the plaintiff and about the protected characteristics and factors of women supervisors.

306. This was done in order to conceal defendant's direct involvement on the issues such as (a) FSI Partner's direct knowledge of plaintiff's disability / medical condition in Dec. 2017, (b) Joanna's involvement on plaintiff's release from the J.P Morgan Project the very next day, (c) defendant's

discrimination against the plaintiff on the basis of protected characteristics / factors of other female employees in 2018. Defendant's treatment of the plaintiff, including instances of racial harassment, and bias such as moving Christina as Chief of Staff to a litigating firm around the same time plaintiff filed his court complaint provide a pretextual reason for discrimination.

307. Plaintiff would not have suffered an adverse employment action at Deloitte, his termination, if the plaintiff (a) was not discriminated on the Anthem project based on his national origin and race and was not given disproportionately heavy workload by his white supervisor for which he filed an ethics report, (b) was not released from the JP Morgan Chase project because he was helped for his disability incident by a White Sr. Partner, (c) was not sent to interview for a project where he was destined not to be hired due to lack of relevant experience, (d) was not accused by his White supervisor of buying an airplane ticket without her approval, (e) was not falsely accused by a 61-year old White female of inadvertently touching her behind, (f) was not treated less favorably than the female accuser, (g) was not informed or interviewed about the malicious sexual harassment case.

308. Based on the above allegations, one may deduce that because of plaintiff's national origin and race, as he was non-White, his White female Supervisors and Human Resource Managers – Ashley, Christina, Joanna, Brenda, Katie, Amye, and Shanah – maintained a racial bias against the plaintiff and treated the plaintiff differently than similarly situated employees. Plaintiff was as such singled out and treated differently than similarly situated employees like Adrienne Moorefield and Morgan Carlson based on his race and national origin. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

309. Similarly, Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not released from projects and replaced by someone outside his protected class, (b) was not assigned short-term projects where plaintiff had no industry knowledge or experience, (c) was not deprived of project opportunities where he had the right skillset, (d) was not given a permanently bad performance rating, (e) was not given less favorable performance evaluation than his White Colleagues, (f) was not subjected to invidious actions and comments by his White supervisors. Thus, plaintiff was treated differently than similarly situated White

employees, and the timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

310. Plaintiff's white supervisors and colleagues (a) released him from projects and sent him on projects where he was destined not to be hired, (b) accused the plaintiff of buying an airplane ticket without approval, (c) accused the plaintiff with impermissible bias of inadvertently touching the behind of a 62-year old woman, (d) treated the female accuser more favorably than the plaintiff, (e) replaced the plaintiff with a white employee more than once, and (f) sabotaged plaintiff's personnel file. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race.

311. In addition, plaintiff was subjected to a constant drumbeat of ridicule, (a) that his white supervisors and colleagues made racially insensitive remarks - plaintiff was called "deplorable" and "expendable Indian" - while his white colleagues were not, (b) that his white colleagues received favorable performance evaluations while plaintiff did not, (c) that his white colleagues were not restricted on seeking new client projects while several of plaintiff's applications were rejected with reason 'Project Closed Not Selected', (d) that similarly situated employees did not have to go through the ordeal of getting released multiple times from multiple projects while the plaintiff was. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race, and plaintiff was subjected to different workplace standards than his white supervisors and colleagues.

312. On March 6th 2018, less than two months after the filing of the malicious sexual harassment allegation against the plaintiff, defendant released the plaintiff from the 21st Century Fox Channel project. Defendant replaced the plaintiff with a less qualified White junior employee with just 1.5 years of experience, Emerson Marenyi, an employee of Caucasian background claiming him to be a subject matter expert. The defendant treated Emerson Marenyi more favorably than the plaintiff. Such repeated harassments by the defendant interfered with plaintiff's job performance. Upon information & belief, this release was planned by Deloitte Human Resource Manager Joanna Rohde, who called the plaintiff shortly after his project release meeting. Her discriminatory bias is evident as she had been meaningfully involved and working

behind the scenes in the process leading to and following plaintiff's malicious sexual harassment allegations and plaintiff's ethics complaint

313. On February 23rd 2018, the plaintiff held a call with his Citibank project team leadership Aditi Shankar and Rushika Patel. Deloitte Female Managers Aditi and Rushika thoroughly checked all of plaintiff past project performances and references said '*it was great to have the plaintiff onboard and they look forward to working with plaintiff*'. During plaintiff's Pfizer project, Sr. Manager Patrick McBrearty praised the plaintiff multiple times in front of multiple client and Deloitte stakeholders. This is consistent with an email that Patrick sent to the plaintiff in Mid-April 2018, on which Patrick requested whether the plaintiff was again interested in working with him on a project. However, by providing inconsistent statements on the matter, defendant Deloitte Consulting LLP again appears to have indulged in tampering of evidence on this matter.

314. Specifically, On February 23 2018, the Deloitte Citibank team asked the plaintiff to provide references at 1:05 PM, and the plaintiff responded to the email at 1:40 PM EST with references of his past project leaders. However, Deloitte production of documents state that Deloitte Citibank team reached out to Sr. Manager Patrick McBrearty on the same date at 12:45 PM, which is factually not possible because the Plaintiff had not provided them with Patrick's information before 1:40 PM EST.

315. On February 23 2018, at 8:33 PM the Citibank team confirmed the plaintiff for the project after checking and verifying the references provided by the plaintiff, which essentially means that a negative reference is out of question here. The defendant Deloitte recently produced this evidence to the plaintiff on April 2nd 2021, and inconsistent statements made by Sr. Manager Patrick McBrearty appear to be tampered. Upon knowledge and belief, this tampering of evidence has been done by defendant HR Joanna Rohde to reduce her own liability and the liability of firm Partner Michael Fernandez on the matter, and to conceal her own mishandling of the sexual harassment allegation and plaintiff's ethics complaint.

316. In fact, Sr. Manager Defendant Patrick McBrearty and Partner Aditya Kudumala praised the plaintiff for his performance at the short three (3) week project at Pfizer. The plaintiff was praised by is Sr. Manager Defendant Patrick McBrearty in front of clients, and also by the client in front of the Sr. Manager. Such supervisor and client appreciations are important to note because they

were earned solely on the basis of plaintiff's effort and excellence on the project, when in fact, the defendant Deloitte Consulting LLP failed to train the plaintiff prior to this Pfizer Client project – a project on R&D Operative Modeling Transformation that was outside of plaintiff's skillset. In Mid-April 2018, Sr. Manager Patrick requested whether the plaintiff was again interested in working with him on a project. Defendant Deloitte appears to be tampering evidence on the case, and the rationale behind such actions highlight that defendant's proffered reason to knowingly assign a negative performance rating to the plaintiff were pretextual.

317. Partner Michael learned about plaintiff's disability in mid-December 2017, and HR Joanna Rohde coordinated internally to have the plaintiff released from the JP Morgan Chase project. It appears that the defendant has (a) forced a Sr. Manager who has a heart condition and suffered a heart attack to assign the plaintiff a negative performance rating, and (b) coordinated with plaintiff's Anthem project leader Ashley Scorsatto such that plaintiff was assigned a false negative rating which was not registered on the system until after the plaintiff completed his firm wide ethics training on February 8th 2018. These events suggest that defendant Deloitte has indulged in fraudulent concealment of facts and fraudulent tampering of evidence to conceal the involvement of Partner Michael Fernandez and Joanna Rohde. Defendant singled out the plaintiff and the plaintiff was discriminated against similarly situated employees who did not have a disability / medical condition and sexual harassment allegation against them.

### 1.5 Further Allegations Malicious Sexual Harassment Complaint and Defendant's Gender Bias against the plaintiff

318. The defendant was motivated by gender-based bias because the defendant did not follow their own processes and protocols of interviewing the accused witness, in this case the plaintiff, on the malicious sexual harassment allegation during his employment at Deloitte Consulting LLP. Defendant Deloitte did not provide any of these procedural protections to the plaintiff.

319. Defendant Deloitte further singled out the plaintiff, discriminated and retaliated against him on the basis of his medical condition / disability for defending himself with proof of his medical condition and identifying several witnesses of being sober at the alleged second incident; and further discriminated and retaliated against him on the basis of a malicious sexual harassment

allegation by (a) failing to follow its own process and procedures of not interviewing any potential witnesses, (b) failing to further investigate Christina's malicious allegations, (c) issuing a malicious letter of reprimand to the plaintiff and threatening plaintiff with termination, (d) by harassing him and filing falsified allegations against the plaintiff.

320. Both plaintiff and Christina Young were subjected to the similar employment conditions, at the same establishment in the same geographic location. However, defendant treated Christina Young more favorably than the plaintiff. (a) Defendant waited for three weeks to interview Christina on her malicious complaint until she started a new project, (b) defendant concealed her identity by filing her malicious complaint as confidential and non-retaliatory, (c) defendant did not inform or interview the accused (the plaintiff) on the issue. Furthermore, upon information and belief, (d) Christina was not released from several projects like the plaintiff, and (e) was not mocked and/or harassed by her supervisors.

321. Upon information & belief, defendant favored the accusing female over the accused male in order to internally demonstrate a commitment to protecting female employees from male sexual harassment. Further, bias is evident from the fact that a majority of Deloitte Human Resource professionals are females, and plaintiff's malicious sexual harassment allegations were discussed internally with females without disclosing the identity of the female accuser. Thus, defendant maintained a sex-based discriminatory intent over the plaintiff. Defendant as such singled out the plaintiff, treated the female accuser more favorably than the plaintiff, harassed him, and forestalled his professional and career growth.

322. Similarly, both plaintiff and Christina young were subjected to the similar employment conditions, at the same establishment in the same geographic location. However, defendant treated Christina Young more favorably by moving her as Chief of Staff to a litigating firm, while at the same time, intentionally harassing the plaintiff by orchestrating recruitment fraud against the plaintiff and by blocking his access to the Deloitte transition website. Defendant as such singled out the plaintiff, terminated his employment, treated the female accuser more favorably than the plaintiff, harassed him, and forestalled his professional and career growth.

323. The sequence and timing of the events suggest that Joanna Rohde showed her discriminatory bias against the plaintiff based on his gender as she (a) coordinated with HR Amye Hanes to

release the plaintiff from the JP Morgan Chase project, (b) architected a malicious letter of reprimand against the plaintiff, (c) did not follow the defendant's own processes and protocols of informing or interviewing the plaintiff on the malicious sexual harassment allegation, (d) concealed the identity of the accuser, Christina Young, and information about her retaliation history at JP Morgan Chase, (e) treated Christina Young's more favorably by not investigating her malicious allegations, (f) requested plaintiff's release from 21st Century Fox and Bausch Health projects, (g) upon information & belief, helped place Christina Young as Chief of Staff to a litigating firm. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to this discriminatory behavior which was mainly based on plaintiff's gender.

324. Christina Young was plaintiff's supervisor on the J.P Morgan Chase project and other internal firm initiatives. Her supervisory oversight suggests that she had input in the final decision of plaintiff's termination. Joanna Rohde was plaintiff's talent relation officer in this case. Her role included responsibilities to coordinate complex legal issues within the HR, and in turn protect the firm from lawsuits and punitive damages. Her supervisory oversight suggests that she had input in the final decision of plaintiff's termination.

325. Plaintiff's employer took an adverse action against plaintiff, that is treated similarly situated employees differently than the plaintiff and terminated his employment, in response to allegations or acquisitions of sexual misconduct and following a clearly irregular investigative or adjudicative process. The evidence substantially favored the plaintiff, but the evaluator, Joanna Rohde, a female, without an apparent reason based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser. Thus, furthering providing an inference that the evaluator has been influenced by gender bias.

326. Similarly, defendant decision-makers choose to accept an unsupported accusatory version of the accuser over that of the accused, and declined even to explore the testimony of the accused witnesses (the plaintiff), thus giving further plausible support to the proposition that they were motivated by gender bias. The defendant decision-makers provided the plaintiff with a malicious letter of reprimand and were hostile towards the plaintiff. For example, on February 16th 2020, after the call with plaintiff where he was presented a malicious letter of reprimand, the defendant

Human Resource executive Joanna Rohde recommended that the "*plaintiff should focus on moving forward*", inferring that the plaintiff should be encouraged to leave the firm or retaliated against so that he himself leaves the firm, and plaintiff Human Resource supervisor Brenda Arends agreed. Plaintiff was never informed of such ill intent by the defendant. This further shows that Joanna used other human resource professionals within Deloitte to further her discriminatory bias against the plaintiff, and defendant's post-hoc non-discriminatory performance-based decision to terminate the plaintiff was pretextual.

327. After these events, the defendant human resource professionals decided to falsely engineer a non-discriminatory reason to illegally control the plaintiff by giving him permanently poor performance rating. The defendant retaliated against the plaintiff by (a) by placing him on business confirmed low performer list in spite of his good work and recommendations by Deloitte and Client leadership, (b) by falsifying his personnel file, (c) by subjecting him to different standards of project selection, and (d) by finally terminating his employment based on performance. Similarly situated employees to the plaintiff, like Youmna Saloumi, Adrienne Moorefield, who did not have a malicious sexual harassment allegation against them, were not subjected to such discriminatory behavior and retaliation.

328. For the years 2016-2018, Plaintiff and a similarly situated employee, Youmna Saloumi, female Senior Consultant, Deloitte Strategy and Analytics, New York, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment and in the same geographic location. Youmna was subject to the same standards of governing performance evaluation and discipline as the plaintiff. Youmna did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against her or was not retaliated or discriminated against due to the existence of a pregnant supervisor.

329. Similarly, for years 2017-18, Plaintiff was similarly situated to Adrienne Moorefield and Irma Arellano, both female Senior Consultants with similar position that required similar skill, effort,

and job responsibilities as mentioned above at Deloitte Strategy and Analytics, New York. Adrienna and Irma were subject to the same standards of governing performance evaluation and discipline as the plaintiff. These similarly situated employees did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation against them.

330. After the defendant became aware of plaintiff's medical condition / disability and malicious sexual harassment allegations, Plaintiff was subjected to different standards of performance evaluation and was given a permanently bad performance rating. However, similarly situated female employees, Youmna Saloumi, Adrienne Moorefield and Irma Arellano, who did not suffer from life-threatening allergies or disabilities and did not have a malicious sexual harassment allegation against them, did not receive biased performance evaluation, were not given a permanently bad performance review, and were not wrongfully terminated on the basis of performance by the defendant. Defendant as such singled out the plaintiff, treated him differently than similarly situated female employees, harassed him, and forestalled his professional and career growth.

331. After the defendant became aware of sexual harassment allegations against him, the defendant sought to intimidate, harass and retaliate against the plaintiff (a) by not informing or interviewing him about the false sexual harassment allegation, (b) by issuing him a malicious letter of reprimand, and (c) by giving him a permanently bad performance rating. The upon information and belief, the defendant carried out an ongoing scheme to intimidate, harass and force the plaintiff out of the company because it also knew that it would be illegal to terminate the plaintiff on the basis of a malicious sexual harassment allegation as the plaintiff would eventually find out and claim discrimination and retaliation. So, the defendant falsely engineered a non-discriminatory performance-based reason to terminate the plaintiff, in spite of plaintiff's good performance, denied him material benefits based on performance such as his customary yearly compensation increase, yearly bonus and/or promotion, and eventually terminated his employment by tagging him as a low performer.

332. In early February 2018, after learning the details of plaintiff's malicious sexual harassment case, the highly biased and discriminatory defendant female Human Resource (HR) managers, knowingly, wantonly and mercilessly decided to give the plaintiff permanently poor

performance rating. Deloitte HR ignored plaintiff's good performance reviews and wantonly placed the plaintiff on business confirmed low performer list, in part to protect their own interests given their own retaliation against the plaintiff, in part to protect the partners, Michael Fernandez and Deborshi Dutt, from any potential legal liability or claims, and in part to protect the firm from any potential legal liability or claims.

333. Plaintiff was given a permanently poor performance by the Human Resource Professionals, Joanna Rohde who had supervisory oversight over plaintiff's malicious sexual harassment case, and Brenda Arends who was a decision maker in plaintiff's termination. This was done despite plaintiff's good work during the 2017-18 performance cycle, despite the appreciations and recommendations he received from both Deloitte and Client leadership, and despite plaintiff's raising an ethics issue for his Anthem project. Defendant as such singled out the plaintiff, discriminated against him for defending himself with proof of his medical condition, discriminated against him by not performing proper investigation or due-diligence on the malicious sexual harassment allegation, and forestalled his professional and career growth.

334. Soon after the defendant became aware of plaintiff's medical condition / disability in December 2017, and Christina Young's allegations on January 11th 2018, during the course of next several months, various female Deloitte Human Resource Professionals and female Deloitte professionals began abusing their position and authority against the plaintiff on the basis of his gender. See further factual allegations in this regard in the examples below.

335. On February 16th 2018, on his call with Defendant's female Human Resource Manager Brenda Arends, plaintiff stated that "he has a medical condition, he had less than 2 drinks and his physician said that drinking alcohol on empty stomach likely exacerbated his underlying medical condition." This is consistent with the medical reports produced by the plaintiff as evidence. In contrast, Brenda Arends altered plaintiff's statements and wrote in her note that "plaintiff stated he had 2-3 drinks and his physician stated he got so drunk because he was drinking on empty stomach," thus changing the context and meaning of the entire conversation. This shows that defendant, Deloitte Consulting LLP, is being represented by extremely biased and discriminatory female Human Resource (HR) managers such as Brenda Arends, who wantonly & mercilessly discriminated against the plaintiff due to his medical condition / disability, on

terms or privileges of his employment because he was a male and refused to sign her fabricated letter of reprimand [id at 30], and given another female employee's falsified sexual harassment allegations against the plaintiff at the height of the "Me Too" movement in 2018.

336. On March 6th 2018, Plaintiff stated to the Defendant's female Human Resource Manager Joanna Rohde that "he has allergies of active nature, he carries an Epipen, he consumed alcoholic beverage at the event, he blacked out and likely suffered an anaphylactic reaction." [*Anaphylaxis could have resulted from alcohol, other ingredients in the alcoholic beverage including coloring agents, preservatives and/or from exacerbation of his underlying medical illness*.] In contrast, however, Joanna Rohde herself drew a direct conclusion and wrote in her notes that the "plaintiff's doctor said plaintiff is allergic to alcohol.". Thus, the Deloitte Human Resource professional knowingly captured selected piece of information to their advantage, discriminating against the plaintiff and his privileges of employment on the basis of his gender, and in light of the given falsified sexual harassment allegations.

337. Defendant's female Human Resource Manager, Brenda Arends, a decision maker on plaintiff's adverse employment action, his termination, showed discriminatory animus on plaintiff's gender by mentioning that - plaintiff has "*issues with women, and women in supervisory positions*". Brenda Arends knew about the involvement of a female employee with protected characteristics and knowingly made such discriminatory statements. However, in contrast, several female members of Deloitte, who were not under the influence of Brenda Arends and/or her female colleagues, praised plaintiff's work ethics, demeanor and professionalism. For example, (a) Danica Devito invited the plaintiff to present an information session on Deloitte's behalf at Duke University Management school, (b) Morgan Carlon and Megan Gorges praised plaintiff's work ethics, (c) Lydia Schffield said "*she really enjoyed working with the plaintiff*", (d) Shelly Rescober said "*it was nice working with the plaintiff*", (e) Aditi Shankar and Rushika Patel who thoroughly checked all of plaintiff past project performances and references on February 23rd 2018 said '*it was great to have the plaintiff onboard and they look forward to working with plaintiff*', and (f) Karma Porter, Fanzi Mao Pitzer, Tanya Srivastava said they *really liked working with the plaintiff*. (g) Similar appreciation was given by client Chandra Miranda and Shruti Nayyar.

338. This further shows that Defendant Human Resource Managers singled out the plaintiff, and maintained a discriminatory bias against him on the basis of his gender, knowingly gave him a bad performance rating which denied his promotion, pay rise, and bonus opportunities given to similarly situated employees, deprived him of project opportunities, treated him differently than similarly situated employees, like Youmna and Adrienne, who did not have a sexual harassment allegation against them, and knowingly forestalled his professional and career growth.

**1.6 <u>Plaintiff Subjected to Different Standards for Project Assignment</u>**

339. Similarly, double standards were being maintained by plaintiff's female Resource Manager, Amye Hanes. After learning about plaintiff medical condition / disability, it became apparent that the defendant did not want to assign the plaintiff to any projects. For example, Amye Hanes praised the plaintiff's and his Financial Services skills on one hand, while at the same time, orchestrated a discrimination campaign against the plaintiff by sending him on projects where he had no experience and was destined not to be hired, like delivering data governance training for 40,000+ employees at client Scotia bank. Similarly, In January 2018, after learning about purported sexual harassment allegations against the plaintiff, Amye Hanes denied plaintiff's staffing for the M&A growth accelerator project as mentioned above.

340. Similarly, double standards were being maintained by plaintiff's female Resource Manager, Shanah Setzen, who made sure that the plaintiff did not get staffed on projects where he had the right skills citing 'Position closed, not selected'. Amye Hanes was plaintiff's resource manager in the 2017-18 period, and Shanah Setzen was plaintiff's resource manager in the 2018-19 period. Their supervisory oversight suggests that they had input in the final decision of plaintiff's termination. Thus, it is clear that Defendant as such singled out the plaintiff, discriminated against him on the basis of his medical condition/disability and gender, deprived him of opportunities for which he had the right skillsets, treated him differently than similarly situated employees who did not suffer from allergies and/or did not have a sexual harassment allegation against them, and knowingly forestalled plaintiff's professional and career growth.

341. Each time the plaintiff got released, plaintiff had to struggle to find a new project. Due to his national origin and visa restrictions, before the plaintiff could start working on a new project at

a new location, the plaintiff would need to first have his Labor Condition application certified by the Department of Labor (DOL), a process which would generally take between 7 - 10 business days to complete. After getting his Labor Condition application certified, the plaintiff could only start his work the day after his H-1B visa amendment was filed by the defendant's immigration team, a process that would generally take another week to complete. Thus, the plaintiff would need to wait anywhere between 2-3 weeks before he could start on a new project. During this time, the plaintiff would not be on a billable project, which would hurt his utilization and performance metrics. By releasing the plaintiff from different projects and by not letting him get staffed, the defendant female resource managers, Amye Hanes and Shanah Setzen, intentionally and wantonly worked towards spoiling the plaintiff's utilization and performance metrics.

342. As stated above, after the defendant became aware of malicious sexual harassment allegations, Plaintiff was subjected to different standards of project selection. However, similarly situated employees, like Adrienne Moorefield and Irma Arellano, who did not suffer from life-threatening allergies or disabilities and did not have a malicious sexual harassment allegation against them, were not deprived of project opportunities, were not sent to client project opportunities where they were destined not to be hired, were not staffed on projects which required deep knowledge of an industry which they did not have. Defendant as such singled out the plaintiff, treated him differently than similarly situated female employees who did not have a malicious sexual harassment allegation against them, harassed him, and forestalled his professional and career growth.

343. Female Human Resource Manager, Brenda Arends, and plaintiff's female Counselor, Sai Hampankatta failed to perform proper performance evaluation due diligence for the plaintiff. In addition, Brenda and Sai worked together exclusively to orchestrate a discrimination campaign against the plaintiff, first staffing him on projects in which he had very little to no relevant industry experience, creating a hostile environment on the project for the plaintiff, asking the project leaders to release him from the project and finally publishing to their human resource colleagues that the plaintiff again staffed himself on a project and needs to be released immediately.

344. For example, on Kaiser Permeante project, Senior Manager Tim Van Ee, confessed to the plaintiff that plaintiff's release request came from Sai Hampankatta, who got the instructions from plaintiff's Talent Manager, Brenda Arends. Defendant as such singled out the plaintiff, discriminated against him on the basis of his gender by maintaining different standards of project selection and performance evaluation, deprived him of opportunities for which he had the right skillsets, treated him differently than similarly situated employees who did not have a sexual harassment allegation against them, and knowingly forestalled plaintiff's professional and career growth.

345. Based on the suspicious timings and the sequence of the events above, one can easily deduce that, female supervisors and employees of the defendant coordinated internally, aided and abetted each other, falsely engineered plaintiff's performance rating, thereby schemed to illegally control the Plaintiff, blocked his customary bonus, pay-raise and/or his promotion to the next level, terminated his employment, constrained his career progression, constrained his civil and constitutional rights, endangered Plaintiff's health, wellbeing, reputation, and harmed Plaintiffs income, and financial resources.

346. Based on the above-mentioned facts, upon information and belief, it is evident that female members of the Deloitte Human Resource department, as mentioned above, have coordinated with project teams internally and falsified plaintiff's performance evaluation report for his Pfizer and Anthem projects. Plaintiff was singled out, treated differently from other employees in this regard, discriminated and retaliated against by the defendant. It is also possible that plaintiff's confidential medical information was leaked to other employees

347. On or about April 6th 2018, male Deloitte Human Resource executive, Austin Perez, coordinated with other female members of Deloitte Human Resource on such issues, showed no interest in the details of the plaintiff's ethics complaint, and instead falsified his own report regarding plaintiff's complaint, by wrongly stating that *"plaintiff would like to rescind his complaint as he no longer feels it necessary".* After the defendant became aware that plaintiff was assigned a disproportionate workload because of his race, defendant chose not to further investigate plaintiff's ethics complaint. Austin further concealed information and allegations from the plaintiff on his ethics complaint investigation. Plaintiff was singled out, treated differently from

similarly situated employees who did not have a malicious sexual harassment complaint or were not discriminated against due to the existence of a female professional with protected characteristics

## Discrimination by Google based on Plaintiff's Gender

348. Google recruiter Jose Martinez Avalos reached out to the plaintiff on behalf of the Google Product Management team. The Google Product Management selected plaintiff's profile and was interested in interviewing the plaintiff. The plaintiff was qualified for the position at all times.

349. Upon knowledge and belief, Deloitte had access to plaintiff's phone and email communications. Given the business interests of Deloitte were at stake, Deloitte also involved state actors on plaintiff's matters. Such state actors, who worked with Deloitte talent relation professionals, maintained surveillance over plaintiff's communications.

350. Given the business interests of both Google and Deloitte were at stake, it can be inferred that the White Deloitte HR professionals and the Google HR and recruiters had a 'meeting of the minds', and thus reached an understanding or agreement that plaintiff should be refused or denied recruitment opportunities at Google.

351. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Deloitte, and in-part on State Actor Joanna's affiliations and relationships with government officials.

352. Deloitte female supervisor and Talent Relations Manager, Joanna Rohde was aware of the inconsistent or incomplete investigation by her subordinate Mr. Austin Perez, yet remained indifferent to the consequences of such discriminatory acts. At all times was Joanna aware of the risks associated with misrepresentation or misconduct by her subordinate, yet continued to overlook facts and intentionally misguide Mr. Perez.

353. By not informing the plaintiff about the sexual harassment issue, and by supervising or conducting an incomplete and inconsistent investigation on plaintiff's ethics and integrity complaint, Joanna established or maintained a policy, practice or custom that directly caused a violation of plaintiff's Federal and State protected rights.

354. since the plaintiff was discriminated by Deloitte female supervisors who raised gender discrimination issues against the plaintiff or by Deloitte female/s with a protected characteristic or factors such as pregnancy, if Google were to hire the plaintiff without letting Deloitte claim any immunity or defenses, a pending litigation against Deloitte or Google in the same area may create tension or conflicts of interests between male and female workers at Google, affecting team dynamics and employee morale. Similarly, the workplace morale, productivity and reputation of Google could have been impacted.

355. Defendant Deloitte substantial procedural irregularities in the investigation of the sexual harassment allegation, including their failure (a) to seek out potential witnesses that the accuser Christina Young had identified as sources of information, (b) accuser Christina's inconsistent statements on the facts, (c) Deloitte's failure to comprehend the causal connection and malicious nexus between the December Holiday Party and the false sexual harassment allegation raised by Christina on January 11th for the January 10th 2018 event, (d) Deloitte's failure to act in accordance with company procedures designed to protect accused employees, and (e) Deloitte's arrival at conclusions such as the plaintiff was inebriated at multiple events without any fact checking or witness testimony – such actions were "incorrect and contrary to the weight of the evidence".

356. The procedural deficiencies in the Deloitte's investigation and adjudication of the sexual harassment complaint raise an inference that the Deloitte was motivated, at least in part, by sex bias. It is plausible that Deloitte was **motivated** to "favor the accusing female over the accused male" in order to **demonstrate its commitment to protecting female employees** from accused male employees. Upon knowledge and belief, after learning about plaintiff's successful interviews at Google, Defendant Deloitte HR communicated with Google HR and **exerted their influence** such that plaintiff would not be able to secure gainful alternate employment at Google.

357. It can be identified that Google's decisions to delay the progress of plaintiff's interviews over July and August 2018, and finally deny a position, were motivated, at least in part, by bias. Since the issue was not just a harassment issue, but a sexual harassment issue, **Google's decision was motivated by sex bias**. It is plausible that Google refused to hire the plaintiff because it was motivated to "favor non-accused female applicants and employees at Google over the accused male plaintiff" in order to **demonstrate its commitment to protecting female applicants** and employees from male sexual harassers.

358. After learning about Plaintiff's malicious sexual harassment allegation, defendant Deloitte consulting took multiple adverse actions against plaintiff, such as issuing him a malicious letter of reprimand, replacing him on a project with a White US national, Deloitte treated similarly situated employees differently than the plaintiff.

359. The clearly irregular investigative or adjudicative process, lack of information on the subject to the plaintiff, lack of communication on the issue to the plaintiff, followed by a constant drumbeat of ridicule, mocking and harassment both on and off projects provide an inference that Deloitte was motivated in-part by sex-based bias. For instance, plaintiff's female supervisor mentioned to the plaintiff that "no one likes working with you", when in fact more than 70% of the performance reviews given to the plaintiff were positive.

360. On the gender discrimination or sexual harassment allegation made by a female employee twice the age of plaintiff, the evidence substantially favored the plaintiff, but the Deloitte evaluator, Joanna Rohde, a White Caucasian female, without an apparent reason based on the evidence, formed an opinion and/or a conclusion in favor of the female accuser. Thus, this further provides an inference that the evaluator has been influenced by gender bias.

361. The plaintiff was retaliated against by his supervisors on his Anthem project based out of Los Angeles from September to November 2017. The defendant Deloitte became aware of plaintiff's disability in December 2017, as informed by the plaintiff to the Deloitte Partner. In early January 2018, Christina filed her malicious acquisitions. The discovery evidence shared by Deloitte identify that after such events, female supervisors started maintaining continued discriminatory animus against the plaintiff.

362. The internal involvement of female Deloitte Human Resource (HR) Managers and their continued communication with plaintiff's female supervisors during this period suggest that defendant Deloitte Consulting formed an opinion or a conclusion – in favor of the female accuser and in-general to protect the interest of other females – and against the plaintiff. Thus, this further provides an inference that the female HR professionals and the plaintiff's female supervisors had been influenced by gender bias.

363. Defendant Deloitte has further concealed information on the protected characteristics or factor of plaintiff's female individuals. Upon knowledge and belief, the plaintiff worked or was employed in market conditions with pregnant individuals, be it pregnant Deloitte supervisor or colleagues, or pregnant spouses, domestic partners or girlfriend of such supervisors or colleagues.

364. After the defendant formed an opinion and/or a conclusion in favor of the female sexual harassment accuser, and after the defendant discovered the existence of a pregnant individuals, be it supervisors, colleagues, or spouses or partners of such supervisors or colleagues, who were responsible to either provide or help identify a performance evaluation for the plaintiff, the defendant Deloitte knowingly and wantonly made sure that the plaintiff was assigned a false non-discriminatory reason for separation.

365. After learning about plaintiff's sexual harassment allegation in mid-January 2018, the defendant Deloitte decided to assign the plaintiff a non-discriminatory performance-based negative evaluation to maintain an illegal control of the plaintiff, and further concealed such information from the plaintiff to limit their liability. Female HR professions and supervisors internally communicated about the plaintiff, yet never informed the plaintiff of his negative performance evaluation until 6-months after such events.

366. On February 16th 2018, the defendant Deloitte issued a discriminatory, biased, false and malicious letter of reprimand to the plaintiff. After the plaintiff refuted the letter and provided witnesses to support his innocence, the defendant concocted a malicious plan to permanently assign a non-discriminatory performance-based reason for plaintiff's termination.

367. On February 16th 2018, the plaintiff provided evidence and witnesses that identified that plaintiff was sober and well behaved on the January 10th 2020 event. After the defendant Deloitte became aware of this fact, the defendant knew that the malicious acquisition filed by Christina Young was false. This provided the defendant a further impetus to conceal material facts on the issue, and knowingly and wantonly provide the plaintiff with a permanent negative performance evaluation.

368. After the plaintiff produced witnesses, the defendant Deloitte employee Joanna Rohde knew that on January 11th 2018, Christina Young had made false allegations against the plaintiff for the January 10th 2018 event. Since Joanna coordinated internally to have the plaintiff released from the JP Morgan Chase project on December 18th 2021 (as identified previously), and because Joanna created a false and malicious letter of reprimand, in order to save herself, the firm and the financial services partners from liability, she had no option but to corroborate with Christina Young. Both Christina and Joanna helped each other by having Christina provide inconsistent statements on the sexual harassment issue, and later Christina was moved as Chief of Staff to a Litigating firm upon knowledge & belief around the same time plaintiff filed his lawsuit in court.

369. Defendant Joanna Rohde acted in this manner in order to conceal defendant's direct involvement on the issues such as (a) FSI Partner's direct knowledge of plaintiff's disability / medical condition in Dec. 2017, (b) Joanna's involvement on plaintiff's release from the J.P Morgan Project immediately after plaintiff's disability event, and (c) defendant's discrimination against the plaintiff on the basis of protected characteristics / factors of other female employees in 2018 specifically because of the existence of a pregnant woman. HR Joanna Rohde was aware of the situation and **actively participated** in retaliatory acts against the plaintiff such as the issuance of a malicious letter of reprimand, and plaintiff's release from the JP Morgan Chase and Fox News Projects.

370. In addition, the plaintiff was rolled off projects and was sent to projects for which he was not properly trained for (e.g. see Kaiser Permanente). For instance, for client Kaiser Permanente, the plaintiff had little training with Epic data, Clinical data, etc in the Healthcare space and no experience with Microsoft Azzue. Thus, it can be inferred that Deloitte staffed the plaintiff on projects without proper training, and Deloitte failed to train the plaintiff for positions on the basis of his gender and race given the gender discrimination allegation and retaliation by White

Supervisors. Deloitte's past negative treatment of the plaintiff on the basis of his gender and race is relevant in showing that Deloitte's proffered reasons for an adverse action against the plaintiff were not true.

371. Specifically, the project Sr. Manager and Supervisor clearly highlighted that he wanted to staff the plaintiff on the project and wanted the plaintiff to lead the project despite the plaintiff having little experience in the Hospital and Healthcare space. The Sr. Manager and Supervisor specifically said "I will help you with the specifics", "that should not be an issue", and it is just "industry stuff".

372. The sequence and timing of the project is important because Deloitte coordinated with Supervisor and Sr. Manager Tim Van Ee, to staff the plaintiff on the healthcare project to build or generate immunity on Dr. Niti Aggarwal and plaintiff's male relative working in the same space. Specifically, plaintiff's girlfriend Dr. Niti Aggarwal worked in the healthcare industry and was targeted by Deloitte and her employer during plaintiff's work at the Kaiser Permeante project. In addition, plaintiff's male relative, whose father was a government official and whose sister worked at Deloitte, also worked in the health care industry at the same geographic location as Dr. Niti Aggarwal in the State of Wisconsin. This relative worked for a Deloitte customer or client named Epic, a well know software and system service provide in the health care space.

373. During the months of September and October 2018, the Plaintiff's submitted his profile for various client projects on the internal job portal, but his Resource Manager (RM) kept closing his project role submissions requests citing 'Position Closed, Not selected'. Deloitte Resource Managers and HR professionals intentionally worked against the terms and conditions of plaintiff's employment, and deliberately influenced or forced the plaintiff to choose the only available option – client assignment in the healthcare space with client Kaiser Permanente

374. Since client utilization and project assignments formed an integral part of compensation and promotion, and since the plaintiff was assigned a poor performance rating for the previous performance cycle, Deloitte indirectly conditioned plaintiff's continued employment upon his agreement to be staffed on the only available option at client Kaiser Permanente Healthcare project. Thus, Deloitte influenced or forced the plaintiff to choose an opportunity outside his

area of interest and outside his skillset, prevented competition and created monopolistic advantages.

375. Upon knowledge and belief, Deloitte's actions are similar to the actions of a software company, Microsoft, which conditioned the purchase of its operating system (windows) on the mandatory purchase of its office suite, leveraging its dominant operating system to monopolize the office suite market, preventing consumers from choosing individual components, and limiting consumer choices by forcing consumers to purchase less-desirable products along with a dominant product. The US courts have held that Microsoft abused its dominant position and prevented competition.

376. Thus, it can be inferred that Deloitte's real intention to staff the plaintiff on the Kaiser Permanente project in Hospital and Healthcare space was to generate immunity from legal claims based on additional false non-discriminatory performance-based reasons for termination, and build or generate immunity against other individuals known to the plaintiff who worked in the healthcare space. For instance, preventing such individuals from filing a claim that they were singled out in a particular industry.

377. The plaintiff started the project on 10/08/2018 and learned that he was getting released on 10/17/2018. On 10/17/2018, less than two weeks after starting the project, the Plaintiff's Human Resource manager Brenda Arends from his Business Unit learned that the plaintiff got staffed on the project. Hence, she immediately intervened along with plaintiff's female counselor to have the Kaiser Permanente Sr. Manager and Supervisor release the plaintiff from the project. The Sr. Manager neither got an opportunity to share the specifics, not could invest time to bring the plaintiff upto speed on the themes he believed should not be an issue as they are just "industry stuff".

378. On her email notes to the Human Resource professional, an email on which the male Superior was not copied, plaintiff's female counselor specifically stated that the plaintiff got released from the project because the Plaintiff "*wasn't able to get along with his team & didn't demonstrate an attitude where he could learn & deliver*". The plaintiff's counselor, human resource manager, overlooked the fact that the plaintiff had not even started working at the client location, had not physically met with his team, had not received client engagement materials on the multiple

different aspects of the work stream, had not received project deliverables for similar or comparable work delivered at other clients, and the project Supervisor had not had an opportunity to share the specifics or bring the plaintiff upto speed on industry stuff.

379. In February 2018, right after the plaintiff filed his ethics and integrity complaint that was leaked to members of plaintiff's business unit, including Deloitte HR Professional Brenda Arends, the very fact that plaintiff's girlfriend, Dr. Niti Aggarwal, who worked at a hospital setting as a Physician in the Healthcare space, was maliciously and wrongly accused of "not getting along with her team of junior fellows or residents".

380. The very fact that Dr. Niti's junior fellows or residents repeatedly showed their eagerness to work with her, praised her professional abilities and inter-personal skills, and would inform her if they knew about any concern, and the very fact that the plaintiff highlighted clear facts and evidence that could lead to multiple Whistle Blower claims against Deloitte, show the causal connection between the two events and demonstrate that Deloitte HR Professionals coordinated with and conferred with Dr. Niti's employer and tried to maliciously build legal immunity against Dr. Niti based on a reason that could be used to effectuate an adverse action or claim immunity.

381. Deloitte HR Professional and Supervisor Brenda Arends had motive to concoct false reasons to effectuate an adverse action against the plaintiff. She first received leaked information on plaintiff's confidentially filed ethics and integrity complaint, then delivered a malicious letter of reprimand to the plaintiff (where she falsely accused the plaintiff of being inebriated on two occasions) and threatened the plaintiff with termination. She then decided to issue the plaintiff with a negative performance rating months prior to informing the plaintiff, failed to perform proper due diligence on gender discrimination and pregnancy related matters, and used such matters as a ruse or subterfuge to support her malicious actions. Since the issues raised by the plaintiff presented a legal basis for claim against both Deloitte and Brenda Arends, she failed to change her finding or decisions even after knowing that the facts and evidence favored the plaintiff, and continued to coordinate with Supervisors to target the plaintiff. Altogether, her actions identify that plaintiff's gender was in-part the motivating cause for her discriminatory acts against the plaintiff.

382. Since Deloitte refused to provide opportunities to the plaintiff in areas where the plaintiff had significant professional experience and competence, it can also be inferred Deloitte had no real or genuine interest in plaintiff's professional growth or development. Deloitte's monopolistic approach towards the plaintiff is similar or comparable to a dominant company which refuses to supply essential products or services to competitors or other market participants, hindering competition and maintaining its monopoly.

383. Upon information and belief, Defendant did not want to continue to employ Plaintiff due to his life-threatening allergies, gender discrimination allegations against him, and legal liability that may arise due to plaintiff's ethics and integrity complaint, but, instead, sought to retaliate against the plaintiff for defending himself with proof of his medical condition, and identifying proof and witnesses on his written ethics and integrity complaint

384. Upon information and belief, similarly situated recruitment candidates who did not suffer from gender-based employment discrimination on the basis of a malicious sexual harassment allegation at their previous employers, or on the basis of protected characteristics of a pregnant female supervisor by their previous employer, were considered for the full-time positions at Google. These recruitment candidates or applicants went through Google's recruitment process and were subsequently hired as full-time employees by Google. Similarly situated applicants were neither discriminated nor retaliated by the Google Recruiter on the basis of their gender.

385. For the years 2018-2024, Plaintiff and a similarly situated to Google female applicants, Carol Skordas Walport and Jessica French. Both plaintiff and Carol Skordas Walport had almost the same number of years of work experience. The applicants were subjected to similar hiring standards, that screened for and required similar skill, effort, and responsibility for the similar position at Google.

386. Upon knowledge and belief, Carol Skordas Walport and Jessica French worked on similar positions that required similar skill, effort, and job responsibilities at Google, which is comparable to plaintiff's Client Consulting work at Deloitte. Carol Skordas Walport and Jessica French were subject to the same standards of fulltime employment discrimination laws at Google, as the plaintiff at Deloitte. These employees had similar or comparable educational

background as the plaintiff, Carol had a Master's degree and Jessica had a MBA, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

387. For the years 2018-2024, Carol Skordas Walport and Jessica French were hired by Google, however, the plaintiff was not. Upon knowledge and belief, Carol Skordas Walport and Jessica French did not suffer from a malicious sexual harassment allegation at their previous employers, were not discriminated by their previous employers on the basis of protected characteristics of a pregnant female supervisor. Carol Skordas Walport and Jessica French also lacked plaintiff's diverse work experience dealing with multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

388. Google singled out the plaintiff and treated the Plaintiff differently than similarly situated female applicants, Carol Skordas Walport and Jessica French, applicants who did not suffer from gender discrimination in the form of sexual harassment allegation or protected female factor like pregnancy. Carol Skordas Walport and Jessica French were finally hired by Google as a fulltime employee while the plaintiff was not. At Deloitte, the plaintiff was not just confidentially accused of any harassment, the plaintiff was accused of sexual harassment which provide the minimal inference of sex bias.

389. The very fact that the plaintiff suffered a disability based on a medical condition, the fact that plaintiff's girlfriend was a physician and could potentially help the plaintiff, the fact that plaintiff's girlfriend was related to an Indian Legend, and the fact that the plaintiff's was helped by multiple Deloitte Partners for his disability event, persuaded White Caucasian female HR and Deloitte Talent Relation Manager Joanna Rohde, who continually engaged in conduct that otherwise may be considered as State Action, to involve or engage state actors to maintain a surveillance over the plaintiff.

390. Deloitte and Joanna knew that the circumstances substantially favored the plaintiff on the sexual harassment issue identified by Christina Young. However, in order to develop or provide immunity to Deloitte Partners, Joanna conducted an incomplete and inconsistent investigation

of the issues raised by the plaintiff. Since it can be inferred that the Deloitte HR professionals or state actors helping Deloitte had a meeting of minds to reach an understanding or agreement not to hire the plaintiff, the circumstances further provide an inference that Google's decision not to hire the plaintiff had been influenced by gender bias.

391. The plaintiff was reached out by Google, and the plaintiff's profile was selected by the Google recruiter. The plaintiff was qualified for the position at all times. However, the Google recruiter, further showed bias by providing better treatment to white female recruitment applicants, like Carol Skordas Walport and Jessica French, who were subsequently hired by Google. While plaintiff, a non-White Asian male applicant, was rejected by Google and his application was denied.

392. It can be inferred that through interactions or involvement of Deloitte State Actors, Google Recruiter knew about plaintiff's gender, race and national origin bias by Deloitte Consulting LLP, and the possibility of liabilities and extended litigation possibilities at Google.

393. The plaintiff's profile was selected by the Google recruiter. The plaintiff was qualified for the position at all times. However, the Google recruiter, further showed bias by continuing to seek applications for the multiple similar positions with the Product Management space. Google subsequently hired females like Carol Skordas Walport and Jessica French. Upon knowledge and belief, other female candidates were continued to be hired for the same or similar positions at Google after the plaintiff's application was denied.

## III. Retaliation

### Retaliation by Deloitte

394. In Sept. – Nov. 2017, on the Anthem project, based out of Los Angeles, Plaintiff was given the task to replace an employee with 8+ years of work experience in a subject area, and manage her functional workstream which had heavy workload, including hundreds of documented open items, a subject area where the plaintiff had no experience at all. Plaintiff was assigned this specific part of a larger IT data migration project work because the mentioned employee was

leaving. Plaintiff had no formal training and/or no experience in the subject area – primitive mainframe system data modeling and migration in healthcare insurance industry vertical.

395. Just as the plaintiff tried to discuss the situation with the leadership, he was given additional responsibility by his project supervisors with discriminatory intent. This additional responsibility was to manage another technical workstream with equivalently heavy workload, held by another employee with 20+ years of experience in the subject area and industry. Plaintiff was required to travel every week from New York to Los Angeles for the project.

396. When plaintiff raised concerns about the enormity of work and complexity of task with his supervisors, he was told by his project supervisor, Senior Manager - Ashley Scorsatto that "*being an Indian, he should be able to handle the situation*", "*he should be able to handle the additional workload",* thus plaintiff was reminded of his temporary visa status in the United States, and was threated to take on extra workload based on his national origin and race as identified by plaintiff in his ethics complaint made in February 2018. Thus, plaintiff was singled out against other US and foreign nationals working for the same supervisor and the same client, who were not assigned workload of two fulltime employees and were not made disparaging comments.

397. Similarly, at another instance, given the enormity of the work, the complexity of the task, and tight timelines, when plaintiff raised concerns that he is required to work more than twice as hard because of the workload and because he did not possess expertise in the subject area, and that the project was not being managed properly, plaintiff was threatened against raising such issues. Plaintiff was told that that "*raising such issues would have consequences*" and "*failure is not an option*" thus plaintiff was intimidated and threatened with termination on failure to complete the disproportionately heavily workload. Plaintiff was also denied additional training opportunity given the tight project timeline. Plaintiff later learned from others that it may result in deliberate poor performance evaluation by his supervisors.

398. However, in spite of these issues, the plaintiff worked extremely hard and coordinated with client, onsite and offshore teams, and technology vendor to ensure timely delivery on almost all of the functional issues. Plaintiff also carefully streamlined all technology tasks for the current and next phase of project release. The defendant as such singled out the plaintiff, treated him

differently than similarly situated employees, like Rishil Murukan, who had significant experience in the specific subject area, and upon information & belief were given good performance rating, were not threatened with adverse consequences of raising project mismanagement issues and were not discriminated based on their race or national origin.

399. On or around November 8th 2020, plaintiff's project supervisors released the plaintiff from the project citing budget issues. They mentioned the project was running low on budget and travelling from New York to Los Angeles was expensive. Another consultant working with the plaintiff on the same team was also released on the same day citing budget restrictions. Plaintiff was to transition his work in a week to a female employee, Swatika Gupta. The team was scheduled to meet next week in Atlanta, GA. Thus, plaintiff's project supervisor Ashley Scorsatto's bias against the plaintiff, a male employee, was further evident by this replacement. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees, like Swatika Gupta, who had significant experience in the specific subject area, were given good performance rating and were treated more favorably by the project supervisor due to her race.

400. For the years 2016-2018, Plaintiff and a similarly situated employee, Swatika Gupta, female Senior Consultant, Deloitte Strategy and Analytics, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment. Swatika did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against her.

401. Plaintiff had good working relationship with his teammates. Next week in Atlanta, GA, on 15th of November 2017, the entire team gave the plaintiff and the consultant a project release party based on plaintiff's efforts and good work. Party was named - Plaintiff and Consultant's release party (names redacted). Upon information and belief, the party was attended by 10+ employees. Plaintiff could not attend his release party as he had to change hotels that day and was suffering from allergies. Since plaintiff had allergies at his previous hotel room at J.W Marriot, he moved

to the Westin on 15th November. Plaintiff again met with his teammates reminiscing the project at a Deloitte University event in February 2018.

402. In January 2018, after the defendant became aware of plaintiff's medical condition / disability and malicious sexual harassment allegations against him, Deloitte Talent Relations HR Joanna Rohde and Performance Management HR Katie Wittenbraker, who knew about the malicious sexual harassment allegations against the plaintiff, coordinated internally with plaintiff's counselor and plaintiff's female project manager for the Anthem project to falsify plaintiff's performance rating. The project manager followed suit, in part to hide her own discriminatory practices on the project, and in part to save the firm from any legal liability on the malicious sexual harassment complaint. For example, Katie Wittenbraker stated in her notes that plaintiff has issues working with female leaders which is incorrect

403. In February 2018, after completing firm wide training, plaintiff filed an ethics violation report citing discrimination and workplace misconduct in the matter. Hence, plaintiff participated in a protected activity by (a) filing an Ethics, Integrity and Personal Conduct violation report, (b) identifying discrimination such as assignment of disproportionately heavy workload, and (c) identifying invidious actions and comments made by his supervisors. Plaintiff was treated differently - that is, plaintiff suffered retaliation - on the basis of his participation in discrimination investigation and/or proceeding. This participation constituted an "impermissible" reason to treat an employee differently.

404. However, instead of completely investigating plaintiff's complaint, taking disciplinary action against plaintiff's supervisors, and giving the plaintiff a good performance rating, the defendant further maintained a discriminatory and retaliatory bias against the plaintiff (a) by assigning him negative performance review for his Anthem Project, (b) by not informing the plaintiff about the outcome of the investigation, (c) by not interviewing the witnesses identified by the plaintiff on this ethics complaint, (d) by not informing the plaintiff about the details of the ethics complaint investigation, or any other complaint, for example, the sexual harassment complaint against the plaintiff

405. The defendant further discriminated and retaliated against the plaintiff by (a) inaccurately paraphrasing plaintiff's account of events, (b) inaccurately claiming that plaintiff wanted to

rescind his ethics complaint, (c) not asking the accused questions on the issues raised by the plaintiff on his ethics complaint, and (d) not informing the plaintiff his potential right to have an employee advocate who can positively represent him within the firm. These actions by the defendant occurred after defendant became aware of plaintiff's disability / medical condition, malicious sexual harassment allegation based on gender, and his workplace discrimination / ethics violation complaint. Upon information & belief, plaintiff was singled out against similarly situated employees who did not suffer from life threatening allergies, did not have a sexual harassment allegation against them and did not file a workplace discrimination complaint based on disproportionately heavy workload, and disparaging comments by their supervisors.

406. Ashley Scorsatto and Binu Janardhanan were plaintiff's supervisor on this Anthem project. They gave the plaintiff a bad performance rating on the project. The rating was submitted on the defendant system in early February 2018 after the plaintiff completed his ethics training, and plaintiff was made aware of it in June 2018. Their supervisory oversight suggests that they had input in the final decision of plaintiff's termination. Plaintiff further believes that above mentioned retaliatory moves and statements were made by the defendant as retaliation to his filing of an ethics complaint and to further discriminate against the plaintiff based on his disability / medical condition. The defendant knew that the plaintiff could claim disability, racial discrimination and retaliation on this specific issue.

407. Plaintiff filed the ethics complaint in February of 2018, right after taking the ethics and integrity training and right after his supervisors filed his performance rating on the system, and the defendant deliberately waited until June 2018 to inform the plaintiff of the negative performance rating on the project. Plaintiff was terminated 4 months later in early November 2018. The causal connection between the act of discrimination, followed by plaintiff's engagement in the protected activity – that is his ethics and workplace conduct violation report, followed by multiple instances of discriminatory treatment adverse employment actions from February to October 2018, followed by plaintiff's termination in November 2018 – the timing, sequence and connection of activities show defendant's retaliatory motive.

408. Had the defendant given the plaintiff good and unbiased performance review, plaintiff would not have received a negative performance rating for the 2017-18 cycle, since this project

constituted for 11 or more weeks of client billable work which in turn-constituted of little more than 33% of plaintiff's billable work for the 2017-18 performance cycle. Good performance review on this project would have added to the great performance rating plaintiff received on the other Citibank project during the same performance cycle. This in turn would have allowed the plaintiff to receive his material annual performance incentive benefits like compensation increase, bonus and/or promotion, during Aug. end / early Sept. 2018, and would not have led to plaintiff's non-discriminatory performance based his termination. Ashley and Binu's discriminatory behavior combined with negative performance rating constitute adverse employment action. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees, like Youmna Saloumi, Rishil Murukan, who did not have a medical condition / disability, did not have a malicious sexual harassment allegation against them or were not discriminated on the basis of gender based protected factors, and were not discriminated against on the basis of their national origin or race.

409. On or about April 6th 2018, Deloitte Human Resource executive, Austin Perez, coordinated with other female members of Deloitte Human Resource on this issue, showed no interest in the details of the plaintiff's complaint, and instead falsified his own report regarding plaintiff's complaint, by wrongly stating that *"plaintiff would like to rescind his complaint as he no longer feels it necessary".* After the defendant became aware that plaintiff was assigned a disproportionate workload because of his race, defendant chose not to further investigate plaintiff's ethics complaint. Austin further concealed information and allegations from the plaintiff on his ethics complaint investigation. Plaintiff was singled out, treated differently from similarly situated employees who did not have a malicious sexual harassment complaint or charge against them

410. In February 2018, plaintiff filed an ethics and workplace conduct violation complaint. However, HR showed no interest in plaintiff's ethics complaint and instead retaliated against the plaintiff and accused the plaintiff of being inebriated on two (2) different occasions, and to sign a letter of reprimand admitting that he was inebriated on two (2) separate events on two (2) different dates otherwise his employment would be terminated. However, plaintiff did not sign the letter and instead produced multiple witness to confirm that he was sober and of his underlying medical condition.

411. By informing Deloitte business leaders and Senior Human Resource professionals about his medical condition, plaintiff stood up for his rights and engaged in a protected activity. Defendant Partner and HR asked the plaintiff to sign a letter of reprimand and threatened plaintiff with termination. However, plaintiff provided witnesses for his innocence. Thus, Plaintiff engaged in a Protected Activity.

412. In addition, plaintiff opposed discriminatory practices and stood up against violations of law, that is engaged in protected activity, by objecting to defendant's discriminatory practices during scheduled calls with Human Resource managers such as (a) call with Partner and HR on Feb 16th 2020 on defendant's malicious letter of reprimand, (b) call with HR Joanna Rohde on Feb 16th and March 6th 2020 on letter of reprimand and defendant's releasing the plaintiff from JP Morgan Chase, M&A project and 21st Century Fox project, and (c) calls with HR on defendant's investigation on plaintiff's ethics complaint. Defendant's motivation and malicious intent in these areas is evident from their malicious letter of reprimand, from plaintiff's release from projects etc.

413. After the malicious letter of reprimand, the firm knew that they have retaliated against the plaintiff, and he may potentially file a discrimination complaint. The firm then falsely engineered a non-discriminatory performance-based reason to illegally control the plaintiff, and knowingly gave him a poor performance rating. In addition, the firm did not pay any bonus to the plaintiff for his hard work. Thus, Plaintiff was singled out, and treated differently than similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano, who did not suffer from life-threatening allergies, who did not have a malicious sexual harassment allegation against them, and were not given a malicious letter of reprimand and threatened with termination

414. After learning about plaintiff's disability / medical condition in December 2017, and malicious sexual harassment allegations against the plaintiff in January 2018, defendant female Resource Managers (RM) Amye Hanes and Shanah Setzen, both women of Caucasian ethnicity, maintained discriminatory bias against the plaintiff, released the plaintiff from projects and closed his project role submissions requests on the internal job portal by citing - *'Position Closed, Not selected'* (*id at 39*). Plaintiff's female Supervisors and Human Resource Managers – Ashley, Christina, Joanna, Brenda, Katie, Amye, and Shanah – maintained a discriminatory bias against

the plaintiff, for example, on her investigatory call between HR Katie Tiller Whittenbraker and Ashley Scorsatto, Katie notes that plaintiff has issues working with female leaders, which is incorrect as plaintiff has recommendation from several women colleagues and leaders at Deloitte (*id at 44 to 48*)

415. Defendant knew that it had discriminated and retaliated against the plaintiff several times before, and plaintiff could make a claim against the defendant. Hence, the defendant planned to make it more difficult for the plaintiff to prove good results in spite of his great efforts by assigning plaintiff projects that were outside his core industry expertise and skillset. Defendant knew that diverse assignments in multiple industries, at different clients distributed among multiple states within United States, combined with a negative performance evaluation, would deter or dissuade a reasonable worker like the plaintiff from making or supporting a charge of discrimination. By excluding plaintiff from projects that contributed significantly to his professional advancement, might well deter a reasonable employee, like the plaintiff, from complaining about discrimination.

416. After the December 14th 2017 event, Plaintiff's project assignments at clients 21st Century Fox, TJX Industries, Ball Corporation and Kaiser Permanente were outside of his core expertise and skillset. As these projects needed additional work in terms of (a) learning a new subject area, at a new client for a new / unique business, (b) preparation for advising internal team and clients and (c) execution both in terms contributing to and delivering client work, Plaintiff had to work twice as hard on such projects to achieve the same results as employees with significant experience in the subject area; and this pattern of work assignment thus constituted a disproportionally heavy work for the plaintiff. Thus, plaintiff was treated differently than similarly situated male and female US and foreign based employees, like Youmna, Morgann and Todd, who did not suffer from life-threatening allergies or disabilities.

417. As mentioned previously, plaintiff's claims for retaliation, and discrimination based on his disability, gender, national origin and race are intertwined. Plaintiff was hired for his experience, expertise and skillset in Life Sciences (Pharma) and Finance. Plaintiff received good performance rating for his projects at Citibank (Finance) and Bausch Health (Life Sciences). Plaintiff further received good performance rating for his firm eminence work in Life Sciences. However, after plaintiff's disability incident in 2017, the above-mentioned project assignments,

outside of plaintiff's core industry experience and expertise, combined with multiple project removals and change in project responsibilities were so significant as to constitute a setback in plaintiff's career. In spite of these challenges, the plaintiff managed to secure praise and recommendations from Deloitte client and internally from Deloitte leaders.

418. In a durable pattern of discriminatory bias against the plaintiff, defendant deliberately placed the plaintiff on diverse short-term projects that were outside of his core expertise to hide its own (a) discriminatory practices at the Anthem and TJX projects, (b) their discriminatory role in the malicious sexual harassment allegation, (c) their malicious letter of reprimand, (d) their release of plaintiff from different projects, (e) their falsely engineered non-discriminatory reason for plaintiff's termination based on performance. However, plaintiff worked twice as hard on these projects and was intermittently commended by his Deloitte and Client leaders.

419. Defendant was motivated to discriminate against the plaintiff. Defendant criticized plaintiff's performance in ethnically degrading terms, replaced plaintiff on projects with employees outside his protected class, and provided more favorable treatment to employees not in the protected group. Defendant knew that it had discriminated against the plaintiff at several instances, and plaintiff may file a charge of discrimination. Thus, to avoid liability on any potential charge of discrimination, defendant gave a plaintiff negative performance rating in spite of his good work and effort, and thus, falsely engineered a false non-discriminatory reason for plaintiff's termination.

420. Further, the sequence and timing of the events suggest that defendant maintained discriminatory bias against the plaintiff based on his gender. After learning about the malicious sexual harassment allegation in January 2018, defendant (a) architected a malicious letter of reprimand against the plaintiff, (b) did not follow the defendant's own processes and protocols of informing or interviewing the plaintiff on the malicious sexual harassment allegation, (c) concealed the sexual harassment complaint, identity of the accuser, Christina Young, and information about her retaliation history at JP Morgan Chase, (d) treated Christina Young's more favorably by not investigating her malicious allegations, and (e) intentionally released the plaintiff from projects before completion.

421. Plaintiff's business unit and defendant talent relations group thereafter created a policy or custom under which discriminatory bias against the plaintiff occurred. For example, plaintiff was intentionally given a negative performance rating on his projects, thus defendant engineered a false and non-discriminatory reason for plaintiff's termination. Similarly, plaintiff's supervisors maintained a discriminatory bias against him, and plaintiff was mocked or harassed on each and every project while similarly situated employees were not. These incidents were more than episodic; they were sufficiently concerted and continuous to be deemed pervasive.

422. Defendant's pervasive discriminatory bias, be it (a) Plaintiff's performance being criticized in ethnically degrading terms, (b) defendant replacing plaintiff on projects with employees outside his protected class, (c) defendant providing more favorable treatment to employees not in the protected group, (d) invidious comments being made by plaintiff's supervisors, and (e) the sequence and timing of events leading up to plaintiff's discharge, indicate that plaintiff's termination occurred under circumstances giving rise to an inference of discrimination on the basis of intertwined factors based on plaintiff's disability, gender and national origin and race.

423. Further, as mentioned in this complaint, plaintiff's HR supervisor Brenda Arends actively participated in plaintiff's release from projects, engineered his negative performance evaluation and his eventual discriminatory termination. Further, Joanna Rohde actively supported her colleagues, acted under the color of law, knowingly concealed information from plaintiff, was informed and aware but failed to take appropriate action with respect to malicious sexual harassment complaint directed at plaintiff. These human resource professionals maintained a discriminatory bias against the plaintiff based on his disability, gender, national origin and race.

424. The discriminatory practices of these senior policy making officials were so persistent or widespread as to constitute a custom or usage under law. The defendant was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff.

425. Thus, plaintiff's termination would not have occurred in the absence of the above-mentioned retaliatory motives. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred. Plaintiff possessed a good faith and objectively reasonable belief that the employment practice at issue

was unlawful under the relevant statutes. On each of the above instances, the employer was put on notice for their illegal conduct, be it assignment of disproportionately heavy workload, invidious actions or comments by supervisors, plaintiff's disability / medical condition being the reason of his unconsciousness, malicious letter of reprimand, incomplete ethics violation investigation, or discriminatory bias on projects. However, on each of the circumstances, defendant acted knowingly and intentionally against the plaintiff and his civil and constitutional rights.

426. Based on the events mentioned above, it is clear that the regulatory body within Deloitte, Talent Relations, led by Joanna Rohde, which advocates slogans like "Integrity is everything", actively collaborated with the Business. By not properly investigating any of plaintiff's ethics and performance concerns on the Anthem project, and personnel issues like the malicious sexual harassment case, it helped other members of the Human resources intentionally sabotage plaintiff's performance rating and personnel file. Defendant as such singled out the plaintiff, treated him differently than similarly situated employees like Youmna Saloumi and Adrienne Moorefield, retaliated against him for defending himself with proof of his medical condition, retaliated against him for filing an ethics and integrity violation on disproportionately heavy workload, and retaliated and discrimination against him based on a malicious sexual harassment allegation and based on his national origin and race, harassed him, and forestalled his professional and career growth.

## Retaliation by Google

427. By filing an internal ethics and integrity complaint at Deloitte, the plaintiff engaged in a protected activity.

428. Deloitte knew that the plaintiff had a valid ethics and integrity complaint because Deloitte had assigned the plaintiff disproportionately heavy workload of two full-time employees to the plaintiff.

429. At all times were Deloitte and their talent relations professional Joanna Rohde aware of the risks associated with overlooking facts and evidence, or omitting or ignoring witness testimonies, identified on plaintiff's ethics complaint.

430. By overlooking facts and evidence, or omitting or ignoring witness testimonies, Deloitte supervisor Joanna Rohde violated Deloitte's internal processes or protocols.

431. Since Deloitte had access to plaintiff's phone communications, emails and messages, Joanna knew that during Deloitte's investigation of plaintiff's ethics and integrity complaint, the plaintiff was being interviewed by Google.

432. Joanna Rohde was aware of the inconsistent or incomplete investigation by Mr. Austin Perez, yet remained indifferent to the consequences of such discriminatory acts. At all times was Joanna aware of the risks associated with misrepresentation or misconduct by her subordinate, yet continued to overlook facts and intentionally misguide Mr. Perez.

433. Joanna Rohde displayed substantial departure from accepted professional judgment, practice, or standards on the issues raised by the plaintiff. Upon knowledge and belief, by basing her decision to protect the business needs and perceived business liabilities of both Deloitte and Google (as further explained below), Joanna violated plaintiff Federal and State protected rights.

434. Google recruiter Jose Martinez Avalos reached out to the plaintiff on behalf of Google Product Management Recruiting team. Google selected plaintiff's profile and demonstrated their intention to interview and recruit the plaintiff. The plaintiff was qualified for the position at all times. However, after the plaintiff filed his ethics and integrity complaint, since Deloitte's business interests were at stake, Deloitte accessed plaintiff's phone and email communications, and maintained a surveillance over the plaintiff. Sequence of events provide an inference that Deloitte communicated with and coordinated with Google recruiter on plaintiff's recruitment.

435. Given the business interests of Deloitte were at stake, the involvement of female HR professionals on plaintiff's gender discrimination matters, and the inference that if Google were to hire the plaintiff without letting Deloitte claim any immunity or defenses, a pending litigation against Deloitte or Google in the same area may create tension or conflicts of interests between male and female workers at Google, affecting team dynamics and employee morale, Deloitte

HR professionals had a 'meeting of minds' with members of Google Recruiting team and/or the Google Recruiter, and thus reached an understanding or agreement (explicit or tacit) that plaintiff should be refused recruitment.

436. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Deloitte, in-part on Deloitte's coordination with Dr. Niti Aggarwal's employer to discriminate against her, and in-part on Joanna's affiliations and relationships with state actors.

437. It can be inferred that in order to establish that the business interests of both Deloitte and Google were at stake, Google was informed or was made aware of the nature of investigation or facts on plaintiff. Had Google not known about (a) malicious sexual harassment allegation by a White woman twice the age of plaintiff, (b) assignment of disproportionately heavy workload to the plaintiff, (c) invidious comments and racial discrimination by Supervisors, (d) plaintiff's disability, and/or (e) existence of plaintiff's female relatives as Deloitte employee, one can infer that Google would not have refused to hire the plaintiff.

438. Upon knowledge and belief, since such situations allowed the state actors, law enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts, such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

439. After filing of plaintiff's ethics and integrity complaint, Deloitte coordinated and conferred with Dr. Niti's employer to allege false allegations to ensure that her position as a strong witness on plaintiff's case was negatively impacted. Since Deloitte knew that it had retaliated against both the plaintiff and Dr. Niti Aggarwal, and since the plaintiff provided proof of his disability / medical condition, Deloitte knew that the plaintiff had a valid claim against the firm based on both his disability / medical condition and the facts identified on his ethics complaint.

440. Previously, as part of Deloitte's internal firm initiative in the Life Sciences industry domain, the plaintiff demonstrated Product Creativity and Strategic Insights by creating and compiling hundreds of pages Case studies, Quals, and Client Proposal Material in the Cognitive / Artificial Intelligence (AI) space, be it in Cognitive Engagement, Cognitive Insights, and Robotic and Cognitive Analytics. Deloitte Sr. Manager and Supervisor provided the plaintiff a recommendation on the matter stating plaintiff "*did a good job of collating use cases and quals from various clients for analytics and cognitive workshops at multiple LS clients"*.

441. The very fact that plaintiff's work was uploaded on the Life Sciences Sharepoint portal, where the same could be accessed and used by the entire Deloitte Life Sciences team, including Sr. Partners, validate the quality and maturity of plaintiff's work, and impact that it could potentially generate.

442. Based on plaintiff's work performance on projects where he did receive a positive recommendation or performance rating prior to being targeted by Leaders, HR and Supervisors from plaintiff's Business Unit, and based on plaintiff's work performance on numerous internal projects, especially in the Life Sciences domain, Deloitte knew that had Google allowed the plaintiff to continue through the interview process, given plaintiff's vast experience and knowledge, the plaintiff would have secured a full-time position with Google. Hence, both Deloitte intentionally and wantonly sought to mitigate their risks on the matter by denying the plaintiff employment at Google.

443. Specifically, in order to create or generate immunity on the specific areas where the plaintiff excelled on, Deloitte likely coordinated with Google Product Management recruiting team to ensure that the plaintiff profile would not get immediately selected for onsite interviews, but would be delayed with a second interview. Deloitte knew that New York laws provide an individual six (6) months of time period to file retaliation claims, and such retaliation claim can be based on another employees complaint or employment. Since the plaintiff worked on Cognitive and Artificial Intelligence (AI) material for Deloitte in January and February 2018, and since the plaintiff took his required firmwide Ethics and Integrity training in early February and subsequently filed his Ethics and Integrity complaint, Deloitte knew that its interests would be served only when plaintiff's recruitment and second interview at Google were delayed past mid-August 2018. Thus, in coordination with Deloitte, Google scheduled a second interview

with the plaintiff with an agenda that the firm wanted to gauge a better understanding on plaintiff's Product Creativity and Strategic insights.

444. Importantly, upon knowledge and belief, since plaintiff's work consisted of creating the basic building blocks of Deloitte's Cognitive / Artificial Intelligence (AI) thought leadership in the Life Sciences industry, and Deloitte still continues to use the materials created by the plaintiff in year 2018, and still continues to generate more revenue by pitching ideas to existing and/or prospective clients, Deloitte's coordination with Google provide the plaintiff with continuing violations against both Deloitte and Google on the matter.

445. For the years 2016-2024, Plaintiff was similarly situated to Google employee, Geoff Stearns and Tom Buckley. Both plaintiff and Mr. Stearns and Mr. Buckley had almost the same or comparable number of years of work experience. Mr. Stearns and Mr. Buckley worked on similar positions that required similar skill, effort, and job responsibilities at Google, which is comparable to plaintiff's Client Consulting work at Deloitte. Mr. Stearns and Mr. Buckley were subject to the same standards of fulltime employment discrimination laws at Google, as the plaintiff at Deloitte. Mr. Stearns and Mr. Buckley got internally promoted to become a Product Manager. The employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

446. The defendant Google as such singled out the plaintiff, treated him differently than similarly situated employees, like Geoff Stearns and Tom Buckley, who (a) did not suffer from serious allergy based medical condition / disability, who (b) were not discriminated by their previous employer or by Google on the basis of protected characteristics or factors of female employees, who (c) were not discriminated on the basis of a malicious sexual harassment allegation against them, and (d) were not discriminated on the basis of their national origin or race. Such employees were not retaliated by Google, and went through the recruitment process and got hired.

447. While hiring for the Product Management Position, Google overlooked plaintiff's key skillsets like having experience with diverse clients in multiple industries, Product knowledge and background, etc. Defendant Google hired candidates like Christopher Schlaepfer and Ben Solomon who were less qualified than the plaintiff as they did not possess such skillsets.

Defendant Google retaliated against the plaintiff by not hiring the plaintiff. Defendant Google hired employees who were outside of plaintiff's protected class.

448. For the years 2018-2023, the Plaintiff was similarly situated to Google applicants Ms. Vennela Subramanyam, Mr. Abhinav Gaiha, etc. Upon knowledge and belief, these applicants were eligible to work for Google on the basis of their specialty worker H1B visa, same as the plaintiff. These applicants also had similar nationality as the plaintiff and were Indian Nationals. These employees had similar or comparable educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

449. Plaintiff had the additional experience of representing himself and corporate America at different clients within the United States, however, upon knowledge and belief, applicants like Ms. Vennela Subramanyam, Ms. Chandrika Rao lacked the experience the plaintiff had. Such applicants also lacked plaintiff's diverse work experience in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

450. Deloitte assigned the plaintiff disproportionately heavy workload of two full-time employees, and violated plaintiff's anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL). Thus, plaintiff was a member of a protected class.

451. Google singled out the plaintiff and treated the Plaintiff differently than similarly situated foreign national employees, like Ms. Vennela Subramanyam, Mr. Abhinav Gaiha, Ms. Chandrika Rao who were hired by Google as a Product Manager. Upon knowledge and belief, the previous employers of these Google Applicants like Ms. Vennela Subramanyam, Mr. Abhinav Gaiha, Ms. Chandrika Rao did not violate the anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL). These Google applicants were outside of plaintiff's protected class based on DOL LCA violations, were hired by Google for Fulltime roles, while the plaintiff was not hired.

## IV. Discrimination Based on National Origin & Race

### Discrimination by Deloitte based on Plaintiff's National Origin & Race

452. The defendant created a workplace atmosphere that was permeated with discriminatory intimidation, and steadily intensifying drumbeats of insult and ridicule that were sufficiently severe or pervasive to alter the conditions of plaintiff's employment with the defendant. As explained, the Defendant purposefully and intentionally created work environment filled with insult and ridicule (a) by threatening the plaintiff with "termination and deportation", (b) by deliberately releasing him from projects in spite of his good performance, (c) by calling him "deplorable" and "expendable Indian", (d) by giving him a bad performance rating, (e) by limiting his project opportunities, (f) by limiting his training opportunities, (g) by making him wait for weeks to start a new assignment based on his visa limitation, and (h) finally by wrongfully terminating his employment. The timing and sequence of events leading to plaintiff's termination suggest that plaintiff was discriminated on the basis of his national origin and race.

453. In October 2017, on the Anthem project, Plaintiff was given disproportionately heavy workload because of his race. He was given the task to replace an employee with 8+ years of work experience in a subject area, and manage her functional workstream which had heavy workload where the plaintiff had no experience at all. Just as the plaintiff tried to discuss the situation with the leadership, he was given additional responsibility by his project supervisors with discriminatory intent. This additional responsibility was to manage another technical workstream with equivalent heavy workload, held by another employee with 20+ years of experience in the subject area. When plaintiff raised concerns with his supervisors, he was told by Ashley Scorsatto that "*being an Indian, he should be able to handle the situation*", "*he should be able to handle the additional workload",* thus plaintiff was reminded of his temporary visa status in the United States, and was threatened and forced to take on extra workload based on his national origin and race. The defendant as such singled out the plaintiff, treated him differently than similarly situated employees like Todd Patman, Rishil Murukan, who had significant experience in the specific subject area, and who were not discriminated based on their national origin and/or race, and forestalled his professional and career growth.

454. In December 2017, Deloitte Partner Michael Fernandez, Chief People Officer, Deloitte US Financial Services, a person of White American ethnicity, noticed the plaintiff unconscious and instead of taking him to a hospital, took him to a hotel room. The partner also witnessed the plaintiff vomit several times. The next day, after learning about the plaintiff medical condition, Caucasian defendant employees retaliated against the terms, conditions or privileges of his employment and initiated an unlawful discriminatory bias based on plaintiff's temporary disability and ethnicity by releasing him from the J.P Morgan project which was scheduled to start in the UK. Plaintiff was singled out and treated differently than similarly situated employees like Youmna Saloumi, a female Sr. Consultant of Middle Eastern ethnicity, and Adrienne Moorefield, a female Sr. Consultant of Caucasian ethnicity, who did not face removal from project based on disability and race.

455. Plaintiff was assigned disproportionately heavier workload than similarly situated employees. Upon information and belief, similarly situated US based white employees with similar responsibilities like Adrienne Moorefield, Morgann Carlon and Irma Arellano, were assigned less work as compared to the plaintiff, were not as heavy workload as the plaintiff, were not released from multiple projects, and were not given a bad performance rating due to their race or national origin. This shows defendant's discriminatory motivation towards the plaintiff based on his race and/or national origin.

456. After learning about plaintiff's medical condition and disability, in December 2017 and January 2018, various defendant Caucasian employees began abusing their power and authority and retaliated against the plaintiff. For example, Victor Bocking and William Murphy sent the plaintiff to interview for a project where he was destined not to be hired due to lack of relevant experience. Christina Young accused the plaintiff of buying an airplane ticket without her approval, when in-fact the air-ticket was a requirement placed by the UK consulate to obtain a visa, and she herself suggested that the air-ticket dates can be later changed per revised project dates, if any, for a nominal fee. These employees maintained unlawful discriminatory bias against the plaintiff, and the terms, conditions or privileges of his employment due to his national origin and race. Plaintiff was singled out against similarly situated employees, like Adrienne Moorefield, who were neither sent on projects for which they destined not to be hired due to lack

of relevant experience, nor were falsely accused of buying an airplane ticket by their supervisor of a different race.

457. Similarly, Christina Young, a 61-year old White American national of Caucasian descent, filed falsified and malicious sexual harassment allegations against the plaintiff. Her malicious allegations and impermissible bias in plaintiff's employment tainted the ultimate employment decision and led to plaintiff's termination. Plaintiff's human resource managers of Caucasian descent further maintained a discriminatory bias against the plaintiff, and the terms, conditions or privileges of his employment by not informing or interviewing him about the issue. Thus, Plaintiff was singled out, and the biased actions of Christina Young along with plaintiff's human resource managers, Joanna Rohde and Brenda Arends, meaningfully impacted the process leading to plaintiff's material loss of employment benefits, and his termination.

458. Similarly, after learning about plaintiff's medical condition and disability, and malicious sexual harassment allegations against him, February 2018 onwards, various defendant Caucasian employees began abusing their power and authority and retaliated against the plaintiff. (a) Amye Hanes released the plaintiff from Mergers & Acquisition (M&A) project. (b) Katie Wittenbraker, Brenda Arends and Joanna Rohde intentionally falsified statements on plaintiff's personnel file, (c) Brenda Arends and Joanna Rohde asked him to sign a malicious letter of reprimand, and (d) gave him a permanently bad performance rating. Thus, Plaintiff was singled out, treated differently than similarly situated employees like Adrienne Moorefield, and the actions of each of defendant employees with discriminatory intent meaningfully impacted the process leading to plaintiff's material loss of employment benefits like compensation increase, and his termination.

459. On March 6th 2018, defendant released the plaintiff from the 21st Century Fox Channel project. Defendant replaced the plaintiff with a less qualified junior employee with just 1.5 years of experience, Emerson Marenyi, an employee of Caucasian background claiming him to be a subject matter expert. The defendant treated Emerson Marenyi more favorably than the plaintiff. Such repeated harassments by the defendant interfered with plaintiff's job performance. Upon information & belief, this release was planned by Deloitte Human Resource Manager Joanna Rohde, who called the plaintiff shortly after his project release meeting. Her discriminatory bias

is evident as she had been meaningfully involved and working behind the scenes in the process leading to and following plaintiff's malicious sexual harassment allegations and plaintiff's ethics complaint

460. In March 2018, plaintiff on a call with Joanna Rohde mentioned that he had allergies of active nature, he carries an Epipen, he consumed alcoholic beverage at the event, he blacked out and likely suffered an anaphylactic reaction. However, Joanna Rohde herself drew a direct conclusion and wrote in her notes that the "plaintiff's doctor said plaintiff is allergic to alcohol.". Thus, the Deloitte HR professional knowingly captured selected piece of information to their advantage, discriminating against the plaintiff on the basis of his disability, gender and race. Plaintiff was singled out and treated differently than similarly situated Caucasian female employees, like Adrienne Moorefield, who did not experience any of the above discriminations. This also further shows that plaintiff's disability / medical condition, gender, race and national origin claims are intertwined.

461. Similarly, upon information & belief, plaintiff's Talent Relation Manager, Joanna Rohde, US National of Caucasian descent, acted with racial animus and hostility towards the plaintiff in light of a medical condition / disability, and malicious sexual harassment allegation by another Caucasian female by (a) by coordinating internally and requesting plaintiff to be released from J.P Morgan Chase project in Dec. 2017, (b) by creating the malicious letter of reprimand for the plaintiff in Feb. 2018, (c) by using her position and authority to intentionally sabotage plaintiff's personnel file and give the plaintiff a permanently bad performance rating in Feb. & Mar. 2018, (d) by treating Christina Young more favorably than the plaintiff by not informing or interviewing him about the malicious sexual harassment case in Jan. - Feb. 2018. Plaintiff was singled out by Joanna Rohde as she maintained her discriminatory intent on the basis of plaintiff's race, and treated him differently than similarly situated Caucasian female employees like Adrienne Moorefield, who did not experience any of the above discriminations.

462. In early October 2018, defendant placed the plaintiff on project which required deep knowledge of the healthcare industry. On Oct. 9th 2018, the plaintiff communicated to his project Sr. Manager, Tim Van Ee, that the plaintiff is skeptical about leading the client project because *plaintiff has no experience in health plans, health care, clinical data or Epic data*. In addition,

plaintiff had *no experience in Microsoft Azzure* which was required for the project. The senior manager confirmed that "*he will help the plaintiff*", and plaintiff's lack of knowledge in the field should not be an issue as it is just *"industry stuff*".

463. On or about Oct. 10th 2018, when the plaintiff requested formal training on the project, Tim dismissed plaintiff's training request, stating the he will help the plaintiff with the specifics, mentioning that the plaintiff may reach out to colleagues for project deliverables from other clients, and may further research about technologies like Microsoft Azzue and Health Care data (*Epic*) on Deloitte portal and further online. Hence, until mid-October, defendant Sr. Manager, Tim Van Ee desperately wanted to keep the plaintiff on his project even after knowing that the plaintiff had very little to no skills in one or more of the subject areas. Tim Van Ee was plaintiff's supervisor on this Kaiser Permanente project. His supervisory oversight suggests that he had input in the final decision of plaintiff's termination two weeks later in early Nov. 2018.

464. Thus, plaintiff was assigned a role where he had no industry experience and no formal training. With benefits of hindsight and months of facing a continued pattern of harassment by the same set of defendant employees, Plaintiff came to understand that these carefully planned project assignment tactics and methods like assigning plaintiff on to short-term projects where plaintiff had no industry knowledge or experience, no formal training, and outside of his skill-set and expertise, were specifically meant to target the plaintiff making his project assignments more difficult. Such repeated harassments by the defendant interfered with plaintiff's job performance.

465. Earlier, plaintiff was assigned a project at Anthem, where he was assigned disproportionately heavy workload of two fulltime employees with racial animus. The project team threatened the plaintiff will negative performance rating and consequences for raising such project and workload issues. Plaintiff attended an integrity and ethics firm wide training, and thought it was his duty to report instances of ethics and workplace conduct violation. Subsequently, the defendant retaliated against the plaintiff by not interviewing the witnesses identified by the plaintiff, assigning him negative performance review, inaccurately paraphrasing plaintiff's account of events, not informing the plaintiff with the outcome of the investigation, assigning him a malicious letter of reprimand and threatening him with termination. Soon thereafter, plaintiff's Caucasian resource managers limited project opportunities available to the plaintiff,

and it became apparent that the defendant did not want to assign the plaintiff projects where he had the right experience and skillset.

466. Defendant knew that it had discriminated and retaliated against the plaintiff several times before, and plaintiff could make a claim against the defendant. Defendant wanted to dissuade the plaintiff from making or supporting a charge of discrimination, therefore, it carefully engineered plaintiff's project assignments by placing him in projects where he had no client or subject matter experience and projects assigned with favorable defendant supervisors, such that, it would become harder for plaintiff to prove good results in spite of his great efforts. Plaintiff had to work twice as hard on such projects as they constituted disproportionally heavy workload for the plaintiff. Such repeated discriminatory and harassment practices by the defendant Caucasian supervisors and resource managers interfered with plaintiff's job performance, and change in project responsibilities were so frequent and significant as to constitute a setback in plaintiff's career. For example, considering project opportunities outside his core skillset and expertise in Life Sciences and Finance constituted a setback in plaintiff's career both his competence and expertise in these specific sectors and subject areas.

467. On October 17th 2018, plaintiff's female counselor reached out to the plaintiff to get specifics about the Kaiser Permeante project and the Sr. Manager, Tim Van Ee. Soon thereafter, defendant Sr. Manager, an employee of Dutch background, notified the plaintiff that the plaintiff would be released from his project. On October 18th 2018, defendant Sr. Manager, Tim Van Ee, stated plaintiff was an "*expendable Indian*". He again apologized to the plaintiff this time over instant message by saying "*no hard feelings, sorry that came across wrong*". The defendant terminated the plaintiff less than two weeks after this incident. Tim Van Ee's criticism of plaintiff in ethnically degrading terms and his discriminatory behavior combined with a project assignment where plaintiff had no industry experience and was denied training rating constitute adverse employment action.

468. On Oct. 12th 2018, three business days before this incident, Brenda Arends mentioned in her notes that the plaintiff was having performance issues. On Oct. 17th 2018, she coordinated internally to get the plaintiff released. Upon information & belief, Tim was instructed by someone higher up, likely based on circumstances including sequence of events and timing, by Brenda Arends, who was a decision maker in plaintiff's termination, to intentionally use these

words to cause racial degradation and significant emotional distress to the plaintiff. Plaintiff was singled out and treated differently than similarly situated employees Youmna Saloumi, Adrienne Moorefield, who did not experience such racial hatred and/or were not terminated based on their race.

469. On October 18th 2018, defendant replaced the plaintiff with Morgann Carlon, a US National female employee of Caucasian background. Defendant replaced plaintiff on projects with employees outside his protected class. The defendant discriminated against the plaintiff on the basis of his national origin and race by treating Morgann, a female US national, more favorably than the plaintiff. Morgann was also not subjected by vitriolic comments made by the Senior Manager. The sequence and timing of plaintiff's discharge within two weeks of this incident suggests that defendant terminated plaintiff due to his national origin and race.

470. For the years 2016-2018, Plaintiff was similarly situated to employee, Morgann Carlon, female Senior Consultant, Deloitte Strategy and Analytics, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. They both were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment. Morgann did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against her. At the end of August 2018, Morgann got promoted to a Manager, just one month before the Kaiser Permanente project started.

471. In this case, plaintiff's Human Resource Manager, Brenda Arends, US National of Caucasian descent, a decision maker on plaintiff's termination, acted with racial animus and hostility towards the plaintiff in light of a malicious sexual harassment allegation by another Caucasian female due to the following reasons, (a) by delivering the malicious letter of reprimand to the plaintiff in Feb. 2018 (b) by using her position and authority to give the plaintiff a permanently bad performance rating in in Feb. & Mar. 2018, (c) by misrepresenting his medical condition on his personnel file in Feb. 2018, (d) by wrongly stating that plaintiff has issues with women, and women in supervisory positions on multiple occasions, (e) by communicating to her colleagues

that the firm needs to move forward with plaintiff's termination regardless of his performance or positive opinions by his supervisors in Oct. 2018, (f) by working exclusively with plaintiff's female counselor to falsify plaintiff's performance reviews and release him from projects with intimidation and racial insults, and (g) by finally terminating plaintiff's employment.

472. Thus, Brenda Arends, a decision maker in plaintiff's termination, harbored prejudice against the plaintiff, and her racial animus is evident from the statements above. Plaintiff was singled out by Brenda Arends who maintained her discriminatory intent on the basis of plaintiff's gender and race, and treated him differently than similarly situated Caucasian female employees like Adrienne Moorefield, who did not experience any of the above discriminations.

473. Racially insensitive comments by plaintiff's supervisors and actions by human resource managers, distressed the plaintiff emotionally. Plaintiff was singled out as against similarly situated employees, like Youmna Saloumi, Adrienne Moorefield, Irma Arellano and Morgann Carlon, who did not experience racial animus against them by defendant employees from various ethnic and racial backgrounds, and were not discriminated based on their national origin. Upon information and belief, these similarly situated employees did receive bonuses and compensation increase per their annual incentive plan (AIP), were not released from multiple projects, were not given a bad performance rating, and were not terminated by the defendant due to their performance.

474. Previously, various Caucasian Deloitte employees had acted against the plaintiff due to a combination of intertwined factors including his disability, gender, national and racial origin. (a) Christina Young filed falsified malicious sexual harassment allegations against the plaintiff. (b) Amye Hanes released the plaintiff from projects. (c) Shanah Setzen made sure plaintiff would not get staffed on projects. (d) Austin Perez falsified a report on plaintiff's ethics and integrity complaint. (e) Brenda Arends falsified statements about plaintiff's medical condition and maliciously modified plaintiff's performance records. The evidence is overwhelming, the defendant has racially discriminated against the plaintiff based on his national origin and racial background, and the timing and sequence of their actions fueled by discriminatory intent lead to plaintiff's termination

475. Plaintiff was also subjected to different standards of project selection by his Human Resource Managers Amye Hanes and Shanah Setzen. However, upon information and belief, similarly situated employees, like Adrienne Moorefield and Irma Arellano, US Nationals, who did not suffer from life-threatening allergies or disabilities and did not have a malicious sexual harassment allegation against them, were not deprived of project opportunities, were not rejected for projects where they had the right skillset, were not sent to client project opportunities where they were destined not to be hired, were not staffed on projects which required deep knowledge of an industry which they did not have. Defendant as such singled out the plaintiff, treated him differently than similarly situated US national employees, harassed him, and forestalled his professional and career growth.

476. The defendant carried out an ongoing scheme to intimidate, harass and force the plaintiff out of the company, because the defendant knew it would be illegal to terminate him based on the malicious sexual harassment allegation by a Caucasian woman, as the plaintiff could claim discrimination and retaliation for such termination. So, instead, various defendant employees of different ethnic and racial backgrounds choose to mock and harass based upon his national origin and race (a) by intimidating and threatening him with deportation and termination, (b) by deliberately mocking him on his racial background and releasing him from projects, and after each project release (c) by deliberately making him wait for multiple weeks to start a new assignment based on his national origin visa limitation, (d) by not following its internal process and protocols of interviewing the plaintiff on the malicious sexual harassment allegation, (e) by letting his Caucasian HR managers subject him to different standards for project selection and performance evaluation, and (f) by falsely engineering his performance rating, and finally (g) by eventually terminating his employment.

477. Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not discriminated on the Anthem project based on his national origin and race and was not given disproportionately heavy workload by his white supervisor for which he filed an ethics report, (b) was not released from the JP Morgan Chase project because he was helped for his disability incident by a White Sr. Partner, (c) was not sent to interview for a project where he was destined not to be hired due to lack of relevant experience, (d) was not accused by his White supervisor of buying an airplane ticket without her approval, (e) was not falsely accused by a

61-year old White female of inadvertently touching her behind, (f) was not treated less favorably than the female accuser, (g) was not informed or interviewed about the malicious sexual harassment case.

478. Based on the above allegations, one may deduce that because of plaintiff's national origin and race, as he was non-White, his White female Supervisors and Human Resource Managers – Ashley, Christina, Joanna, Brenda, Katie, Amye, and Shanah – maintained a racial bias against the plaintiff and treated the plaintiff differently than similarly situated employees. Plaintiff was as such singled out and treated differently than similarly situated employees based on his race and national origin. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

479. Similarly, Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not released from projects and replaced by someone outside his protected class, (b) was not assigned short-term projects where plaintiff had no industry knowledge or experience, (c) was not deprived of project opportunities where he had the right skillset, (d) was not given a permanently bad performance rating, (e) was not given less favorable performance evaluation than his White Colleagues, (f) was not subjected to invidious actions and comments by his White supervisors. Thus, plaintiff was treated differently than similarly situated White employees, and the timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

480. Plaintiff's white supervisors and colleagues (a) released him from projects and sent him on projects where he was destined not to be hired, (b) accused the plaintiff of buying an airplane ticket without approval, (c) accused the plaintiff with impermissible bias of inadvertently touching the behind of a 62-year old woman, (d) treated the female accuser more favorably than the plaintiff, (e) replaced the plaintiff with a white employee more than once, and (f) sabotaged plaintiff's personnel file. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race.

481. In addition, plaintiff was subjected to a constant drumbeat of ridicule, (a) that his white supervisors and colleagues made racially insensitive remarks - plaintiff was called "deplorable" and "expendable Indian" - while his white colleagues were not, (b) that his white colleagues

received favorable performance evaluations while plaintiff did not, (c) that his white colleagues were not restricted on seeking new client projects while several of plaintiff's applications were rejected with reason 'Project Closed Not Selected', (d) that his white colleagues were not subjected to recruitment fraud and technically not forced to leave the country while the plaintiff was, (e) that similarly situated employees did not have to go through the ordeal of getting released multiple times from multiple projects while the plaintiff was. Thus, defendant maintained a discriminatory bias against the plaintiff on the basis of his national origin and race, and plaintiff was subjected to different workplace standards than his white supervisors and colleagues.

482. Similarly, during plaintiff's employment, the defendant coordinated and released the plaintiff from his projects several other times. Each time the plaintiff got released, plaintiff had to struggle to find a new project. Due to his national origin and visa restrictions, before the plaintiff could start working on a new project at a new location, the plaintiff would need to first have his Labor Condition application certified by the Department of Labor (DOL), a process which would generally take between 7 - 10 business days to complete. After getting his Labor Condition application certified, the plaintiff could only start his work the day after his H-1B visa amendment was filed by the defendant's immigration team, a process that would generally take another week to complete. Thus, the plaintiff would need to wait anywhere between 2-3 weeks before he could start on a new project. During this time, the plaintiff would not be on a billable project, which would hurt his utilization and performance metrics. By releasing the plaintiff from different projects, the defendant intentionally and wantonly worked towards spoiling the plaintiff's utilization and performance metrics.

483. The Defendant Deloitte knew it would be illegal to immediately terminate the plaintiff based on his medical condition, falsified sexual harassment allegations and the protected characteristics or factors of a pregnant female supervisor, so the defendant resorted to engineering plaintiff's exit by taking advantage of his national origin by releasing him from projects, by causing emotional trauma based on his racial background by mocking him on and off projects, thus slowing and terminating his internal progress within Deloitte, and traumatizing him emotionally so he would himself leave the firm. The defendant failed to provide the plaintiff any cure on plaintiff's utilization and performance metrics negatively impacted by these repeated project

releases and project start delays, or the negative stress induced by these forced project releases. The defendant schemed to illegally control the Plaintiff, blocked his pay-raise and promotion to the next level, constrained his career progression, constrained his civil and constitutional rights, endangered Plaintiff's health, wellbeing, reputation, and harmed Plaintiffs income, and financial resources.

484. For the years 2016-2018, Plaintiff and a similarly situated employees, Rishil Murukan M and Vaibhav Pawar, male Senior Consultants, Deloitte Consulting LLP, performed similar work consisting of the same or similar duties including, but not limited to advising clients, leading, and/or contributing to client work or projects, building firm eminence, contributing to internal firm initiatives and client proposals, collaborating with and/or mentoring junior staff, etc. These employees, who were all foreign nationals, were subjected to similar employment conditions, that required similar skill, effort, and responsibility at the same establishment and on the same work permit (H1B visa). Like others, Rishil and Vaibhav were subject to the same standards of governing performance evaluation and discipline as the plaintiff. Rishil and Vaibhav did not suffer from life-threatening allergies or disabilities, and did not have a malicious sexual harassment allegation filed against them.

485. Defendant Deloitte’s similarly situated employees, like Rishil Murukan M and Vaibhav Pawar, who were foreign workers, comparable to the plaintiff on having a H1b work visa, did not have to go through the ordeal of getting released multiple times from multiple projects. Plaintiff was singled out against similarly situated foreign workers, who were not released multiple times from projects, who were not subjected to invidious actions and comments by their White supervisors, and who did not suffer the same career setback and emotional trauma as the plaintiff did.

486. Similarly, Defendant’s similarly situated employees, like Adrienne Moorefield, who were U.S Nationals and/or U.S Permanent residents, comparable to the plaintiff on level or skills, did not have to go through the ordeal of waiting for 2-3 weeks before they could start working on a new project. Plaintiff was singled out against similarly situated US Nations and Permanent residents, who did not suffer from performance utilization impact due to visa related delays.

487. Similarly, for years 2017-18, Plaintiff was similarly situated to Todd Patman, a US National Manager at Deloitte Strategy and Analytics, with similar employment policies to the plaintiff,

except he had additional managerial job responsibilities over project management and delivery. Upon information and belief, Todd neither was released from several projects, nor was harassed based on his ethnicity. And unlike the plaintiff, he also did not have to go through the ordeal of waiting for 2-3 weeks before he could start working on a new project.

488. Plaintiff would not have suffered an adverse employment action, his termination, if the plaintiff (a) was not treated differently than similarly situated White employees, (b) was not treated differently than similarly situated specialty immigrant employees on H1B visa, (c) was not deliberately made to wait for multiple weeks to start a new assignment based on his national origin visa limitation, (d) was not assigned biased supervisors and decision maker who acted with racial animus and hostility towards the plaintiff. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred.

489. After termination, plaintiff applied to various jobs through Deloitte Marketplace website. A member of the Deloitte transition team, Aileen Baxter, had multiple coaching sessions with the plaintiff where she secured confidential information from the plaintiff as to which all firms plaintiff was interviewing at, and allegedly coordinated either directly with those firms or indirectly through other Deloitte or non-Deloitte Human Resource managers to make sure that the plaintiff could not secure alternate full-time employment. Upon information and belief, Plaintiff was treated differently than other Deloitte employees who successfully used Deloitte transition services and got recruited.

490. Defendant Deloitte disrupted plaintiff's progress and his right to seek alternate employment at other firms. One incident alone can seem coincidental; however, multiple instances with similar actions and results are unlikely to be coincidental. The evidence for recruitment fraud on plaintiff's employment lawsuit is overwhelming, the defendant Deloitte has used illegal means to track into plaintiff's communications and exerted their influence on innocent recruiters from prestigious firms to further their scheme to illegally control the Plaintiff, deny his rights and freedom to find equal opportunity employment, constrain his civil and constitutional rights, endanger Plaintiffs life, health, wellbeing, and reputation, and harm Plaintiffs income, financial resources, and access to credit.

491. After termination, during the course of next months, defendant's interference and harassment on plaintiff's day to day life activities increased. The facts presented below highlight the unlawful and illegal harassment activities by the defendant, Deloitte Consulting LLP, including activities by their employees, agents, contractors, and servants under their control, after plaintiff's termination. After plaintiff's termination, plaintiff was offered to use defendant Deloitte Consulting LLP's career transition services. While using defendant's career services, Plaintiff witnessed massive recruitment fraud, which was primarily orchestrated by defendant to harass the plaintiff based on his national origin, race and visa-based work permit limitations.

492. During plaintiff's employment, defendant, Deloitte Consulting LLP, contrived a set of fraudulent events to maintain and enhance their illegal control of the plaintiff. These activities continued after plaintiff's termination, for instance, Plaintiff applied to various jobs at different companies to secure gainful alternate employment. However, the defendant in a carefully calculated plan to illegally interfere with plaintiff's rights, primarily organized, orchestrated, managed and terminated these employment opportunities for which the plaintiff was primarily qualified. These fraudulent manipulations and misrepresentations add to defendant's long-running series of plans and actions to coerce, manipulate and illegally control the plaintiff.

493. During his employment, after the defendant became aware of plaintiff's medical condition / disability, protected factor of a pregnant female supervisor, and a false complaint by a woman twice plaintiff's age, defendant resorted to falsely engineering a non-discriminatory performance-based reason to wrongfully terminate the plaintiff to avoid legal liability. Defendant knew that plaintiff was a minority employee of Indian origin working for the defendant on H-1B visa. The defendant knew that plaintiff would have 60-days to find another job or exit the country. The defendant terminated the plaintiff on November 5th 2018, close to the US holiday season, in order to make it even harder for him to find another job.

494. As explained in plaintiff's employment complaint, and further explained in this complaint, after his termination, in an effort to maintain an illegal control of the plaintiff, defendant made every effort possible to make sure that the plaintiff is not able to secure suitable alternate employment within the allotted 60-day grace period given by the government. By coordinating with and conferring with the Human Resource departments of other firms, defendant discriminated and

retaliated against the plaintiff on his national origin and race, and acted with reckless indifference to the state & federally protected rights of the plaintiff.

495. After his termination, in November 2018, plaintiff was offered to use defendant Deloitte Consulting's career transition services. Plaintiff was assigned a career coach, named Aileen Baxter, and was given access to a career transition website where plaintiff could apply for jobs at other firms. The defendant knew that plaintiff was on H1B specialty work visa, and that the plaintiff would have just two (2) months until after his termination to find a new job or leave the country. The defendant concocted a malicious scheme to tortuously interfere with plaintiff's employment interests by (a) sending plaintiff on sham interviews, (b) sending plaintiff on interviews which did not support H1B work visa sponsored employment, (c) sending plaintiff on interviews that did support H1B visa but were carefully placed to cause plaintiff to expend his time and resources on fraudulent employment opportunities, and (d) in December 2018, by intentionally revoking his access to the defendant transition website so plaintiff could not apply for jobs at other firms.

496. After plaintiff's termination, in November and December 2018, Plaintiff used Deloitte Consulting LLP's career transition portal to apply for full-time employment opportunities at the different firms for the following roles (a) CVS Health as *Director, Retail Strategic Projects*, (b) McKesson as *Sr. Manager Corporate Strategy*, (c) Kohls as *Sr. Strategy Manager*, (d) Vanguard as *Sr. Manager Strategy & Planning*, (e) Hewlett Packard for a role at their *Personal System Strategy* Team, and (f) IBM and State Street for various roles at their *Data Management Marketing Roles* and *Transformation Strategy Roles* respectively. Plaintiff's profile was selected at each of these firms; however, none of these firms offered visa-sponsored employment for these specific positions. Upon information and belief, defendant conspired against and prevented plaintiff from seeking alternate visa sponsored employment by selectively releasing plaintiff's profile to firms where plaintiff was destined not to be hired because of his visa limitation.

497. Similarly, in November & December 2018, Plaintiff used Deloitte Consulting LLP's career transition portal to apply for full-time employment opportunities at the different firms for the following roles (a) Microsoft as *Workplace Analytics Manager*, (b) J.D Power & Associates as *Director PIN data and Analytics*, (c) Keurig Dr. Pepper as *Channel Strategy Manager*, (d)

Jet.com as *Analytics Manager*, and (e) VMWare as *Lead Business Analytics*. Plaintiff was invited and subsequently interviewed at each of these firms, however, plaintiff was not selected for a full-time position. Upon information & belief, Defendant used plaintiff's job applications through Deloitte career transition portal and his interviews as a ruse and subterfuge in part to knowingly abuse plaintiff's visa limitation, in part to facilitate gathering of intelligence information on plaintiff, in part to cause plaintiff to unnecessarily expend time and resources on fraudulent interviews, and in part to continue their maliciously pattern to illegally control the plaintiff.

498. During his coaching sessions with the plaintiff, defendant coach, Aileen Baxter, would secure confidential information from the plaintiff, as to where all he applied and interviewed, and coordinate with employers to ensure plaintiff could not secure alternate employment. Defendant employees, specially female members of defendant Human Resource department, were aware, and acted together and separately to aid and abet, and facilitate the illegal control of the plaintiff as described in this complaint, against plaintiff, his interests and his civil and constitutional rights, and at all other times failed to properly act and properly supervise employees, agents, contractors, and servants under their control. Upon knowledge and belief, the defendant employees responsible for these activities against the plaintiff include, Human Resource Professionals Brenda Arends, Aileen Baxter, Amye Hanes, Shanah Setzen, Joanna Rohde and others not known to the plaintiff.

499. During his coaching sessions with the plaintiff, a member of the Deloitte transition team, Aileen Baxter, secured confidential information from the plaintiff as to which all firms plaintiff was interviewing at, and upon information & belief, allegedly coordinated either directly with those firms or indirectly through other Deloitte or non-Deloitte Human Resource managers to make sure that the plaintiff could not secure alternate full-time employment. The facts identified below outline defendant's malicious recruitment fraud activities outside of their career transition services. Plaintiff applied to these positions himself.

500. On December 4th 2018, Plaintiff started interviewing at Teva Pharmaceuticals. On December 11th 2018, the Teva Pharma recruiter invited the plaintiff for his final round of interview. Later that same day, on a meeting with Deloitte transition services coach, Aileen Baxter, the Plaintiff

was asked where he was interviewing outside the Deloitte Market Place job portal. The plaintiff naively and honestly disclosed his final round of interview with firm Teva Pharmaceuticals to Aileen Baxter.

501. Next day, on December 12th 2018, early morning, Teva recruiter confirmed plaintiff's final round interview both by phone and email. The interview was scheduled for the next day, December 13th 2018. However, as the day progressed, Teva recruiter sent an email to the plaintiff canceling plaintiff's final round of interview, stating that the process has been put on hold. Based on direct evidence, and upon information and belief, it is evident that Aileen Baxter leaked plaintiff's confidential information and coordinated either directly or indirectly though other Deloitte or non-Deloitte Human Resource managers to make sure that the plaintiff could not secure alternate full-time employment at Teva Pharmaceuticals. Aileen Baxter conspired against and prevented Plaintiff from seeking alternate private sector employment, thereby further harassing and retaliating against the plaintiff based on his national origin and visa restriction.

502. Similarly, on December 11th 2018, plaintiff mentioned about his interviews at indeed.com and wayfair.com to Aileen Baxter. The interviews had similar outcome as above, Plaintiff got his rejection from indeed.com around December 13th 2018, and from wayfair.com on December 17th 2018. Thus, upon information & belief, Aileen Baxter conspired against and prevented Plaintiff from seeking alternate private sector employment, thereby further harassing and retaliating against the plaintiff based on his national origin and visa restriction. Upon information and belief, Aileen's behavior towards the plaintiff was tainted by discrimination based on gender stereotypes.

503. In early 2019, plaintiff applied to two roles at firm MassMutual - Project Manager (Data Science and Analytics), and Director Product Management. In February 2019, MassMutual recruiter reached out to the plaintiff for the Director Product Management position. However, late February, plaintiff logged on to the MassMutual recruitment website to learn that his underlying employment applications were deleted with just the application name remaining intact. Upon information and belief, the defendant made an ongoing effort to retaliate against the plaintiff, by first invading his privacy and reading his emails through cyber-espionage, then coordinating with MassMutual team to first change the title of plaintiff's application / position from Director

Product Management to Project Manager (Analytics and Data Science), then deleting plaintiff's underlying application from MassMutual system, and then sending a rejection letter to the plaintiff of not being selected.

504. In early 2019, before filing his employment lawsuit, plaintiff applied for a Director, Commercial Effectiveness position at Pharmaceutical firm GlaxoSmithKline (GSK). On February 18th 2019, the Human Resource Manager of GSK invited the plaintiff for an interview for this position. On February 22nd 2019, the plaintiff held an interview with a Senior Director within GSK for his role, the interviewer really liked plaintiff's profile and said that plaintiff would hear back from the recruiter next week. Upon information & belief, the miscreates from defendant, Deloitte Consulting LLP, gained access to plaintiff's emails and phone conversation by illegal means, reached out the GSK recruiter, Kim Saintz, and disrupted plaintiff's progress by stalling his interviews at the Equal Opportunity Employer GSK. Plaintiff's progress is evident because the recruiter invited the plaintiff for the next round of the interview, however, knowingly did not schedule it.

505. Upon knowledge & belief, on or around the time of filing this complaint on April 7th 2021, the firm Deloitte Consulting LLP has moved eight (8) to twelve (12) employees mentioned on plaintiff's employment lawsuit to other firms. The firm Deloitte is hoping to limit their liability on plaintiff's lawsuit, and appears to have used their privileged court access to delay plaintiff's valid claims such that the employees moved on plaintiff's lawsuit are not able to file a claim against Deloitte. Upon knowledge & belief, delaying or denying plaintiff his gainful employment opportunities or other government benefits is a part of their strategy to limit their firm liability on this lawsuit.

## Discrimination by Google based on Plaintiff's National Origin & Race

506. Google was Deloitte's client or customer. Deloitte Provided professional services to Google. Deloitte and Google shared same or similar interests in multiple areas of growth and development. Deloitte HR coordinated with Google HR or recruiting team to reach an understanding or agreement that if Google were to hire the plaintiff without providing Deloitte any immunity, the liabilities that may incur from potential Whistle blower claims against

Deloitte may provide a perception of on-going conflict or unresolved issues at Deloitte, and may impact the existing business relations, common interests, work projects and resource deployment between the two firms.

507. It can be inferred that both Google and Deloitte shared the same intent or community of purpose not to get entangled into needless litigation or added liabilities based on gender discrimination issues against the plaintiff, including protected characteristic or factors such as pregnancy.

508. Upon knowledge and belief, since such situations allowed the state actors, law enforcement or intelligence services professionals, or people engaging in conduct that may be considered as state action, to conceal their prior relations / affiliations or conceal their own malicious and discriminatory acts, such individuals supporting Deloitte deliberately wanted to take advantage of their positions or prior knowledge of situations, in order to create defense for themselves.

509. For example, Joanna Rohde worked with White Deloitte Financial Services Partners as identified, and previously targeted the plaintiff using a similar pattern of recruitment tactics at JP Morgan Chase to shield the interests of White Deloitte Financial Services Partners Jonston and Fernandez, and shield her personal collaboration with such Partners.

510. Given that as Deloitte Talent Relations Manager, Joanna Rohde has access to State actors, regular interacts with State Actors, and/or requests State actors to perform tasks to directly or indirectly support the interests of Deloitte, provides a strong inference on the involvement of State actors on the matters.

511. Given the business interests of Deloitte were at stake, the involvement of White female HR professionals on plaintiff's gender discrimination matters, and discrimination by White female supervisors, and the inference that if Google were to hire the plaintiff without letting Deloitte claim any immunity or defenses, a pending litigation against Deloitte or Google in the same area may create tension or conflicts of interests between male and female workers at Google, affecting team dynamics and employee morale, Deloitte HR professionals had a 'meeting of minds' with members of Google Recruiting team and/or the Google Recruiter, and thus reached an understanding or agreement (explicit or tacit) that plaintiff should be refused recruitment.

512. It can be further inferred that such understanding or agreement (express or tacit) was based in-part on plaintiff's disability, gender and race based discriminatory events at Deloitte, in-part on plaintiff's Whistle Blower retaliation ethics and integrity complaint, in-part on the existence of plaintiff's female relative working at Deloitte, in-part on Deloitte's coordination with Dr. Niti Aggarwal's employer and that she was discriminated or retaliated against by her White Supervisor, and in-part on Joanna's affiliations and relationships with state actors.

513. Google recruiter Jose Martinez Avalos reached out to the plaintiff on behalf of Google Product Management Recruiting team. Google selected plaintiff's profile and demonstrated their intention to interview and recruit the plaintiff. The plaintiff was qualified for the position at all times. However, after the plaintiff filed his ethics and integrity complaint, since Deloitte's business interests were at stake, Deloitte accessed plaintiff's phone and email communications, and maintained a surveillance over the plaintiff. Sequence of events provide an inference that Deloitte communicated with and coordinated with Google recruiter on plaintiff's recruitment.

514. The plaintiff has identified that White male HR Professional, Austin Perez, held racial animus against the plaintiff. The presence or involvement of the same White HR professional with racial animus against the plaintiff provides an inference that Google's decision not to hire the plaintiff was based in part on plaintiff's race.

515. Since defendant Google's decision to refuse to hire the plaintiff was based in part on plaintiff's race, it can be established that defendant Google's refusal to hire the plaintiff was not based on non-discriminatory terms.

516. It can be inferred that in order to establish that the business interests of both Deloitte and Google were at stake, Google was informed or was made aware of the nature of investigation and allegations such as a (a) malicious sexual harassment allegation by a White woman twice the age of plaintiff, (b) assignment of disproportionately heavy workload based on plaintiff's race and national origin, (c) invidious comments and racial discrimination by Supervisors, (d) plaintiff's disability. Such investigation or allegation based on plaintiff's race and the involvement of Joanna Rohde with State actors are sufficient to establish that Google's refusal to hire the plaintiff was based in part on plaintiff's race.

517. Defendant Google Recruiter, Martinez Avalos, was a US Citizen or National and worked as a recruiter at Google. Upon knowledge and belief, he was supported by another female US Citizen or National named Rebecca from the Candidate Experience team.

518. The fact that Google Recruiter, Martinez Avalos, reached out to the plaintiff on behalf of Google Product Management Recruiting team in July 2018, interacted with the plaintiff and proposed plaintiff's profile, and the hiring team also liked plaintiff's profile and wanted to more forward with interviews, denote that the Recruiter had some supervisory oversight over plaintiff's recruitment. The recruiter later communicated with the plaintiff that Google wanted to schedule another round of phone interview based on Product creativity and Strategic insights, the same suggests that he interacted with other members of Google Product Management Recruiting team who had input in the final decision of Google's refusal to hire the plaintiff.

519. Since Google knew that the plaintiff would require visa sponsorship for his full-time employment at Google, it can be inferred that the Google recruiter or hiring team must have considered plaintiff's national origin as a factor in their decision not to hire the plaintiff

520. By engaging with one or more state actors as part of Deloitte talent relations team, or by engaging in actions to mitigate the risks associated with involvement of family members of current or former State Actors and their families, Joanna engaged in conduct that otherwise may be considered as State Action.

521. Being a person of Indian National Origin impacted plaintiff's employment at US employer Deloitte in five (5) ways.

522. First, in order to hire the plaintiff, Deloitte need to get plaintiff's H1B visa petition approved by the Department of Homeland Security and USCIS.

523. Second, in order to ensure the plaintiff could work at multiple locations, Deloitte had to file a Labor Condition Application (LCA) petition for each such location and wait for approval.

524. Third, each time the plaintiff changed his work location, Deloitte was required to get a LCA approval, a process which took 2-3 weeks to complete.

525. Fourth, Plaintiff's National Origin impacted plaintiff's green card petition, and petitions by applicants similarly situated to the plaintiff based on his employment and education category would require ten or more years to get approved (due to the high number of petitions from plaintiff's country of origin).

526. And Fifth, after getting separated or terminated from Deloitte, the plaintiff had 60-days to find another job and transition his H1B to the new employer, or change his status to another visa category, or leave the United States in order to avoid accruing any illegal period of stay in a foreign country.

527. As identified previously, Deloitte intentionally released the plaintiff from multiple projects, in-part to ensure that the plaintiff's client utilization matrix would be impacted because the plaintiff would need to wait before he could travel to a new client location and start a project. Plaintiff was treated differently than similar situated White employees and US Citizens or Nationals.

528. Additionally, on plaintiff's case, Deloitte violated the anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the US Department of Labor (DOL). As a H1B employee, Deloitte certified to provide the plaintiff with non-discriminatory working conditions on their government petitions. However, Deloitte provided the plaintiff with disproportionately heavy workload of two full-time employees, which was outside of the working conditions allowed on plaintiff's specialty worker Labor Condition Application (LCA) submitted and signed by Deloitte.

529. It can be inferred that Plaintiff would not have suffered an adverse employment action at Deloitte, his termination, if the plaintiff (a) was not discriminated on the Anthem project based on his national origin and race and was not given disproportionately heavy workload by his white supervisor for which he filed an ethics report, (b) was not released from the JP Morgan Chase project because he was helped for his disability incident by a White Sr. Partner, (c) was not sent to interview for a project where he was destined not to be hired due to lack of relevant experience, (d) was not accused by his White supervisor of buying an airplane ticket without her approval, (e) was not falsely accused by a 61-year old White female of inadvertently touching her behind,

(f) was not treated less favorably than the female accuser, (g) was not a victim of inconsistent and incomplete investigation by Deloitte.

530. Plaintiff was as such singled out and treated differently than similarly situated employees like Adrienne Moorefield and Morgan Carlson based on his race and national origin. The timing, sequence and causal connection of these events suggest that but for defendant's unlawful conduct, plaintiff's termination would not have occurred. Thus, defendant Deloitte maintained a discriminatory bias against the plaintiff on the basis of his national origin and race, and was motivated to influence Google to take adverse employment action against the plaintiff or not hire the plaintiff based on the same reasons identified above.

531. Deloitte knew that the plaintiff would require visa sponsorship in order to work at Google, and knew that Deloitte had violated the terms and conditions of LCA petition required by the Department of Labor on plaintiff's case. Hence, Deloitte persuaded Google not to hire the plaintiff to avoid added liabilities on the matter; because violation of H1B visa norms on plaintiff's case could be used as a reason to file a retaliation claim against Deloitte, and in case of such litigation, plaintiff's employment and work at Google would be impacted.

532. Upon knowledge and belief, since the previous employers of similarly situated Google applicants like Ms. Vennela Subramanyam, Mr. Abhinav Gaiha, Ms. Chandrika Rao did not violate the anti-discriminatory practices of the specialty worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL), these Google applicants were outside of plaintiff's protected class based on Deloitte's DOL LCA violations. These applicants were hired by Google for Fulltime roles, while the plaintiff was not hired.

533. Since defendant Google's decision to refuse to hire the plaintiff was based in part on plaintiff's National Origin, it can be established that defendant Google's refusal to hire the plaintiff was not based on non-discriminatory terms. That is, Plaintiff's national origin was in part a limiting factor on their decision not to offer equal employment opportunity to the plaintiff.

534. For the years 2018-2024, Plaintiff was similarly situated to Google White female employees, Carol Skordas Walport and Beth Cooper. Both plaintiff, Carol Skordas Walport and Beth Cooper

had almost the same or comparable number of years of work experience. Carol Skordas Walport and Camila worked on similar positions that required similar skill, effort, and job responsibilities at Google, which is comparable to plaintiff's Client Consulting work at Deloitte. Carol Skordas Walport and Camila were subject to the same standards of fulltime employment discrimination laws at Google, as the plaintiff at Deloitte. These employees had similar educational background as the plaintiff, plaintiff had a Bachelor's degree, a Master's degree and had completed several graduate (MBA) level business certifications from University of Pennsylvania – Wharton School of Business.

535. For the years 2018-2024, Carol Skordas Walport and Beth Cooper was hired for similar position that the plaintiff applied to, however, the plaintiff was not hired. Upon knowledge and belief, Carol Skordas Walport and Jessica French did not suffer from a malicious sexual harassment allegation at Google, were not discriminated by Google on the basis of protected characteristics of a pregnant female supervisor or their race. Carol Skordas Walport and Jessica French lacked plaintiff's diverse work experience dealing with several multiple clients in different business industries such as Financial Services, Life Sciences and Pharmaceuticals, Consumer and Product Goods etc.

536. Google singled out the plaintiff and treated the Plaintiff differently than similarly situated White female employees, Carol Skordas Walport and Beth Cooper, who did not suffer from **gender discrimination** by their previous employer or by Google in the form of sexual harassment allegation or **protected female factor** like pregnancy, or were not discriminated at Google based on their **race**. Carol Skordas Walport and Beth Cooper, full-time Google employees who were **outside of plaintiff's protected gender and race class**, were hired and/or internally promoted by Google for similar positions that the plaintiff was not hired for.

537. Similarly, Defendant Google's similarly situated applicants, like Carol Skordas Walport and Beth Cooper, who were **U.S Nationals and/or U.S Permanent residents**, did not have to go through the ordeal of having their employment application at Google denied. Plaintiff was qualified for an available position at Google, was rejected by Google, and after plaintiff's rejection Google hired a White applicants Carol Skordas Walport and Beth Cooper as

employees. Defendant Google's actions suggest that **White US National Female applicants** and employees were given preference over the Non-White Foreign National Male plaintiff.

538. Deloitte coordinated with or conferred with Google to not hire the plaintiff, thus restraining plaintiff's recruitment and/or employment rights. Just prior to termination, the plaintiff received the same salary 23 months into his work at Deloitte, as he received on the first day of work. Similarly situated Deloitte employees like Youmna Saloumi did receive a yearly salary hike.

539. Defendant Google's similarly situated applicants, like Ms. Vennela Subramanyam, Abhinav Gaiha, who were foreign workers and later hired by Google as employees, comparable to the plaintiff on having a H1b work visa, did not have to go through the ordeal of having their Google application denied after being selected by the Google recruiter. Plaintiff was singled out against similarly situated foreign workers, who did indulge in protected activities at their employers yet were outside of plaintiff's protected class, who did not have a false and malicious sexual harassment allegation by a woman twice their age.

540. In fact, **US Citizens,** Carol Skordas Walport, Beth Cooper, Tom Buckley, Ben Solomon, were hired by Google, yet the plaintiff was rejected. Plaintiff was singled out against similarly situated US Nations and Permanent residents, who did not suffer from race and national origin-based discrimination from their previous employer.

541. In fact, plaintiff was **more qualified** than similarly situated White employees Christopher Schlaepfer, Eric Savage, etc. The applicants were hired for similar position/s after Google started their recruitment process with the plaintiff. Plaintiff had more experience in terms of diverse Client Consulting Experience in different industries over 8+ years that gave him an added advantage as an applicant. Such actions show that Google was unwilling to provide non-discriminatory employment opportunity as a fulltime employee to the plaintiff

542. The defendant Google terminated plaintiff's application by providing no substantive legitimate reasons for denial or failure to hire. Upon knowledge & belief, Google knowingly misjudged and disregarded plaintiff's job qualifications, and plaintiff was not able to enjoy the same employment privileges as offered to White employees or US Nationals.

## DELOITTE'S MATRIMONIAL FRAUD AGAINST THE PLAINTIFF

543. In order to further maintain an illegal control of the plaintiff, Deloitte HR Joanna Rohde and her UK and Indian colleagues, have blocked or manipulated plaintiff's access to prospective matches and genuine profiles who are interested in seeking matrimonial alliances

544. Deloitte HR Joanna Rohde and her UK and Indian colleagues have tried to illegally entrap the plaintiff into fake matrimonial alliances through online website and matrimonial application manipulation, with an illegal agenda to maintain an illegal control of plaintiff's liberty, his finances and his constitutional rights.

545. During years 2022 through 2024, Deloitte and actors supporting Deloitte, including Indian state actors, have intentionally and purposefully targeted plaintiff's profile at an Indian matrimonial service provider "Bharat Matrimony"

546. Upon knowledge and belief, in order to further dissuade or discourage the plaintiff from using other apps, Deloitte and supporting actors intentionally blocked plaintiff's access to dating and matrimonial service provider "JeevanSaathi", and manipulated plaintiff's communications with the service provider customer support to ensure that the plaintiff would not be able to verify his account. Ideally such accounts are verified within two-three business days, however, plaintiff's account that was created on April 27th 2023, and still remains unverified.

547. For service provider "Bharat Matrimony", Deloitte has targeted plaintiff's application and his profile. Deloitte has both blocked the plaintiff from accessing genuine female profiles who are interested in dating or matrimonial alliances, and has also targeted the plaintiff with fake profiles.

548. Likewise, Deloitte likely blocked genuine female prospects from accessing plaintiff's profile.

549. Specifically, the plaintiff had created his profile at one of the leading dating or matrimonial service provider in India, Bharat Matrimony, on or around May 2022. From June 2022 through the end of January 2023, the plaintiff hardly received any interests on this application.

550. In fact, in July 2023, the plaintiff secured a three-month paid premium subscription to enhance his prospects, however, the plaintiff was still not able to secure any meaningful interests.

551. To begin with, the plaintiff purchased paid Gold membership in 2022. However, during the seven-month period in 2022, the plaintiff just received one (1) match. During this period, Deloitte continued to send fake profiles to the plaintiff and block plaintiff's interests and communications with valid and genuine female prospects.

552. After his paid membership expired in 2022, dejected by the response and disheartened by Deloitte's intervention, the plaintiff decided not re-subscribe his paid membership in year 2022.

553. In November 2022, the plaintiff informed another case witness, Dr. Niti Aggarwal, about Deloitte targeting plaintiff's dating or matrimonial prospects. The plaintiff also reminding her of her rights, and requesting her to investigate her own personal situation. The plaintiff reminded her that Deloitte may be possibly interfering with her own dating or matrimonial prospects, and requested her to document details.

554. The matrimonial service provided an option to maintain an account without a subscription, still providing the user an ability to receive message from prospective matches, and ability to send interests to existing profiles. The identified matrimonial website, Bharat Matrimony, provides every user free ability to send a limited number of interests every day. Ability to send emails or chat messages are only available on subscription.

555. Subscription is mainly of three types, Gold with the ability to send emails, chat messages to potential interests; Prime with an included ability to view ID verified profiles and ID verified pictures; and Assisted with an included ability of having a matrimonial executive conduct search and initiate communication on behalf of a member.

556. In January 2023, the plaintiff notified the Deloitte's defense attorney of the same, and subsequently filed information with evidence on the court docket one of his related cases

557. After the plaintiff the plaintiff notified the Deloitte's defense attorney of the same, and subsequently filed information with evidence on the court docket one of his related cases, during

the next 90-day period, starting from Early February 2023 through Early May 2023, the plaintiff received close to 100 matches or interests on the Bharat Matrimony profile. This was very sharply in contrast with just 1 match or interest which the plaintiff received during the preceding seven (7) month period.

558. Thus, the events provide an inference that the Deloitte and actors supporting Deloitte actively blocked plaintiff's dating and matrimonial prospects during the last few years, and used its HR professionals or intelligence service agents to ensure that the plaintiff is not able to secure a suitable dating or matrimonial prospect. Deloitte and female actors supporting Deloitte, including Deloitte HR Professionals remain the biggest beneficiaries from such acts (as further identified below).

559. In fact, as further explained below, Deloitte and female actors supporting Deloitte remain motivated to block plaintiff's prospects, and intend to further benefit from not allowing the plaintiff to seeking a successful matrimonial alliance.

560. During the last several years, Deloitte has singled out the plaintiff and continues to single out the plaintiff by manipulating his online dating and matrimonial prospects. Upon knowledge and belief, similarly situated Deloitte employees like Adrienne Moorefield, Youmna Saloumi, Morgann Carlon and Irma Arellano, were not retaliated against by Deloitte and their matrimonial prospects were not blocked. Deloitte retaliated against the plaintiff and continues to retaliate against the plaintiff because the plaintiff filed a confidential ethics and integrity complaint, because the plaintiff defended his disability / medical condition with proof, because multiple actors supporting Deloitte have not been able to recruit the plaintiff into their money laundering and sexual services scheme.

561. On or around April 2020, in order to further investigate Deloitte and Joanna Rohde's prior malicious acts against the plaintiff on limiting or manipulating online information, targeting the plaintiff with fake news, and to investigate their prior actions on the same matter, the plaintiff created a profile on a US based dating app. This was during the COVID Pandemic, during which there was a lockdown. The plaintiff informed Dr. Niti Aggarwal of the application, and Dr. Niti said yes, go ahead and play on Tinda (aka Tinder).

562. On or around April 2020, the plaintiff received a match from a Radiologist in New York. The plaintiff believed it was Dr. Niti Aggarwal who wanted to communicate some confidential information to the plaintiff, hence, he accepted the interest, and accepted invitation for a Facetime call.

563. The plaintiff took the call because the plaintiff believed it was Dr. Niti Aggarwal who wanted to communicate from a different ID. However, the person over the Facetime call was not Dr. Niti Aggarwal, but Joanna Rohde's HR colleague from the Deloitte UK office.

564. Since the plaintiff was at home during this Facetime call, upon knowledge and belief, plaintiff's Google Nest camera must have video and recorded the conversation.

565. Upon knowledge and belief, Joanna and her UK colleague called the plaintiff on Facetime with an agenda to entrap the plaintiff into their money laundering and sexual services scheme.

566. During this period, these female actors supporting Deloitte also targeted the plaintiff with multiple fake messages through various means, sent improper messages to one another through plaintiff's online applications, and tried to invite the plaintiff to have another call with a different female person.

567. Interestingly, during years 2014 and 2015, upon knowledge and belief, Indian state actors supporting Joanna Rohde constantly persuaded a Radiologist friend of plaintiff's ex-wife, Dr. Priyanka, to discourage and misguide her in multiple aspects. For instance, at one time, Dr. Priyanka scratched the bonnet of her adjacent car at a move theater parking lot, yet her Radiologist friend persuaded her to vacate the scene, thus promoting hit and run.

568. Since the plaintiff denied and declined to participate, and later went on to meet Dr. Niti Aggarwal in the State of Minnesota, Deloitte and the actors supporting Deloitte knew that the plaintiff had a valid claim against them. Deloitte and Joanna Rohde knew that previously they had coordinated with Google to deny the plaintiff an opportunity to get recruited, and his Google Nest account and cameras installed inside his house could provide the plaintiff another reason to file a claim against Deloitte.

569. When the plaintiff visited Dr. Niti Aggarwal in the State of Minnesota during the Covid

Pandemic in 2020, Deloitte, Joanna Rohde and supporting actors intervened to persuade their dual agenda. First, ensure that the plaintiff would not expose their efforts to recruit the plaintiff into their money laundering and sexual services scheme.

570. Second, since Dr. Niti Aggarwal was harassed by her employer, in coordination with Deloitte, and since Dr. Niti resigned and found a suitable employment only after close to six (6) months after resignation, Deloitte, Joanna Rohde and supporting actors intervened to maintain an illegal control over Dr. Niti to ensure that Dr. Niti would not expose (a) Deloitte's likely intervention amounting to employment and recruitment fraud, (b) would not testify as a witness to plaintiff's disability / medical condition

571. During this time since Dr. Niti was working at a prestigious medical institution yet the plaintiff was not, Dr. Niti had a valid work permit for continued employment in the United States yet the plaintiff did not, Deloitte, Joanna Rohde and supporting actors acted with deliberate indifference and conscious disregard to plaintiff's rights by constantly communicating with Dr. Niti Aggarwal to help them "investigate" matters, and in order to further entrap both the plaintiff and Dr. Niti Aggarwal maliciously influenced Dr. Niti to enact sexual gestures which Joanna and her colleagues previously enacted.

572. In 2020, Dr. Niti was busy with her employment in the healthcare industry as a Physician during the Covid Pandemic. Given the Covid Pandemic and Dr. Niti's busy schedule, since it did not appear or look like that Dr. Niti was interested in filing a claim against Deloitte or her previous employer, Deloitte white female HR professionals decided to take advantage of the situation.

573. Upon knowledge and belief, Deloitte white female HR professionals maliciously used their technique to motivate one woman to sympathize with another woman, under the disguise of genuine effort to protect female interests.

574. Upon knowledge and belief, Deloitte white female HR professionals were motivated to favor the interests of female employees with protected factors like pregnancy, and females who alleged they were a victim of sexual harassment, in order to demonstrate their commitment to protecting the interests of female employees from harassment or discrimination.

575. Upon knowledge and belief, Deloitte white female HR professionals maliciously used such

techniques on Dr. Niti Aggarwal. Given the presence of Deloitte as well as state actors, and unaware of their real intention to recruit the plaintiff into their money laundering scheme, Dr. Niti entered into an understanding or agreement (express or tacit) to help Deloitte females in their investigation.

576. While the plaintiff visited Dr. Niti Aggarwal, Dr. Niti enacted several gestures on behalf of Deloitte and the supporting state actors. On one instance, Dr. Niti asked the plaintiff to consume two (2) pieces of peanuts, a gesture to investigate plaintiff's allergies. On another instance, Dr. Niti turned on a Youtube video on which one female convinces another female not to disclose her habit of keeping secrets from a male.

577. On another instance, Deloitte HR professionals tampered a video to state excerpts from a conversation between the plaintiff and his supervisor Brian Zhong, and then Dr. Niti brought the plaintiff outside her house and asked the plaintiff to look at the sky to enact plaintiff's conversation with phrases "god is watching".

578. Upon knowledge and belief, with Dr. Niti on their side, Deloitte white female HR professionals believed that the plaintiff would be so impressed by their surveillance and their techniques to enact concurrent circumstances, that they would be able to recruit the plaintiff into their malicious money launder scheme and sexual services.

579. Unbeknownst to Dr. Niti Aggarwal, these Deloitte white female HR professionals also asked Dr. Niti Aggarwal to perform sexual gestures which they had previously used to entrap the plaintiff into their money laundering scheme.

580. Given that Dr. Niti was discriminated at her previous employer, and harassed to the point she resigned, and found another job with great difficulties after a considerable period of time, when the plaintiff requested Dr. Niti Aggarwal to disclose her affiliations, and disclose the nature and motivation of her actions, Dr. Niti seemed reluctant.

581. Deloitte white HR Professionals knew that based on their research or surveillance on Dr. Niti Aggarwal, in part due to very nature of her work to serve patients as a Cardiologist Physician, in part based on her life experiences, and in part due to the COVID pandemic and the stress on healthcare professionals during the pandemic, Dr. Niti did not want to go against the interests of

a large number of females, and against the interests of one of the biggest consulting firm and professionals service provider in the United States.

582. In 2020, Deloitte white HR Professionals failed to entrap the plaintiff into their sexual services, yet were able to conceal their crimes by persuading witness Dr. Niti Aggarwal not to disclose their actions or affiliations. Since the plaintiff was targeted by Joanna, Indian state actors and Joanna's acquaintances over a long period of time, even from before the plaintiff had met Dr. Niti Aggarwal, plaintiff's interests were deeply impacted such actions.

583. Thus, Deloitte white HR Professionals were able to entangle Dr. Niti Aggarwal in their fraud, and ensured that the plaintiff would not be able to successfully expose their money laundering and sexual services. In 2020, Deloitte white female HR Professionals were successfully able to separate the plaintiff, Dr. Niti Aggarwal and their relationship, due to the conflict of interests during the COVID pandemic, and the malicious and nefarious nature of fraud orchestrated by Deloitte, Joanna and supporting state actors.

584. Notably, the plaintiff has previously highlighted that Deloitte HR and/or Indian law enforcement agents followed the plaintiff into a night club in Delhi in February 2023.

585. Deloitte cannot claim the incident was coincidental because the very next day, on or around February 19th 2023, the same Indian state actor followed the plaintiff in her White Mercedes Benz with Government Plates and identifiable Government Logo ("Star"), while the plaintiff was riding an auto-rikshaw in between Chanakyapuri and Connaught Place in Delhi.

586. The timing or the sequence of events matter because prior to raising the identifiable dating or matrimonial fraud issues (in January 2023), Deloitte blocked plaintiff's access to genuine female profiles and Deloitte blocked genuine female prospects from accessing plaintiff's profile.

587. However, after raising the identifiable dating or matrimonial fraud issues, Deloitte targeted the plaintiff with fake matrimonial profiles.

588. Deloitte continued to block genuine female prospects from accessing plaintiff's profile with a dual agenda: First, Misuse Indian female HR professionals to accomplish multiple goals with

one narrative. Second, Re-distributing the risks associated with sexual services or money laundering fraud by White Female HR professionals

589. On plaintiff's letter dated March 10th 2023 to the Deloitte CEO, the plaintiff identified that Deloitte HR professionals Joanna Rohde and her UK colleague influenced or forced several Deloitte Indian female HR professionals or agents to follow the plaintiff into a night club [1].

590. Specifically, since the Indian website predominantly listed female profiles of Indian origin, currently situated within or outside India, Joanna and her UK female devised a malicious strategy to conceal their own involvement outside of the United States, and to continue providing incentives to women who support them.

591. With one single narrative of misusing the Indian female HR professionals to entrap the plaintiff, Joanna and her UK colleague wanted to both conceal their malicious actions, and redistribute the risks and liabilities from the malicious actions

592. First, Joanna and her UK colleague wanted to mitigate the risks associated with maintaining an illegal control over plaintiff's well-being and personal life. Specifically, Deloitte targeted and hampered plaintiff's ability to search and secure a suitable alternate life partner; Joanna knew that plaintiff's interactions with female HR professionals or female Indian state actors disguised as suitable match prospects would eliminate Deloitte's liability on the matter.

593. Thus, upon knowledge and belief, Joanna persuaded multiple Indian females and supporting actors to target the plaintiff with fake profiles from 2023 onwards. The plaintiff received more than 100 interests within a three-month period.

594. Second, White Female Deloitte HR professionals Joanna and her UK colleague knew that plaintiff's interactions with female Indian HR professionals or female Indian state actors disguised as suitable match prospects, especially any advanced interactions on sexual interests or favors, would help re-distribute the risks associated with their continued attempts to recruit the plaintiff into their money laundering scheme.

[1] The plaintiff duly requested Deloitte to use their state affiliations, agents or connections to retrieve the CCTV images or video from the event.

595. Females professionals and state actors supporting Deloitte fraudulently positioned themselves as suitable prospects, and continued to send fake interests, fake or fraudulent messages to the plaintiff.

596. White Female Deloitte HR professionals Joanna and her UK colleague persuaded these females into believing that since the plaintiff has already seen them at the Noida event, and already spent more than 2 hours with them under the same roof, they had a higher chance to recruiting the plaintiff into their money laundering scheme. Specifically, their money laundering scheme included providing online or in-person sexual favors to the plaintiff, in exchange for a percentage from plaintiff's future lawsuit settlement with Deloitte.

597. It can be inferred that with limited time and potentially highly rewarding prospects, White Female Deloitte HR professionals Joanna and her UK colleague positioned their favored female colleagues to visit the plaintiff in Delhi, and then positioned their most valuable player, the Indian intelligence female, who followed the plaintiff riding a German made Mercedes, to seal the deal.

598. In order to recruit the plaintiff into their unsolicited and unlawful acts, these state actors and females have tried to show the plaintiff how skillful they are. Upon knowledge and belief, their presentations, which any reasonable normal law-abiding citizen would consider as a nuisance, included manipulating plaintiff's internet content (including sending sexually inviting messages or content), manipulating plaintiff's TV content with similar themes, tap-jacking into plaintiff's phone, manipulating the content of plaintiff's emails, sending Whatsapp messages from fake accounts or masqueraded accounts belonging to identified online prospects, making unsolicited calls to the plaintiff, making unsolicited calls by masquerading voice of known persons, etc.

599. For instance, Deloitte attacked plaintiff's Phone with Tapjacking on July 31st 2023. Tapjacking is a type of phone hacking which involves screen overlay as method of masquerading applications, unauthorized and/or unintended usage of applications.

600. Similarly, for the period March through August 2023, the plaintiff had genuinely tried to communicate with prospective matches over WhatsApp. However, each such time, based on

one or more factors like chronological sequence of events, previous pattern of communication, causal connection between disjoint individuals, identification of favorable instances over a long-period of time, identification of concurrent circumstances or conditions, common culture and precedence, etc, the plaintiff found that it was Deloitte HR professionals and/or supporting state agents who had previously targeted the plaintiff, and were again trying to communicate with the plaintiff and recruit him into their matrimonial fraud.

601. Over a period of time, when their desperate attempts to showcase their perceived technology superiority and ability to use government affiliation to impress the plaintiff failed, the same actors set a retaliatory campaign against the plaintiff, like identifying one or more previous instance of harassment or retaliation against the plaintiff, manipulating content over different channels like digital TV, radio, phone, sending malicious content online and on phone, sending harassment messages, etc.

602. Since the plaintiff was related to a democratically elected Government official, these individuals supporting Deloitte and their departments have maintained a surveillance of the plaintiff over a long period of time.

603. In order to recruit the plaintiff into their malicious acts, first the state actors supporting Deloitte sent the plaintiff pleasant messages, favorable circumstances and reminders about plaintiff's past relationships when the plaintiff was in school and in college.

604. However, when their desperate attempts to recruit the plaintiff into the malicious acts and money laundering scheme failed, these individuals have targeted the plaintiff with obnoxious messages, reminding the plaintiff about negative or unpleasant circumstances over a long period of time, draw unpleasant similarities between common circumstances or events over a long period of time, show their intentions to promote the interests of individuals not liked or not favored by the plaintiff, etc.

605. Such targeted manipulation of a communication devices allowed Deloitte to maintain an illegal control over plaintiff's matrimonial prospects, his liberty and pursuit of happiness, and his civil and constitutional rights.

606. Upon knowledge and belief, since one or more Indian females who retaliated against the plaintiff are government officials, the malicious acts against the plaintiff can be attributed to both Deloitte and the state.

607. The retaliatory action by Deloitte and their supporting state actors have directly impacted plaintiff's rights and his ability to secure a suitable alternate partner.

608. The plaintiff has already waited multiple years on his matters against Deloitte. Since the plaintiff is a witness on his court cases, Deloitte had a duty not to tamper or negatively impact plaintiff's rights. Similarly, since Deloitte involved multiple state actors on the matter, such state actors had a duty not to retaliate against the plaintiff.

609. Upon knowledge and belief, it is the duty of Deloitte to discipline and reprimand the involved Deloitte professionals, and ensure disciplinary action is taken against state actors Deloitte has involved on such matters.

610. Deloitte and supporting state actors have intentionally hacked or manipulated plaintiff's Matrimonial prospects, and have not allowed the plaintiff to seek alternate suitable match by communicating with authentic female prospects. Based on the facts, it can be inferred that Deloitte has retaliated against the plaintiff in order to limit their liability on (a) plaintiff's gender discrimination claims, and (b) efforts to recruit the plaintiff into their money laundering or sexual services

611. Deloitte and supporting state actors have Tapjacked of Plaintiff's Whatsapp, and created a number of fake or fraudulent User accounts / profiles to target the plaintiff. Deloitte has sent numerous targeted messages to the plaintiff through such accounts. Deloitte and Deloitte supporting actors remain the biggest beneficiaries from such acts

612. Such matters are important because in order to conceal their targeted attempts of recruiting the plaintiff into sexual services and money laundering scheme, the females supporting Deloitte and Joanna from the Indian government continue to block plaintiff's matrimonial prospects, and

continue to abuse government technology or funds to institute fraud and harassment campaign against the plaintiff.

613. Deloitte, Joanna Rohde and supporting actors have willingly, intentionally and wantonly maintained an illegal control over plaintiff's federal and state civil and constitution rights, his personal liberty, his life, health, and personal wellbeing.

614. More importantly, Deloitte has maintained an illegal control over plaintiff's ability to search and secure a suitable alternate life partner, thus severely impacting plaintiff's personal well-being and reputation, his ability to secure or maintain a relationship.

615. The plaintiff has previously identified that he hardly received any interests until he informed the court about the matter on or around the end of January 2023. Specifically, in January 2023, the plaintiff received no interests, followed by six (6) accepted interests in February.

616. After white female professionals, Joanna Rohde and her UK colleagues, influenced Indian females to physically follow the plaintiff in Delhi, in order to limit Deloitte's accrued liability and limit punitive damages on the matter, in March 2023, the plaintiff received thirty-two (32) accepted interests, followed by forty-eight (48) accepted interests in April.

617. Upon knowledge and belief, one or more such female professionals who targeted the plaintiff first worked for Deloitte. They subsequently changed career paths to become law enforcement professionals or state actors. Deloitte subsequently ensured that they continued to provide professional services to the firm.

618. Upon pattern of actions, knowledge and belief, white Deloitte HR professionals Joanna and her UK colleague strategically placed one or more such female professionals (a) such that they are forced to take ownership of Joanna's wrongful acts, and (b) such that they be held be accountable or responsible for "owning the fraud" orchestrated by Joanna and her colleagues.

619. The plaintiff received close to 100 interests on the identified dating / matrimonial website in the three-month period starting from February through Early May. Such sudden outburst of unexpected interest on plaintiff's online profile can be attributed to renewed realization by

Deloitte white female professionals that that may still recruit the plaintiff into their money laundering scheme, and still hope to settle the claims with the plaintiff without any negative impact on their own lives and professional careers.

620. The plaintiff continued to receive high number of Interests until mid-May 2023, when the plaintiff made a filing on the matter with evidence at the US Court of Appeal with the Third Circuit.

621. On his court filing with the Third Circuit dated May 16th 2023, the plaintiff identified 20+ profiles belonging to good-looking or well-educated young women. These are the profiles which first accepted plaintiff's interests. Upon knowledge and belief, in order to entice the plaintiff into their fraud, Deloitte and state actors first created fake or fraudulent profiles, and then after learning the fact that their fraud would get exposed, later deleted such profiles such that the evidence on the matter is no longer available to the plaintiff.

622. Thus, Deloitte first created fraudulent profiles, and then tampered with evidence on the matter to further maintain an illegal control over the plaintiff and disproportionately impact his civil and constitutional rights, such as right to free and unbiased news and information, right to seek a suitable life partner,

623. Specifically, by creating fake profiles and sending interests from such potential fake profiles, Joanna and her UK colleague falsely enticed the plaintiff into communicating with Deloitte female HR professionals and state actors who posted fake profiles or masqueraded profiles of known people. The website or matrimonial app provided a "Go ahead and contact her now" option, providing the member an option to access phone numbers, send messages and emails to a suitable prospect.

624. By creating fake profiles and sending interests from such potential fake profiles, Joanna and her UK colleague accomplished the following objectives. First, they falsely made the plaintiff more interested in dating or matrimonial prospects.

625. Second, they erroneously created false market demand, and maliciously made the plaintiff more

needed or more in-demand than he actually was.

626. Third, they incorrectly made the plaintiff more self-confident about his own profile and his own prospects of finding a suitable alternate match.

627. Fourth, they wasted two or more years of plaintiff's valuable time, and ensured that the plaintiff would get aged and less likely to find an alternate suitable match.

628. Subsequently, by deleting the fake profiles of high caliber women, Joanna and her UK colleague accomplished the following objectives. First, they maliciously created a demand supply mismatch, where profiles of more fair, more beautiful and more educated women are taken off the market, thus, falsely pushing the plaintiff to "act soon" or "act now".

629. Second, they limited the supply of more attractive (beautiful, fair, young) or accomplished (educated and working) women with an objective to tactically push the plaintiff towards more realistic matches, that is, influence the plaintiff into having conversation with their HR professionals and preferred state actors.

630. That is, by artificially creating demand and completely eliminating fair competition for a specific period of time, Deloitte influenced or forced the plaintiff to choose from one of their own preferred products, identifiably Deloitte HR professionals and preferred state actors.

631. Deloitte influenced or forced the plaintiff to renew his subscription, such that the plaintiff may start communicating with the remaining matched profiles at the earliest.

632. Given the fact that Deloitte created a strong need, on or around May 2nd 2023, the plaintiff decided to sign-up for Prime Membership Subscription. Through both verbal and written communication from his mobile device, the plaintiff agreed to sign-up for and purchase 3-months Prime membership (with added options like the profile highlighter). Prime membership would have served plaintiff's interests mainly by assuring that the plaintiff received ID verified and picture verified profiles.

633. However, Deloitte continued to target the plaintiff with fake profiles or fake communications with profile. For instances, in order to ensure that the matches were valid, the plaintiff initially

replied to and requested a few matches to communicate with the plaintiff over Apple's Facetime (an encrypted and secure means of communication), however, the profiles declined. Upon knowledge and belief, since Joanna Rohde and her UK colleague had called the plaintiff on facetime previously, Deloitte females and supporting actors were reluctant to use the same means or form of communication because the plaintiff could record them and present them to the court.

634. Nevertheless, Deloitte continued to target the plaintiff with fake profiles or fake communications and continued to show interest in having phone conversations with the plaintiff. In June and July 2023, Deloitte masqueraded the identities of multiple women, including Tanya Agarwal, Pihu Pandey, Tanu, Akansha Jaiswal, Somya Jaiswal, Surbhi Choubey, etc, to send messages with just their phone numbers. The plaintiff filed this information on a related matter filed by the plaintiff at the US Court of Appeals for the Second Circuit with evidence. The plaintiff never asked these females to share their phone numbers. An uninterested observer may infer or conclude that when an unknown woman sends a message just with her phone number something is not right. Thus, Deloitte and supporting state actors tried to increase their own chances of falsely communicating with the plaintiff through masqueraded (fake) profiles.

635. During this period of time, Deloitte and supporting state actors also ensured their interests remained protected. For instance, the plaintiff confirmed his membership renewal over written text messages with the Matrimonial site sales executive. The sales executive confirmed and agreed to providing the plaintiff with Prime membership with add-on options such as profile highlighter.

636. The plaintiff made payment to secure 3-months of Prime membership post receiving both verbal and written confirmation of Prime membership (with identified added options such as profile highlighter). However, to plaintiff's dismay, which is similar to the dismay plaintiff experienced after learning that the Profiles of desirable candidates like "Shikha Singh", "Shalu Singh" and "Shweta Singh" were deleted, the plaintiff paid for Prime membership but received Gold membership, without any of the promised add-on options.

637. Upon knowledge and belief, one or more Indian female HR professionals or agents who followed the plaintiff into a night club in Delhi were law enforcement professionals. These females are

equipped with the skill and the ability to hack or intercept plaintiff's communications. Since the plaintiff had already identified their presence and malicious involvement to the court, and since the plaintiff had already made a formal complaint to the Deloitte CEO and the defense attorneys, these professionals believed they had reasons to retaliate against the plaintiff.

638. Upon knowledge and belief, these Deloitte professionals, under the guidance of Joanna Rohde and UK colleague, intercepted plaintiff's communications with the matrimonial website sales representative, and influenced the sales representative to harass the plaintiff by not honoring his verbal or written contract, and by not providing the plaintiff the promised add-on options. The sales professional refused to honor his verbal and written agreement, and mentioned that the settings cannot be changed.

639. Since prime membership would have equipped the plaintiff with the option to contact ID verified and Photo verified profiles, Deloitte and supporting actors maliciously ensured that the option was not provided with prime membership during the three-month period starting May 2023, so that they may reduce their liabilities on matters.

640. It can also be inferred that Deloitte and supporting actors, who were in-charge of sending fake profiles to the plaintiff, would have to work extra steps in terms of generating a fake ID verified and Photo verified, or sending a message from a masqueraded ID verified and Photo verified profile. Upon knowledge and belief, while intelligence service agents can easily hack and create fake profiles, but not every member of their team, that is not every female who followed the plaintiff into the night clubs in Noida was proficient with such skills.

641. In order to further conceal their harassment, Deloitte and supporting actors blocked plaintiff's communications and written email requests to the Matrimonial services company to ensure that the plaintiff would not receive a receipt of the transaction. The plaintiff was only able to secure a receipt six months after the transaction. One can infer the involvement of Deloitte white female professionals on such matters, as they wanted motivated to block any supporting Indian female actor from reporting the malicious intentions of White females and claim retaliation under New York State laws.

Case 1:24-cv-02470-JGLC Document 6-1 Filed 04/02/24 Page 146 of 187

642. Moreover, Deloitte has previously retaliated against the plaintiff in similar fashion. The issues identified on this section are analogous to Deloitte revoking plaintiff's access to Deloitte transition website access in December 2018, in order to ensure that the plaintiff would not able to secure suitable alternate fulltime employment. Similarly, the plaintiff was not able to secure a suitable match, date or matrimonial prospect in 2022 and 2023.

643. Thus, based on the above identified facts, one can conclude that Deloitte intentionally masqueraded profiles, mislead the plaintiff by targeting him with fake profiles of young, fair, good looking and educated female profiles, and targeted the plaintiff into believing that he was indeed getting genuine interest. Deloitte actions were directly targeted to stall plaintiff's competitive growth, and his limit the options available to him on his liberty, property and pursuit of happiness

644. Upon knowledge and belief, Deloitte and white female HR professionals tried to promote Indian females as new market entrants with exclusive promotions. Since the Indian females and supporting actors indulged in practices such as visiting the plaintiff at a night club, following the plaintiff in their Mercedes, constantly pushing profiles to grab plaintiff's attention, masquerading phone calls and mobile applications, one can infer that such females were placed as new market entrants with exclusive promotions to uncut plaintiff's ability to compete with white female HR professionals and to limit liabilities on discrimination based on race.

645. Upon knowledge and belief, since the salaries of female working in India are significantly lower than the salaries of their foreign counterparts, one can relate the above identified aggressive marketing tactics by white US female actors is analogous to dumping in International markets, when a manufacturer intends to harm competitors or monopolize them by selling products in foreign markets at significantly discounted prices. Since Deloitte successfully blocked plaintiff's online prospects, Deloitte harmed the plaintiff and limited his competitive options. However, Deloitte failed to notice the fact that the plaintiff has utmost respect for Indian women, and would never allow white US female HR professionals to monopolize the market with such malicious tactics.

646. Upon knowledge and belief, Deloitte and supporting actors achieved such malicious results

through unity of purpose of promoting the interests of Deloitte and white HR professionals, and/or through common design of suppressing any potential competition from the plaintiff. Deloitte and supporting actors were able to achieve malicious results by using the power of artificial intelligence, by blocking or manipulating plaintiff's internet-access, by manipulating the content management systems which fetch data to the plaintiff, and/or by hacking or tapjacking plaintiff's devices.

647. One can infer or conclude that since Deloitte white female HR Professionals influenced Dr. Niti to enact sexual gestures, and since Dr. Niti was a witness to the involvement of Deloitte white female HR, Deloitte, Joanna and supporting state actors were motivated to limit competitive options available to the plaintiff. Because if the plaintiff were able to seek an alternative match, such person could potentially have a conflict of interest with Deloitte, and Deloitte would not be able to hold the person responsible for confidentiality or from risk of reputation damage. In such a scenario, Deloitte and supporting actors would neither be able to limit their liabilities on their acts with Dr. Niti Aggarwal, nor would be able to conceal their long-term malicious intent to entrap the plaintiff into their crimes.

648. Given that Dr. Niti is a witness to the involvement and malicious practices of Deloitte female HR professionals, and given the fact that Deloitte has discriminated against the plaintiff based on his gender, one can infer or conclude Deloitte, Joanna and supporting state actors created an artificial market allocation agreement with Dr. Niti to prevent the plaintiff from competing against their sexual services and money laundering scheme. This act or agreements of allocating markets to prevent rivalry, and to avoid new entrants to challenge existing market dominance by White female HR professionals, is against the competitive guidelines or purpose of antitrust laws.

649. Given the fact that Dr. Niti was retaliated against by her previous employer, and the plaintiff and Dr. Niti were discriminated against based on his gender, by persuading Dr. Niti not to disclose the sexual preferences and practices of White female HR professionals (including Joanna Rohde), Deloitte, Joanna Rohde and supporting actors entered into a virtual non-compete clause with Dr. Niti, where Deloitte and actors supporting Deloitte reached an agreement or understanding not to interfere with her existing job at Mayo clinic in exchange for non-disclosure

of facts. Such territorial agreement impacted the progress of plaintiff's lawsuits, impacted the options available to the plaintiff for years 2020 through 2024, and, thus, suppressed competition from the plaintiff.

650. Given that Dr. Niti is a witness to the involvement and malicious practices of Deloitte female HR professionals, and given the fact that Deloitte has discriminated against the plaintiff based on his gender, one can infer or conclude Deloitte, Joanna and supporting state actors were motivated to limit the options available to the plaintiff and curb his competitive enthusiasm. Upon learning about plaintiff's situation and circumstances, female prospects would have a negative perception about Deloitte as an employer, and may potentially harm Deloitte's image in the market place based on the fact that Deloitte female HR professionals and leaders actively and genuinely engage in entrapping innocent persons into their trades.

651. By manipulating plaintiff matrimonial profile and by sending fake interests and fake messages, Deloitte intended to create an artificial barrier for entry which prevented the plaintiff to seeking new prospects, broaden his own interests or involve in new ventures. This restricted plaintiff's personal prospects, and stifled his personal and professional growth including his ability to grow and maintain a family. For instance, it could be inferred plaintiff's prospective match could be working for a different industry such as healthcare, technology education, finance or manufacturing, thus, by blocking such prospects, Deloitte curbed plaintiff's options to network in another industry and seek alternative employment in another industry.

652. One can also businessz infer or conclude that Deloitte achieved such malicious results by using the power of artificial intelligence, by blocking or manipulating plaintiff's internet-access, and/or by manipulating the content management systems which fetch data to the plaintiff.

653. First by blocking plaintiff's online access and limiting his ability to secure matches, and then by blocking plaintiff's ability to receive ID and picture verified profiles, Deloitte has indeed maintained an illegal control over plaintiff's life and his ability to secure or maintain a relationship. Due to Deloitte's direct intervention, the plaintiff has suffered life-changing impact on his personal well-being, his reputation and his ability to secure a suitable life partner.

654. Since these aspects are linked or inter-twined with plaintiff's constitutional rights and his ability

to seek alternate employment, the defendant would forever remain liable for their malicious, discriminatory and retaliatory acts against the plaintiff. Deloitte must cease to interfere with plaintiff's well-being, his personal choices and prospects.

## CAUSE OF ACTION

### COUNT ONE

**(Against Defendant Google and Deloitte Consulting LLP)**

**Discrimination based on Disability / Medical Condition**

*[in violation of Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

655. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

656. Plaintiff reported his disability / medical condition to the Google recruiter. Because of Plaintiff's disability / medical condition, plaintiff belongs to a group of persons that Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq. and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq. intended to protect against discrimination in the terms and conditions of employment.

657. By the above-described acts, Defendant Google discriminated against plaintiff because of his disability, by refusing to hire him for a fulltime position. Google coordinated with Deloitte and discriminated against Plaintiff with respect to terms, conditions and privileges of his employment because of his disability, through denial of his employment rights and benefits, and future promotions and achievements, by refusing to hire him, all in violation of Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.)

658. Further, Defendant Google acted with indifference to both state & federally protected rights of the Plaintiff. At all relevant times, Plaintiff was qualified for his position with Defendant Google.

659. Google recruiter and Deloitte State actor had a meeting of mind to reach an understanding not to hire the plaintiff. Thus, it can be inferred that Google recruiter was aware of plaintiff's disability / medical condition.

660. Plaintiff was treated differently than others outside his protected class, and he suffered discrimination because of his disability / medical condition.

661. Because of Defendants' discriminatory actions, Plaintiff has suffered adverse employment actions in the form of failure to hire. Plaintiff has suffered an inability to earn a living at Google and the unjust refusal to be hired.

662. Plaintiff also suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future.

**COUNT TWO**

**(Against Defendant Google and Deloitte Consulting LLP)**

**Discrimination based on Disability / Medical Condition**

*[in violation of New York City Human Rights Law (NYCHRL),*
*N.Y City Admin Code § 8-101 et seq.]*

663. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

664. Plaintiff was treated less well by defendant Google than similarly situated applicants and/or employees based on his disability / medical condition

665. As mentioned above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment. Defendant Google coordinated with Deloitte to deny the plaintiff an employment opportunity.

666. By the above-described acts, defendant Google is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

667. Further, Defendant Google acted with reckless indifference to federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**<u>COUNT THREE</u>**

**(Against Defendant Google and Deloitte Consulting LLP)**

**Discrimination based on Gender**

*[in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

668. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

669. Because Plaintiff was subjected to false & malicious sexual harassment allegations against him at Deloitte Consulting LLP, he belongs to a group of persons that Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq. and New York State Human Rights Law intended to protect against discrimination in the terms and conditions of employment.

670. By the above-described acts, defendant Google discriminated against plaintiff's gender because of the false and malicious sexual harassment allegations at Deloitte, by subjecting him to different treatment than other applicants, by tolerating and failing to take affirmative action to correct these unlawful employment practices, by discriminating against Plaintiff with respect to terms, conditions and privileges of his employment because of his gender, through denial of his employment rights and benefits, promotions and achievement, and by refusing to hire him as an employee, all in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq, and New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.

671. Google recruiter and Deloitte State actor had a meeting of mind to reach an understanding not to hire the plaintiff. Thus, it can be inferred that Google recruiter was aware of plaintiff's gender discrimination claims or the involvement of females with protected characteristics.

672. Defendant Deloitte followed a clearly irregular investigative or adjudicative process, and plaintiff's employment at Google was denied during this irregular investigative or adjudicative process.

673. Here, Defendant Google took an adverse employment action against plaintiff, (a) in response to allegations of sexual misconduct at Deloitte, and/or (b) in response to a possibility of extended litigation because of the existence of plaintiff's relative female as a Google employee. Google new that because of such issues, the plaintiff belonged to a protected group.

674. The defendant Google provided more favorable treatment to employees not in plaintiff's protected group. Defendant Google abandoned promised procedural protections under the law to the plaintiff. These circumstances support a case of sex discrimination.

675. Further, Defendant Google acted with reckless indifference to both state & federally protected rights of the Plaintiff.

676. At all relevant times, Plaintiff was qualified for his role / application for full time position with Defendant Google, and his job performance was very good. Plaintiff was treated differently than others outside his protected class, and he suffered discrimination because of his gender.

677. Deloitte coordinated with Google, and Google treated similarly situated female employees better than the plaintiff. Plaintiff was released from multiple projects by his female HR or female supervisors with discriminatory bias. Female HR falsified plaintiff's personnel file and incorrectly mentioned that plaintiff has issues with women, and women in supervisory position, in spite of several recommendations from women. Plaintiff's new project / staffing availability was limited by his female staffing resource manager, and plaintiff was assigned a false negative performance rating.

678. Defendant Google knew about plaintiff's allegations against Deloitte. Defendant Google refused to hire the plaintiff, and maintained a discriminatory bias against the plaintiff on the basis of his gender. Because of defendant Google's discriminatory actions, Plaintiff has suffered adverse employment actions, including his inability to earn a living at Google and the unjust refusal to be hired.

679. Plaintiff also suffered loss of past and future wages, as well as emotional distress, mental anguish, pain & suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future.

**<u>COUNT FOUR</u>**

**(Against Defendant Google and Deloitte Consulting LLP)**

**Discrimination based on Gender**

*[in violation of New York City Human Rights Law (NYCHRL),*
*N.Y City Admin Code § 8-101 et seq., Stop Sexual Harassment in NYC Act]*

680. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

681. Plaintiff was treated less well by defendant Google than similarly situated applicants and/or employees based on his gender. Defendant Deloitte coordinated with Google to deny the plaintiff an employment opportunity.

682. As mentioned above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq., and Stop Sexual harassment in NYC Act intended to protect against discrimination in the terms and conditions of employment.

683. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. & Stop Sexual harassment in NYC Act

684. Further, Defendant Google acted with reckless indifference to federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is

entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT FIVE**

**(Against Defendant Google and Deloitte Consulting LLP)**

**Discrimination based on National Origin & Race**

*[in violation of 42 U.S.C 1981,*

*Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq,*

*New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

685. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

686. Plaintiff is a male of Indian nationality and is an Asian. Because of Plaintiff's national origin and race, he belongs to a group of persons that 42 U.S.C. § 1981, 42 U.S.C. § 2000e, et seq. (Title VII of the 1964 Civil Rights Act, as amended), and/or New York City Human Rights Law intended to protect against discrimination in the terms and conditions of employment.

687. By the above-described acts, Defendant Google discriminated against plaintiff because of his national origin and race, by refusing to hire the plaintiff on the basis of his race. In fact, by refusing to hire the plaintiff, defendant Google knowing impaired plaintiff's right for equal employment opportunity as a fulltime employee enjoyed by similarly situated White US Citizen (same as the right to make employment contract). (Note: Failure to hire on the basis of race is the same as not offering an employment contract, actionable under 42 USC § 1981)

688. Google's refusal to hire the plaintiff based on his race was a discriminatory conduct under 42 USC 1981, which provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State ... to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.". US Supreme Court has held that § 1981 "prohibits racial discrimination in the making and enforcement of private contracts". Based on the precedence by the US Supreme Court Plaintiff's claim is actionable under **Title VII** as a "refus[al] to hire" based on race, 42 U. S. C. § 2000e-2(a), and under **42**

**USC § 1981** as an impairment of "the same right . . . to make . . . contracts . . . as . . . white citizens," 42 U. S. C. § 1981

689. Deloitte violated 42 U.S.C. § 2000e-2(a)(1) (1982) which protects employees when an employer acts unlawfully, when employer discharges or discriminates against any individual on the basis of race, color, religion, sex, or national origin. Google's Refusal to hire based on race (same refusal enter into a non-discriminatory employment contract at the initial formation) is actionable under 42 USC 2000e-2(a).

690. Google recruiter and Deloitte State actor had a meeting of mind to reach an understanding not to hire the plaintiff. Thus, it can be inferred that Google recruiter was aware of the involvement and influence of White State Actors, and race-based discrimination faced by the plaintiff at Deloitte.

691. Google was not only unwilling to hire the plaintiff (same as enter into a nondiscriminatory employment contact with the plaintiff), Google refused to hire the plaintiff on racially neutral terms.

692. Google knew that Deloitte had failed to take affirmative action to correct their unlawful employment practices. In order to protect their self-interests, Google discriminated against the Plaintiff with respect to terms, conditions and privileges of his employment because of his national origin and race, through denial of his employment rights and benefits, promotions and achievement, and by failure to hire the plaintiff, all in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000e, et seq. (Title VII of the 1964 Civil Rights Act as amended) and/or New York City Human Rights Law

693. Further, Defendant Google has acted with malice, in the alternative, with reckless indifference to the federally and statewide protected rights of the Plaintiff.

694. It can be inferred that if the plaintiff did not have malicious sexual harassment allegations made by a 62-year old White female employee, defendant Google's recruiter would have eliminated the possibility of prolonged litigation risk against Google and not discriminated against the

plaintiff on the basis of his race. In such a scenario, Google would have continued its recruitment process with the plaintiff and plaintiff would likely have been hired for the position.

695. Plaintiff was treated differently than similarly situated White employees, and the timing, sequence and causal connection of these events suggest that but for defendant Google's unlawful conduct based on plaintiff's national origin and race, plaintiff's failure to hire would not have occurred.

696. At all relevant times, Plaintiff was qualified for his position with Defendant Google. The Plaintiff was treated differently than other applicants or employees outside of his protected class, and plaintiff suffered discrimination because of his national origin and race.

697. It can be inferred that defendant Google knew about plaintiff's ethics and integrity complaint, and that Deloitte provided more favorable treatment to employees not in the protected group as identified above. Defendant Deloitte followed a clearly irregular investigative or adjudicative process, and plaintiff's employment at Google was denied during this irregular investigative or adjudicative process. As identified, the sequence and timing of events leading up to Deloitte's inconsistent investigation, occurred under circumstances giving rise to an inference of discrimination on the basis national origin and race.

698. Defendant Google maintained a discriminatory animus against the plaintiff by not hiring the plaintiff and by hiring less qualified White employees.

699. Defendant Google treated similarly situated White US based applicants and/or employees better than the plaintiff.

700. Google knew that plaintiff's female relatives with government affiliations either worked for Deloitte or Google. Given their concern to protect the privacy or security of family members of current or former State Actors and their affiliations, it can be established that Google and Deloitte shared intent or community of purpose to limit their liabilities, and such intent was based in-part on plaintiff's National Origin. That is, Plaintiff's national origin was in part a limiting factor on their decision not to offer equal employment opportunity to the plaintiff.

701. Given the business interests of both Google and Deloitte were based in-part on plaintiff's national origin, the involvement of a law enforcement official in light of the sequence that followed, provide an inference from the circumstances that the White State Actor working for Deloitte and Google recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

702. Because of Defendant Google's discriminatory actions, Plaintiff has suffered adverse employment action, including his inability to earn a living at Google Inc. and the unjust termination of his employment application.

703. As a result of Defendant Google's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

704. The acts of Deloitte white female HR professionals, especially on matters concerning Dr. Niti Aggarwal, provide evidence and inferences of harm to non-parties like Dr. Niti Aggarwal.

705. Further, Defendant Google acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendant Google's conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT SIX**

**(Against Defendant Google and Deloitte Consulting LLP)**

**Discrimination based on National Origin & Race**

*[in violation of New York City Human Rights Law (NYCHRL),*

*N.Y City Admin Code § 8-101 et seq.]*

706. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

707. Plaintiff was treated less well at defendant Google than similarly situated applicants and/or employees based on his national origin & race. Defendant Deloitte coordinated with Google to deny the plaintiff an employment opportunity.

708. As identified above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment.

709. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

710. Further, Defendant Google acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants' conduct, Plaintiff is entitled to an award of compensatory & punitive damages in an amount to be further determined at trial.

**COUNT SEVEN**

**(Against Defendant Google and Deloitte Consulting LLP)**

**RETALIATION**

*[in violation of Title VII of Civil Rights Act of 1964 (42. U.S.C § 2000e) et seq,*
*Americans with Disabilities Act (ADA) (42. U.S.C § 12101) et seq,*
*New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.]*

711. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

712. 42 U.S.C. § 2000e-3(a) of the Civil Rights Act of 1964 protects employees against retaliation by their employer. In addition, Americans with Disabilities Act (ADA) (42. U.S.C § 12101) also protects employees against retaliation by their employer.

713. Defendant Google knew that plaintiff had filed an ethics and integrity complaint at Deloitte,

and thus engaged in a protected activity.

714. Google knew about Deloitte's providing more favorable treatment to employees not in plaintiff's protected group. The White State Actor working for Deloitte and Google recruiter had a 'meeting of the minds' and thus reached an understanding that plaintiff should be refused recruitment.

715. The sequence and timing of events leading up to plaintiff's recruitment at Google, indicate that Google's refusal to hire the plaintiff occurred under circumstances giving rise to an inference of discrimination on the basis of intertwined factors based on plaintiff's disability, gender and national origin and race.

716. Defendant Google knew that in accordance with Deloitte Consulting's employee policy, Plaintiff had exposed misrepresentations by his supervisors where Plaintiff was given disproportionately heavy workload because of his race, and was threatened with termination. Defendant Google knew that Plaintiff engaged in a Protected Activity at Deloitte.

717. Defendant Google hired applicants or similarly situated applicants as fulltime employees who were outside of plaintiff's protected class

718. Defendant Google hired applicants or similarly situated applicants as fulltime employees who were less qualified than the plaintiff

719. Defendant Google treated the plaintiff differently and less well than similarly situated US national and White employees based on his protected class, or national origin and race.

720. Had plaintiff's Google recruiter not know about plaintiff's relative working at Google and the concern for their privacy, and had the plaintiff not filed an ethics complaint at Deloitte with facts such as the assignment of disproportionately heavy workload, Google would not have denied plaintiff's employment application, and thus, the plaintiff would not have suffered an adverse employment action at Google.

721. Defendant Google retaliated against the plaintiff with motive, and deliberately refused the plaintiff an opportunity to progress on his hiring process and interviews. Google refused to hire

the plaintiff in spite of him being qualified for the position at all times and liked by the recruiter.

722. Defendant Google's discriminatory practices were a motivating factor in plaintiff's refusal to hire. The defendant was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff. The timing, sequence and causal connection of these events suggest that but for defendant's discriminatory and unlawful conduct, plaintiff's refusal to hire would not have occurred. Plaintiff's failure to get hired would not have occurred in the absence of the above-mentioned retaliatory motives.

723. As a result of retaliatory action by Google, plaintiff was not only unjustifiably removed from the hiring process, but also denied full time employment opportunities, and potential loss of material benefits such as customary bonus and health benefits.

724. Defendant Google's actions constitute unlawful retaliation for which the Plaintiff has suffered damages. As such, Plaintiff seeks damages on this Cause of Action including back pay, front pay, compensatory damages, punitive damages, pain and suffering, and attorney's fee in an amount to be determined at trial, but in no event less than $1,000,000.00.

## COUNT EIGHT

**(Against Defendant Google and Deloitte Consulting LLP)**

**RETALIATION**

*[in violation of New York City Human Rights Law (NYCHRL),*
*N.Y City Admin Code § 8-101 et seq.]*

725. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

726. New York City Human Rights Law (NYCHRL) protects employees against retaliation by their employer.

727. Defendant Deloitte coordinated with Google to deny the plaintiff an employment opportunity.

728. Defendant Google's actions such as collaboration or meeting of minds with Deloitte were a "motivating factor" in defendant's refusal to hire the plaintiff. Since Google failed to provide any reason or explanation not to hire the plaintiff, Google knew that actions could deter a reasonable person like the plaintiff from engaging in protected activity.

729. The circumstances defined above were sufficient to prove retaliation based on a protected activity. Defendants' harassment and ill-treatment of Plaintiff violates New York City Human Rights Law (NYCHRL), for which Plaintiff request compensatory and punitive damages.

**COUNT NINE**

**(Against Defendant Google)**

**NEGLIGENCE**

*[in violation of New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq., New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.]*

730. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

731. Defendant Google's hiring team had a had a 'meeting of the minds' with the White State Actor working for Deloitte, and thus reached an understanding that plaintiff should be refused recruitment.

732. It can be inferred that Google was made aware of plaintiff's disability / medical condition, yet did not train, supervise or request their own employees or recruiters not to act without standard of care toward the plaintiff. Defendant recruiters discriminated against the plaintiff based on his disability / medical condition, race and gender by delaying and denying plaintiff's application.

733. Defendant facilitated the discrimination and retaliation suffered by the plaintiff by the negligence of its employees or recruiters, including negligent supervision as a result of unsound judgment and/or negligent hiring practices.

734. By not letting the plaintiff proceed though the next round of interviews and the hiring process, the defendant Google, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

735. By denying plaintiff career enhancement and development opportunities as a result of fulltime employment at Google, the defendant Google, in violation of their own policies and procedures, released the plaintiff into a "foreseeably uncertain setting" partly of their own making and thereby breached their duty of care.

736. Defendant employees were required to act with standard of care toward the plaintiff, however, they breached their duty by denying plaintiff's employment after they had a meeting of minds with Deloitte.

737. Defendant Google knew about plaintiff's disability / medical condition and gender discrimination claims; however, they still did not stop their recruiter from failing to perform her duties like matching plaintiff's profile with other open roles, scheduling interviews etc.

738. Defendant knew or should have known that plaintiff had made an ethics and integrity discrimination complaint against Deloitte, however, did not train, supervise or request their own employees not to act without standard of care toward the plaintiff. Defendant Google knew about a plaintiff's race, ethnicity and national origin; however, they still failed to stop their recruiter from maintaining bias against the plaintiff.

739. Plaintiff concludes that defendant Google failed to, in good faith, take measures which were both feasible and reasonable under the circumstances.

**COUNT TEN**

**(Against Defendants Google and Deloitte Consulting LLP)**

**NEW YORK STATE LABOR LAWS**

*[in violation of New York State Human Rights Law (NYSHRL),*

*N.Y Exec Law § 290 et seq.,*
*N.Y Labor Law § 215]*

740. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

741. Since Deloitte has continued to violate plaintiff's rights, plaintiff's claims are valid under the doctrine of continuing violations.

742. Plaintiff was not hired by Google in April 2018, and thus plaintiff faced an adverse employment action.

743. The plaintiff engaged in a protected activity at Deloitte by filing an ethics and integrity complaint. Google knew that New York Human Rights Law and New York Labor Law § 215 provides protection to employees against retaliation for exercising their rights under labor laws

744. After Deloitte became aware of plaintiff's disability, gender discrimination allegations, existence of plaintiff's female relative at Google with government affiliations and privacy requirements, Deloitte had vested interest in not allowing the plaintiff to secure an alternate employment at Google.

745. Upon knowledge & belief, Deloitte made sure the Plaintiff could not secure alternate employment by coordinating with and conferring with the Human Resource or Recruiting department of defendant Google.

746. Deloitte has maintained a surveillance on the plaintiff's communications and devices and appear to have tracked plaintiff's phone conversation with Google, and interjected and disrupted plaintiff's recruitment at Google. Plaintiff also alleges that he ultimately was not hired by Google, which undisputedly can constitute actionable retaliatory conduct under New York statutes.

747. In a continued effort to maintain a control on the plaintiff, Plaintiff's alleges that defendant Deloitte sought to damage plaintiff's ability to earn a living by gaining access to plaintiff's recruitment information at Google.

748. Google Recruiter did not provide any substantive reasons for his refusal to hire the plaintiff.

749. Since Deloitte coordinated with Dr. Niti Aggarwal's employer to discriminate and retaliate against her, such improper acts by Google raise questions on the motive of both Deloitte and Google. Upon knowledge and belief, Deloitte maintained an illegal control over the plaintiff by retaliating against friends or family members. Such retaliation was practiced by coordinating with or conferring with the human resource professionals of other firms.

750. Google knew that Leaders who retaliated against the plaintiff at Deloitte had a higher propensity of targeting plaintiff's female relative working at Google, to generate a direct inference on gender discrimination. Based on the allegations, it can be inferred that Google had a "vested interest" in ensuring that such Deloitte employees were prevented from asserting anti-retaliation provisions under New York Laws.

751. Defendant Google knew that plaintiff was a minority employee of Indian origin who would be working for Google on H-1B visa. The plaintiff was treated differently than similarly situated White US based applicants. Such White US based applicants who had comparative less qualifications than the plaintiff, were not only selected for interviews but also hired by Google. Thus, Google showed racial and national origin bias by hiring White US based applicants who were less qualified than the plaintiff.

752. In addition, the plaintiff was treated differently than similarly situated applicants based on his gender. Upon knowledge and belief, Female applicants were given a preference by Google, and were hired by Google. Google knowingly misjudged and disregarded plaintiff's job qualifications. After Google rejected the plaintiff, Google continued to seek Female applicants. White Female applicants who were less qualified than the plaintiff, were ultimately hired. Thus, Google showed gender-based bias by hiring less qualified Female applicants.

**COUNT ELEVEN**

**(Against Defendants Google and Deloitte Consulting LLP)**

**NEW YORK CITY LABOR LAWS**

*[in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.]*

753. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

754. As identified above, plaintiff belongs to a group of persons that New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq. intended to protect against discrimination in the terms and conditions of employment or hiring. In addition, New York City Human Rights Law (NYCHRL) protects employees against retaliation by their employer.

755. Plaintiff was treated less well at defendant Google than similarly situated applicants and/or employees based on his national origin & race

756. By the above-described acts, defendant is in violation of New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.

757. Defendant Google's actions such as collaboration or meeting of minds with Deloitte State Actor were a "motivating factor" in defendant's refusal to hire the plaintiff. Since Google failed to provide any reason or explanation not to hire the plaintiff, Google knew that actions could deter a reasonable person like the plaintiff from engaging in protected activity.

758. Defendants' harassment and ill-treatment of Plaintiff violates Plaintiff's Rights under the New York Labor Law, for which Plaintiff requests compensatory and punitive damages. Similarly, Defendants' discriminatory acts, harassment and ill-treatment of Plaintiff violates similar labor Laws under New York State Human Rights Law (NYSHRL), and New York City Human Rights Law (NYCHRL) for which Plaintiff requests compensatory damages. Also, a result of the Defendant's conduct, Plaintiff has suffered monetary damages, pain and suffering and

emotional distress. As such, Plaintiff seeks damages, including attorneys' fees, for this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

## COUNT TWELVE

**(Against Defendants Google and Deloitte Consulting LLP)**

**AIDER AND ABETTOR**

*[in violation of New York State Human Rights Law (NYSHRL), N.Y Exec Law § 290 et seq.), New York City Human Rights Law (NYCHRL), N.Y City Admin Code § 8-101 et seq.)]*

759. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein. Since Deloitte has continued to violate plaintiff's rights, plaintiff's claims are valid under the doctrine of continuing violations.

760. On his ethics and integrity complaint, the Plaintiff cited the assignment of disproportionately heavy workload, and misconduct by Supervisors.

761. After Deloitte learned about plaintiff's disability / medical condition, and his ethics complaint, Deloitte Human Resource Resources Professionals aid and abetted the discriminatory conduct of Deloitte Leaders and Supervisors

762. Based on the arguments identified on this complaint, it can be inferred that by preventing the plaintiff from securing alternate visa-sponsored employment at Google, both Deloitte and Google acted with "**community of purpose**" to shelter themselves from liabilities and extended litigation possibilities.

763. Given that Google employed plaintiff's female relative with government affiliation, and Deloitte employed or used a State Actor on the issue, **Google shared the intent or purpose** of the principal actor/s "Deloitte" or "Joanna Rohde" that the plaintiff be denied employment opportunities.

764. It can be inferred that both Google and Deloitte shared the same intent or community of purpose that had plaintiff been selected and recruited by Google, the Deloitte female supervisors who raised gender discrimination issues against the plaintiff or the Deloitte female/s with a protected

characteristic or factors such as pregnancy may entangle both Google and Deloitte into needless litigation based on both plaintiff's employment and the employment of plaintiff's female relatives, and such litigation can be initiated during an extended period of time.

765. Given that Deloitte had targeted and discriminated against Dr. Niti Aggarwal, it can be further inferred that Google knew that Leaders who retaliated against the plaintiff at Deloitte had a higher propensity of targeting plaintiff's female relative working at Google, to generate a direct inference on gender discrimination and protect their personal interests. Based on the allegations, it can be inferred that Google had a "vested interest" in ensuring that certain Deloitte employees were prevented from asserting anti-retaliation provisions under New York Laws.

766. Previously, the plaintiff has already identified that the defendant Deloitte Human Resource manager Joanna Rohde acted under the color of law to conceal information about the malicious sexual harassment allegation against the plaintiff. Joanna Rohde knew about the protected characteristics of one or more female employees.

767. Joanna Rohde conducted an incomplete and inconsistent investigation on the sexual harassment and ethics issues. Plaintiff was knowingly assigned a negative performance rating after Deloitte employees became aware of plaintiff's disability and sexual harassment allegation. Thus, defendant Deloitte created a policy or custom under which unconstitutional practices occurred, like giving negative performance rating on his projects in spite of his good performance thereby falsely engineering a non-discriminatory reason for plaintiff's termination

768. Based on the suspicious timings and the sequence of the events, one can easily deduce that, Deloitte female supervisors and employees coordinated internally, aided and abetted each other, falsely engineered plaintiff's performance rating, thereby schemed to illegally control the Plaintiff, blocked his customary bonus, pay-raise and/or his promotion to the next level. The defendant Deloitte and HR Joanna Rohde were not only grossly negligent in managing the plaintiff's case, they acted with reckless intent against the plaintiff.

769. Defendant Deloitte continued to maintain policy or custom under which unconstitutional practices occurred, for example, supervisors maintained a discriminatory bias against him, and

plaintiff was mocked or harassed on each and every project while similarly situated employees were not. These incidents were more than episodic; they were sufficiently concerted and continuous to be deemed pervasive.

770. Plaintiff alleges that the defendant Human Resource manager Joanna Rohde acted under the "color of law" and "actively supported" her colleagues in plaintiff's release from projects, engineered his negative performance evaluation and other adverse employment actions against him. Plaintiff also states that Joanna's decision was tainted by discrimination based on gender stereotypes, and plaintiff was treated differently than similarly situated employees.

771. Plaintiff has further indicated a connection between defendant Google and Deloitte, and that Google recruiter had a meeting of minds with the Deloitte State Actor to deny him employment opportunity. Deloitte actively participated in discriminatory conduct against the plaintiff.

772. Under the doctrine of vicarious liability, Deloitte remained liable for the discriminatory conduct of its employees, including employed State Actors. In this case, the alleged discriminatory conduct of Deloitte and its employees was specifically targeted towards the plaintiff, such that the plaintiff would not be allowed or enabled to secure a fulltime job at Google.

773. As identified on this complaint, Discriminatory practices of senior policy making officials at Deloitte was so persistent or widespread as to constitute a "*custom or usage under law*", while discriminatory practices of subordinate employees at Deloitte were so manifest as to imply the constructive acquiescence of senior policy makers. Therefore, we can safely deduce and imply the constructive acquiescence of senior "policy-making" defendant officials. Since policy making officials were plaintiff's supervisors, for example Brenda Arends was plaintiff's HR supervisor, who later on either provided an input on or directly influenced plaintiff's termination from Deloitte, their acts or edicts may fairly be said to represent the official policy of defendant, Deloitte Consulting LLP.

774. Similarly, since the defendants Deloitte and Google acted in concert, the discriminatory practices of human resource professionals at Deloitte were so persistent or widespread as to constitute a "*custom or usage under law*" and negatively influence Google's hiring of the

plaintiff. Upon knowledge & belief, Deloitte actively schemed against the plaintiff to deprive him of a job opportunity, and their acts to derail plaintiff's recruitment with Google cannot go unnoticed.

**COUNT THIRTEEN**

**(Against Defendants Google and Deloitte Consulting LLP)**

**DEPRIVATION OF RIGHTS**

*[in violation of Federal Laws, 42 USC § 1983, New York State Laws]*

775. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

776. Since Deloitte and state actors supporting Deloitte have continued to violate plaintiff's rights, plaintiff's claims are valid under the doctrine of continuing violations.

777. Plaintiff is a person with disability. Under Americans with Disabilities Act (ADA), the Congress has placed express private rights of action into legislation. See Americans with Disabilities Act, 42 U.S.C. § 12188 (a)(1) ("The remedies and procedures set forth in [the Act] are . . . provid[ed] to any person who is being subjected to discrimination on the basis of disability in violation of [this Act].") (emphasis added)

778. Plaintiff is a person with disability. Section 36.501 of the Americans with Disability Act (ADA) Title III Regulation 28 CFR Part 36 allows private suits. Plaintiff was subjected to discrimination in violation of section 303 of the act or subpart D. The plaintiff was subjected to discrimination on the basis of his disability, in violation of section 42 USC 12183 of this subtitle by the defendants on this lawsuit.

779. Google recruiter and Deloitte State actor had a meeting of mind to reach an understanding (express or tacit) not to hire the plaintiff. Thus, it can be inferred that Google recruiter was aware of the involvement and influence of White State Actors, and intertwined factors of disability, gender, race or national origin-based discrimination faced by the plaintiff at Deloitte.

780. Google knew that plaintiff's female relatives with government affiliations either worked for Deloitte or Google. Given their concern to protect the privacy or security of family members of current or former State Actors, and their business need to shelter themselves from liabilities and extended litigation possibilities, it can be established that Google and Deloitte shared intent or community of purpose

781. Defendant State Actors abused their official positions, and resources for the purpose of perpetuating the abuse of Plaintiff and depriving him of his civil and constitutional rights, controlling activities of Plaintiff, willfully endangering Plaintiff health, well-being, reputation, and harming his reputation, privacy, quality of life, and personal and economic prospects. Defendant actions violate 42 USC § 1983

782. Defendant Deloitte state actors have continued to manipulate plaintiff's electronic communications, media information and news. Such defendant's actions continue to harm the plaintiff in a manner or pattern that form the basis of Deloitte's continuing violations against the plaintiff.

783. The actions of defendant have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation, unless the acts of Defendant complained of herein are enjoined during the pendency of this action and thereafter.

784. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial. As such, Plaintiff seeks damages on this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

**<u>COUNT FOURTEEN</u>**

**(Against Defendants Google and Deloitte Consulting LLP)**

**CONSPRIRACY TO INTERFERE WITH CIVIL RIGHTS**

*[in violation of Federal Laws, 42 USC § 1985]*

785. Plaintiff repeats and incorporates by reference each and every allegation contained in the

Case 1:24-cv-02470-JGLC Document 6-1 Filed 04/02/24 Page 171 of 187

preceding paragraphs as if fully set forth herein.

786. Google recruiter and Deloitte State actor had a meeting of mind to reach an understanding (express or tacit) not to hire the plaintiff. Thus, it can be inferred that Google recruiter was aware of the involvement and influence of White State Actors, and intertwined factors of disability, gender, race or national origin-based discrimination faced by the plaintiff at Deloitte.

787. The plaintiff has identified the involvement of state actors and the understanding or agreement (express or tacit) between state actor and a private entity. Google's denial of plaintiff's employment petition on April 3rd 2018, followed by Deloitte state actor Austin Perez's inconsistent and biased investigation on April 6th 2018 provide an inference that they acted in concert to inflict a constitutional injury upon the plaintiff.

788. The plaintiff has clearly identified that Deloitte conducted an inconsistent and incomplete investigation despite credible evidence and witnesses identified by the plaintiff to conceal their discriminatory practice of assigning a false non-discriminatory reason for adverse employment action, and to conceal their internal coordination with female supervisors.

789. Furthermore, Deloitte conspired with Google to deny the plaintiff of his rights to conceal such discriminatory practices, and to ensure that the firms limit their possibilities of getting entangled into prolonged litigation and liabilities as identified. In order to accomplish such objectives, the firms interfered with plaintiff's protected rights / characteristics or civil rights based on race, national origin, disability and gender.

790. Upon information and belief, Defendant has knowingly abused their official positions, and resources for the purpose of perpetuating the abuse of Plaintiff and his civil and constitutional rights, controlling activities of Plaintiff, willfully endangering Plaintiff health, well-being, reputation, and harming his reputation, privacy, quality of life, and personal and economic prospects. Defendant actions violate 42 USC § 1985

791. Deloitte has continued to retaliate against the plaintiff for a period of five or more years. Because of the direct actions of Deloitte, Joanna Rohde and their female human resource professionals, plaintiff has been deprived of employment opportunities and livelihood.

Deloitte's actions to deprive the plaintiff of livelihood over a period of five or more years and their continued retaliation against the plaintiff provides direct inference of the severity and the extent of their violations against the plaintiff.

792. The Plaintiff has alleged that White Deloitte professionals like Joanna Rohde and Christina Young held race-based bias against the plaintiff. Based on such actions, one could draw the reasonable inference that Deloitte Consulting harassed the plaintiff in part because plaintiff's race, ethnicity or national origin. Deloitte acted in furtherance of their conspiracy to not allow the plaintiff to secure a gainful employment position acted in concert with Google.

793. Plaintiff has identified specific racial animus by defendant Deloitte Consulting LLP, and that Deloitte and Google acted in concert. Based on plaintiff's allegations, it can be inferred that if plaintiff and his female relative working at Google were White US Citizens or Nationals, the plaintiff would not have been discriminated by Deloitte, and, conversely, Google would not have refused to hire the plaintiff.

794. Plaintiff has identified specific racial animus on the part of defendant Google. After getting aware of plaintiff's gender discrimination, sexual harassment and racial discrimination claims against Deloitte, one could draw the reasonable inference that Google recruiter maintain a racial bias towards the plaintiff, and/or her actions were "tainted with ... racial animus"

795. At all times defendant Deloitte was (a) aware of plaintiff's protected class, (b) bore requisite discriminatory intent, (c) acted with motive to discriminate against the plaintiff, and (d) acted with bias and intent to harm the plaintiff. Defendant Google treated similarly situated applicants outside of plaintiff's protected class better than the plaintiff.

796. Since the acts of Deloitte, Google, and the State actors supporting Deloitte were themselves discriminatory, one can infer that such entities and their employees were motivated by racial or class-based invidious discriminatory animus behind their action. For instance, Defendant Google treated similarly situated White US Citizens or Nationals better than the plaintiff.

797. The actions of defendant have damaged, and will continue to damage, Plaintiff's economic situation, income, prospects of future income, civil and constitutional rights, and reputation,

unless the acts of Defendant complained of herein are enjoined during the pendency of this action and thereafter.

798. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial. As such, Plaintiff seeks damages on this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

**COUNT FIFTEEN**

**(Against Defendants Google and Deloitte Consulting LLP)**

**Collective Boycotts Against the Plaintiff**

*[in violation of § 1 of the Sherman Act, Federal Laws, New York State Laws]*

799. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

800. In 2017, the plaintiff took Deloitte's mandatory training on non-discrimination. In 2018, the plaintiff took Deloitte's mandatory training on ethics, compliance and integrity. Since plaintiff's employer Deloitte violated the Labor Conditions Application (LCA) requirements identified by the Department of Labor for H1B employees, the plaintiff advocated for better working conditions and filed an ethics, compliance and integrity complaint based on the training he received from Deloitte.

801. Defendant Deloitte issued a biased non-discriminatory performance rating to the plaintiff, and subsequently terminated plaintiff's employment, in-part because the plaintiff identified that he was provided disproportionately heavy workload and advocated for non-discriminatory working conditions.

802. Defendant Deloitte refused to provide fair competitive wages to the plaintiff, refused to provide a salary hike. The plaintiff was treated differently than similarly situated Deloitte employees based on plaintiff's disability/medical condition, gender, national origin or race.

803. Similarly, the plaintiff was treated differently than similarly situated Google applicants based

on plaintiff's disability/medical condition, gender, national origin or race.

804. Deloitte coordinated with or conferred with Google to restraint plaintiff's recruitment and employment rights. Google refused to hire the plaintiff, and subsequently Deloitte refused to work with the plaintiff as an employee. Such collective action restrained plaintiff's rights to organize or express concerns, infringing on both fair competition and employees' rights to fair treatment.

805. As a result of Defendant Deloitte's and Google's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

806. Further, Defendants Google & Deloitte acted with indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT SIXTEEN**

**(Against Defendants Google and Deloitte Consulting LLP)**

**Discriminatory Hiring Practices in Collusion**

*[in violation of § 1 of the Sherman Act, Federal Laws, New York State Laws]*

807. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

808. Deloitte provided professionals services to Google on an ongoing basis. Thus, Google was Deloitte's customer or client.

809. Deloitte terminated the plaintiff because the plaintiff filed an ethics, compliance and integrity complaint against the firm, and in-part because Deloitte conducted an incomplete or inconsistent investigation on matter or issues raised by the plaintiff.

810. Deloitte Leaders and HR professionals agreed in advance to manipulate plaintiff's performance evaluation process. Deloitte supervisors subsequently issued the plaintiff a negative performance rating despite plaintiff good performance. The plaintiff was treated differently than similarly situated Deloitte employees based on plaintiff's disability/medical condition, gender, national origin or race.

811. Similarly, the plaintiff was treated differently than similarly situated Google applicants based on plaintiff's disability/medical condition, gender, national origin or race.

812. Based on Deloitte's ongoing projects and work at Google, where Deloitte Provided professional services to Google, Deloitte and Google colluded to manipulate plaintiff's performance reports. Deloitte manipulated plaintiff's performance report internally, while Deloitte and Google colluded in the determination of plaintiff's performance during interviews at Google. Deloitte and Google shared same or similar interests in multiple areas of growth and development. Deloitte and Google colluded to pre-determine that the plaintiff must not be selected.

813. Deloitte HR coordinated with Google HR or recruiting team to reach an understanding or agreement that if Google were to hire the plaintiff without providing Deloitte any immunity, the liabilities that may incur from potential Whistle blower claims against Deloitte may provide a perception of on-going conflict or unresolved issues at Deloitte, and may impact the existing business relations, common interests, work projects and resource deployment between the two firms. Deloitte and Google agreed to divide or allocate the market based on potential liabilities that may arise in future. Thus, Deloitte and Google limited the competition options available to the plaintiff.

814. Deloitte coordinated with or conferred with Google to restraint plaintiff's recruitment and employment rights. Google refused to hire the plaintiff, and subsequently Deloitte refused to work with the plaintiff as an employee. Such collective action restrained plaintiff's rights to seek equal opportunity employment, infringing on fair competition and plaintiffs' rights to fair

treatment.

815. As a result of Defendant Deloitte's and Google's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

816. Further, Defendants Google & Deloitte acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

## COUNT SEVENTEEN

**(Against Defendants Google and Deloitte Consulting LLP)**

**Conspiracy to Fix Wages of H1B Employees**

*[in violation of § 1 of the Sherman Act, Federal Laws, New York State Laws]*

817. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

818. Deloitte provided professionals services to Google on an ongoing basis. Thus, Google was Deloitte's customer or client.

819. Deloitte and Google shared same or similar interests in multiple areas. Deloitte provided professional services to Google both by using US Citizens and Foreign Nationals, including Indians on H1B visa, in the United States. Google paid Deloitte the same client engagement fee for Indian nationals on H1B visa, as it paid for US Citizens.

820. The client engagement fees were project based, and were derived from the rate card provided by Deloitte. Specifically, Deloitte had a different rate for each level of worker, that is, a

Manager had a different rate than a Sr. Manager and so on. On a comparative basis, the Standard rates paid to Deloitte for yearly project work by an Indian national on H1B visa, would be a large multiple of the yearly salary paid by Deloitte.

821. Deloitte hired the plaintiff in December 2016, and Deloitte recruiter verbally assured the plaintiff that he may be considered for promotion one year after his work. One or more interviewers wanted to hire the plaintiff for the next level (Consulting Manager) or provide assurance for expediated promotion to the next level. The facts provide an inference that plaintiff was more likely to receive a promotion or salary hike had he not been discriminated by Deloitte on the basis of his disability/medical condition, gender, race, national origin or ethics complaint.

822. Just prior to the completion of his one-year term, in October and November 2017, defendant Deloitte provided disproportionately heavy workload to the plaintiff, and discriminated or retaliated against the plaintiff.

823. In early 2018, the plaintiff took Deloitte's mandatory training on ethics, compliance and integrity. Since plaintiff's employer Deloitte violated the Labor Conditions Application (LCA) requirements identified by the Department of Labor for H1B employees, the plaintiff filed an ethics, compliance and integrity complaint based on the training he received from Deloitte. The plaintiff identified that he was assigned disproportionately heavy workload, that he was discriminated on the project and made retaliatory threats of a negative performance rating despite his good performance. The plaintiff advocated for better working conditions.

824. Since the plaintiff worked for Deloitte on H1B visa and filed an ethics complaint which violated the basic tenants of his H1B visa, Defendant Deloitte refused to provide fair competitive wages to the plaintiff, refused to provide a salary hike. The plaintiff was treated differently than similarly situated Deloitte employees on H1B visa who were given a salary hike.

825. Similarly, the plaintiff was treated differently than similarly situated Deloitte employees who did not raise an ethics and integrity complaint, or were not discriminated based on plaintiff's disability/medical condition, gender, national origin or race.

826. Similarly situated Google applicants like Ms. Vennela Subramanyam, Mr. Abhinav Gaiha, Ms. Chandrika Rao did not violate the anti-discriminatory practices of the specialty H1B worker Labor Condition Applications (LCA) governed by the Department of Labor (DOL), were hired by Google for full-time roles, yet the plaintiff was not. These Google applicants were outside of plaintiff's protected class based on Deloitte's DOL LCA violations.

827. Deloitte Leaders and HR professionals conspired in advance to manipulate plaintiff's performance evaluation process. Deloitte supervisors subsequently issued the plaintiff a negative performance rating despite plaintiff good performance. The plaintiff was treated differently than similarly situated Deloitte employees based on plaintiff's disability/medical condition, gender, national origin or race.

828. Based on Deloitte's ongoing projects and work at Google, where Deloitte Provided professional services to Google, Deloitte and Google colluded to manipulate plaintiff's performance reports. Deloitte manipulated plaintiff's performance report internally, while Deloitte and Google colluded in the determination of plaintiff's performance during interviews at Google. Deloitte and Google shared same or similar interests in multiple areas of growth and development. Deloitte and Google colluded to pre-determine that the plaintiff must not be selected.

829. Deloitte HR coordinated with Google HR or recruiting team to reach an understanding or agreement that if Google were to hire the plaintiff without providing Deloitte any immunity, the liabilities that may incur from potential Whistle blower claims against Deloitte may provide a perception of unresolved conflict based on plaintiff's H1B visa at Deloitte, and may impact the existing business relations, common interests, work projects and resource deployment of H1B visa specialty workers between the two firms. Deloitte and Google agreed to divide or allocate the market based on potential liabilities that may arise in future. Thus, Deloitte and Google limited the competition options available to the plaintiff.

830. Deloitte coordinated with or conferred with Google to not hire the plaintiff, thus restraining plaintiff's recruitment and/or employment rights. The plaintiff continued to receive the same

salary 23 months into his work at Deloitte (and just prior to termination), as he received on the first day of work. Similarly situated Deloitte employees like Youmna Saloumi did receive a yearly salary hike. By not paying the plaintiff inflation adjusted wages, by not hiking plaintiff's salary, and by providing inadequate working conditions to the plaintiff, Deloitte violated labor laws under the Sherman Act.

831. By collaborating with Google and limiting plaintiff's recruitment prospects at Google, Deloitte made it difficult for Google to operate without restrictions. Similarly, by not hiring the plaintiff, Google limited competition in hiring and suppressed plaintiff's wages.

832. Since H1B visa holders must be paid prevalent market wages as determined by the US Department of Labor, by suppressing plaintiff's wages, Google and Deloitte collaborated to reduce competition in the H1B labor market, and reduced the ability of H1B visa holders like the plaintiff to negotiate better wages. Such wage restrictions limited the plaintiff's ability to work at other firms at competitive wages, and reduced labor market competition among similarly situated H1B workers.

833. In August 2018, Google refused to hire the plaintiff, and refused to provide a salary hike to the plaintiff. And subsequently Deloitte refused to work with the plaintiff as an employee. Such collective action Restricted fair competition based on skills and qualifications and plaintiffs' rights to fair treatment.

834. As a result of Defendant Deloitte's and Google's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

835. Further, Defendants Google & Deloitte acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT EIGHTEEN**

**(Against Defendants Deloitte Consulting LLP)**

**Deloitte's Market Dominance and/or attempts to monopolize the market**

*[in violation of § 2 of the Sherman Act, Federal Laws, New York State Laws]*

836. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

837. From at least as early as 2016 and continuing at least through the filing of this Complaint, Deloitte has willfully maintained or abused its monopoly power against the plaintiff based on unreasonable restraint of trade on plaintiff's H1B visa-based employment in the relevant market, and, by explicitly agreeing with Google not to hire the plaintiff, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

838. During the months of September and October 2018, the Plaintiff's submitted his profile for various client projects on the internal job portal, but his Resource Manager (RM) kept closing his project role submissions requests citing **'Position Closed, Not selected'**. Deloitte Resource Managers and HR professionals intentionally worked against the terms and conditions of plaintiff's employment, and deliberately influenced or forced the plaintiff to choose the only available option – client assignment in the healthcare space with client Kaiser Permanente

839. Since client utilization and project assignments formed an integral part of compensation and promotion, and since the plaintiff was assigned a poor performance rating for the previous performance cycle, Deloitte indirectly conditioned plaintiff's continued employment upon his agreement to be staffed on the only available option at client Kaiser Permanente Healthcare project. Thus, Deloitte influenced or forced the plaintiff to choose an opportunity outside his area of interest and outside his skillset, prevented competition and created monopolistic advantages.

840. Upon knowledge and belief, Deloitte's actions are similar to the actions of a software company, Microsoft, which conditioned the purchase of its operating system (windows) on the mandatory purchase of its office suite, leveraging its dominant operating system to monopolize the office

suite market, preventing consumers from choosing individual components, and limiting consumer choices by forcing consumers to purchase less-desirable products along with a dominant product. The US courts have held that Microsoft abused its dominant position and prevented competition.

841. Thus, it can be inferred that Deloitte's real intention to staff the plaintiff on the Kaiser Permanente project in Hospital and Healthcare space was to generate immunity from legal claims based on additional false non-discriminatory performance-based reasons for termination, and build or generate immunity against other individuals known to the plaintiff who worked in the healthcare space. For instance, preventing such individuals from filing a claim that they were singled out in a particular industry.

842. The plaintiff started the project on 10/08/2018 and learned that he was getting released on 10/17/2018. On 10/17/2018, less than two weeks after starting the project, the Plaintiff's Human Resource manager Brenda Arends from his Business Unit learned that the plaintiff got staffed on the project. Hence, she immediately intervened along with plaintiff's female counselor to have the Kaiser Permanente Sr. Manager and Supervisor release the plaintiff from the project. The Sr. Manager neither got an opportunity to share the specifics, not could invest time to bring the plaintiff upto speed on the themes he believed should not be an issue as they are just "industry stuff".

843. Since Deloitte refused to provide opportunities to the plaintiff in areas where the plaintiff had significant professional experience and competence, it can also be inferred Deloitte had no real or genuine interest in plaintiff's professional growth or development. Deloitte's monopolistic approach towards the plaintiff is similar or comparable to a dominant company which refuses to supply essential products or services to competitors or other market participants, hindering competition and maintaining its monopoly.

844. Similarly, it can be inferred that since Deloitte and Google HR professionals had a meeting of minds to reach an agreement or understanding not to hire the plaintiff, the firms entered into an exclusionary contract or dealing. Deloitte acted with specific intent to monopolize and to destroy effective competition from the plaintiff in the market.

845. As a result of Defendant Deloitte's and Google's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

846. Further, Defendant Deloitte acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

**COUNT NINETEEN**

**(Against Defendants Google and Deloitte Consulting LLP)**

**Creating Monopolistic advantages**

*[in violation of § 3 of the Clayton Act, Federal Laws, New York State Laws]*

847. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

848. In 2018, Deloitte collaborated with Google to ensure that plaintiff's interview with the firm can only proceed if the plaintiff were to accept a negative performance rating. Since the plaintiff refused to accept a discriminatory action by Deloitte, the firms agreed to terminate plaintiff's recruitment at Google.

849. Specifically, the three supervisors, Kartik Nagaraja, Brian Zhong and Wout Vandegaer, acted under the premise that if they were to become Deloitte Partners, they must not only protect their own interests and but also protect the interests of the firm and other Deloitte Partners, and wanted to showcase their own talent in terms of strategic insights and product creativity. So they decided to combine a trifecta of factors – hiring, performance and compensation - to provide immunity to themselves, the involved Deloitte Partners, and the firm Deloitte.

850. With each supervisor wanting the other to validate their discriminatory bias, as identified on the communication between Kartik Nagaraja, Brian Zhong, Sai Hampankatta and Wout Vandegaer, one can infer that the supervisors were eager to impose market allocation agreements such as limited or shortened client assignments, wage fixing against the plaintiff, or Supervisors helping each other to prevent the plaintiff from competing against them on the basis of their biased project performance evaluation.

851. By agreeing in advance to manipulate the performance evaluation of the plaintiff, each Sr. Manager, namely Kartik Nagaraja, Brian Zhong, Sai Hampankatta and Wout Vandegaer, acted against the Federally protected rights of the plaintiff and indulged in artificially limiting or deflating plaintiff's wages, thus, limiting the options available to the plaintiff and stifling competition, in-exchange for high-markup or salary increases for themselves, and added bonuses for themselves.

852. Thus, Deloitte and Google entered into a tying arrangement with respect to plaintiff's recruitment. Deloitte and Google acted in violation of Section 3 of the Sherman act, where the sale of one product is conditioned upon the purchase of another product (also known as tying arrangement), preventing competition, limiting plaintiff's options or creating monopolistic advantages.

853. By collaborating with Google and limiting plaintiff's recruitment prospects at Google, Deloitte made it difficult for Google to operate without restrictions. Similarly, by not hiring the plaintiff, Google limited competition in hiring and suppressed plaintiff's wages.

854. Since H1B visa holders must be paid prevalent market wages as determined by the US Department of Labor, by suppressing plaintiff's wages, Google and Deloitte collaborated to reduce competition in the H1B labor market, and reduced the ability of H1B visa holders like the plaintiff to negotiate better wages. Such wage restrictions limited the plaintiff's ability to work at other firms at competitive wages, and reduced labor market competition among similarly situated H1B workers.

855. As a result of Defendant Deloitte's and Google's discriminatory actions, Plaintiff has suffered loss of wages, both in the past and in the future, as well as emotional pain, mental anguish, suffering, inconvenience, loss of enjoyment of life in the past, and in all probability, in the future

856. Further, Defendant Deloitte acted with reckless indifference to both federal, state and New York City protected rights of the Plaintiff. Due to the severity of Defendants conduct, Plaintiff is also entitled to an award of compensatory & punitive damages in an amount to be determined at trial, but in no event less than $1,000,000.00

## COUNT TWENTY

**(Against Defendants Google and Deloitte Consulting LLP)**

**Exclusive dealing arrangements and predatory wage fixing**

*[in violation of § 2 of the Clayton Act, Federal Laws, New York State Laws]*

857. Plaintiff repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

858. Previously, the plaintiff has identified that Deloitte entered into exclusive dealing arrangements with Google, and targeted the plaintiff with wage fixing.

859. Deloitte's deliberate discriminatory employer actions created artificial barriers of entry for the plaintiff and Dr. Niti Aggarwal prohibiting or preventing them from exceling in certain areas, prohibiting them from acquiring new skills, clients or customers in certain areas, and preventing them from entering into or exploring new market spaces with new or renewed competition.

860. Plaintiff has been, and will continue to be, damaged by such actions in an amount to be proven at trial. As such, Plaintiff seeks damages on this Cause of Action in an amount to be determined at trial, but in no event less than $1,000,000.00.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for Judgement against defendant as follows:

1. The Plaintiff demands judgment against Defendants Deloitte and Google in the amount set forth by a jury and for relief requested herein, back pay with prejudgment interest and all the fringe benefits to which he is entitled; pain and suffering, front pay and benefits; actual and punitive damages, and costs incurred because of the Defendant's unlawful behavior; including costs, disbursements, and attorney's fees to the extent permitted by law, and for such and other further relief that this Court deems just, proper and equitable.

2. That the defendant Deloitte and Google be required to pay Plaintiff amount set forth by a jury and for relief requested herein, including front pay and benefits; actual and punitive damages, and costs incurred because of the Defendant's unlawful behavior, including all civil penalties authorized by law.

3. That the defendants Deloitte and Google be required to pay plaintiff such damages as plaintiff has sustained, or will sustain, in consequence of defendants abuse of plaintiff's economic, civil and constitutional rights, loss of professional or business income, loss of personal property or profits owned by plaintiff and destroyed by defendants, loss of reputation and willful endangerment, but in no event less than a reasonable compensation for services and damages, accounting all gains and advantages derived by defendants that are attributable to such unlawful acts that relate to the matters described in this complaint, as defined by Federal and State laws, including all civil penalties authorized by law.

4. That the defendants be required to pay plaintiff such all costs related to this action, including interests, and any reasonable future attorney fees (if applicable) with interest if the plaintiff requires so by law, including all civil and criminal penalties authorized by law.

5. That plaintiff be granted such other and further relied upon relief as this court may deem just, proper and equitable

Yours, etc.,

**Ashu Shukla**
*_s_ashu shukla*
*Plaintiff*
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143

# VERIFICATION

On March 13th, 2024, the Plaintiff declares that all statements on this Complaint, and are verified to be true under the penalties of perjury, pursuant to CPLR 2016. He had read the complaint, and he believes the matters stated to be alleged in the above sections of the complaint to be true. The source for this information and the ground for his belief were derived from the facts and evidence file maintained in the normal course of business by the plaintiff.

Discovery evidence has previously been provided by the defendant Deloitte Consulting LLP as part of their duty to disclose documents.

Dated: New York, New York
March 13th, 2024

Yours, etc.,

**Ashu Shukla**
*_s_ashu shukla*
*Plaintiff*
202 Salem CT, Apt#11
Princeton, NJ 08540
ashu.shukla@gmail.com
T # 917-488-6143